UNITED STATES DISTRICT COURT<br/>
MIDDLE DISTRICT OF FLORIDA<br/>
JACKSONVILLE DIVISION

**ADAM BETANCOURT,**

      **Plaintiff,**

**v.**                                           **Case No. 3:13-cv-00287-HES-JRK**

**STATE OF FLORIDA DEPARTMENT<br/>
OF CORRECTIONS; MICHAEL<br/>
CREWS, Secretary of the<br/>
Department of Corrections, in his<br/>
official capacity; STEVEN WELLHAUSEN,<br/>
Warden of Columbia Correctional<br/>
Institution Annex, in his individual<br/>
and official capacities;<br/>
K. UPHAUS, RN;**

      **Defendants.**

_____/

<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants **Uphaus**, **Wellhausen**, **Crews**, and **Tucker**, through undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, submit this Motion for Summary Judgment and request summary judgment be granted in their favor.

<u>PRELIMINARY STATEMENT</u>

Mr. Betancourt is an inmate who is currently incarcerated for DUI-Manslaughter.  Nurse Uphaus is a former employee of the Florida Department of Corrections who had some minimal interaction with Mr. Betancourt during the timeframe referenced in the complaint.  Warden Wellhausen was warden of Columbia C.I. during part of the timeframe referenced in the lawsuit. Secretary Tucker is the former secretary of the Florida Department of Corrections ("FDOC"). Secretary Crews is the current secretary of the FDOC.  Mr. Betancourt, via counsel, has filed a civil rights complaint alleging violations of the First, Eighth, and Fourteenth Amendments of the

1

U.S. Constitution as well as violations of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA").  (DE 81)

**STATEMENT OF MATERIAL AND GENUINE FACTS**

*Exhaustion of Administrative Remedies*

1.     Mr. Betancourt knows how to use the prison grievance procedure and does not think the procedure is complicated.  (Exh. A at 18:1-14)[1]  To the extent Mr. Betancourt needed any assistance with the grievance procedure, he has been in contact with his current law firm since early 2012.  (Exh. A at 18:1-14)  Mr. Betancourt's complaint was filed in this Court on December 21, 2012.  (DE 1 at 17)

2.     During his deposition, Mr. Betancourt stated the following when asked whether he was provided grievance forms: "Q: When were you not provided grievance forms, Mr. Betancourt? A: Never. In the box it took a while to get them, but we got them."[2] (Exh. A at 94: 22-25)

3.     Mr. Betancourt filed four grievance appeals prior to the filing date of his complaint.  (Exh. M)  The only issues properly exhausted occurred in grievance 12-6-32956 (regarding the number of catheters issued to him) and grievance 12-6-33897 (regarding his care received after an alleged injury to his right ankle).

4.     Mr. Betancourt did not exhaust his administrative remedies regarding his ADA request. (Exh. A at 108:11 – 111:4; Exh. B[3]) Ron McAndrew, Plaintiff's prison procedures expert, admitted that Mr. Betancourt never filed a request for accommodation. (Exh. E at 36:18-24) Mr. McAndrew also admitted that Mr. Betancourt's only grievance appeal concerning the

---

[1] When citing to depositions, the number before the colon is the page cited and the number after the colon is the line cited.

[2] The "box" is prison slang for confinement.  (Exh. A at 98:5-6)

[3] This exhibit was Exhibit E to the deposition of Adam Betancourt.

ADA was returned without action for non-compliance with the Department's grievance procedure. (Exh. E at 39:4 – 41:7)

***Issues under the ADA***

5.    The only time Mr. Betancourt was in a non-ADA complaint cell was when he was housed in N-Dorm at Columbia Annex.  (Exh. A at 77:1-22, 100:13-15)  He was assigned to N-Dorm (the disciplinary confinement dorm) at Columbia Annex on the following dates: 3/6/11 to 4/4/11, 9/16/11 to 9/22/11, and 8/5/12 to 10/22/12.  (Exh. L)  Mr. Betancourt believes the cells he was in while assigned to N-Dorm were non-ADA compliant in the following ways: he was required to store his supplies under his bunk, his toilet[4], and he could not spin his wheelchair around.  (Exh. A at 77:23 – 80:12)

6.    Due to changes to the Department's classification software, it is no longer possible for an inmate with a wheelchair pass to be placed in a non-ADA compliant cell absent an override by designated personnel at the Central Office in Tallahassee.  (Exh. F at 28:9 – 29:7, 32:7 – 34:18, 39:6-25, 46:16-23, 47:25 – 48:1, 50:23 – 54:23, 61:7-23, 62:25 – 65:13, 70:12 – 75:12)  Overrides are rare and are only done under very narrow circumstances.  (Exh. F at 72:13 – 73:10)

7.    Mr. Betancourt believes that the services he was being denied as a disabled inmate were catheters and diapers.  (Exh. A at 116:15 – 117:21)  Mr. Betancourt's issue is the amount of catheters and diapers he was being provided, not whether he was being deprived of catheters and diapers.  (Exh. A at 116:21 – 117:5; Exh. G at 17:12-15)  Mr. Betancourt admitted that he did not use adult diapers prior to being incarcerated.  (Exh. A at 50:2-7)

8.    Mr. Betancourt considers his catheter use a medical issue.  (Exh. A at 57:21-23)

---

[4] Mr. Betancourt admitted that he used a regular toilet outside of prison and admitted he used the toilets located in the cells in N-dorm.  (Exh. A at 76:4-14; 79:5-9; Exh. BB at ¶ 4; Exh. DD at ¶ 2)

9.      Mr. Betancourt's last residence before he entered prison had no ADA modifications.  (Exh. A at 47:13-20)  Mr. Betancourt can walk with a brace, drive a car, and ride a bicycle.  (Exh. A at 35:8-23, 36:11 – 37:16, 38:9-22; Exh. D at 120:5 – 121:7)

*Provision and Disposal of Medical Supplies*

10.     Mr. Betancourt has a neurogenic bladder and paralysis of his right leg.  (Exh. A at 39:10-24, Exh. T at 1, 2)  When Mr. Betancourt came into the FDOC in August of 2010, he was provided passes for urinary catheters, diapers, and medical supplies.  He was to go to medical daily to obtain catheters and he was to obtain diapers and medical supplies as needed.  (Exh. A at 31:15 – 32:21; Exh. T at 2)

11.     Plaintiff's medical expert, Rebecca Lubelczyk admitted that Mr. Betancourt was receiving sufficient amounts of diapers.  (Exh. D at 162:20 – 163:22)  Mr. Betancourt stated that his bed area was clean at all times, that he disposed of used diapers in N-dorm by rolling them under the door of his cell, and that orderlies came around to put the diapers in the garbage. (Exh. A at 99:5-18, 136:11 – 137:6; Exh. BB at ¶ 5)

12.     Mr. Betancourt admitted that county jails do not allow inmates to have more than one catheter at a time.  (Exh. A at 43:22 – 44:21)

13.     His last time in N-Dorm (confinement) at Columbia Annex was from 8/5/12 to 10/22/12.  (Exh. L)  During this time frame, Mr. Betancourt was provided catheters either on a one-for-one basis or three per day.  (Exh. T at 16-20; Exh. W at response dated Sept. 17, 2012; Exh. BB at ¶ 3; Exh. DD at ¶¶ 2-3)

*Security Issues*

14.     On August 5, 2012, Mr. Betancourt was caught trying to smuggle contraband in his diapers from the visiting park to the prison.[5]  (Exh. A at 107:7-17; Exh. K)  Prior to this 2012 incident, Mr. Betancourt was suspected of hoarding and selling his catheters by medical and security staff at Columbia Annex.  (Exh. A at 90:2-7, 93:5-13, 106:21 – 107:6; Exh. G at 23:10-20, 57:21-23; Exh. W at response dated Apr. 7, 2011 and request dated July 13, 2012; Exh. DD at ¶ 4)  As noted in a grievance response by Nurse Rhoden dated April 7, 2011, Mr. Betancourt was suspected of improperly using his medical supplies.  (Exh. W)  Mr. Betancourt was found with supplies he didn't have a pass for on at least one occasion.  (Exh. G at 47:24 – 48:11; Exh. T at 6)  It was these incidents that led Dr. Jan Gurney to issue a pass that stated Mr. Betancourt was to receive one catheter at a time.  (Exh. G at 30:1-10, 59:21 – 61:9; Exh. T at 7)

15.     During 2010-2012, there was an ongoing security issue of inmates making wine from bags and catheters.  Catheters are used as tubing to assist the fermentation gases escape from the container holding the liquid. (Exh. Z at ¶ 2, Exh. AA at ¶ 2; Exh. G at 87:19 – 88:18)  Catheters may also be used to form a shank.  (Exh. G at 57:24 – 58:8)

16.     Plaintiff's medical expert, Dr. Lubelczyk, has worked in the correctional environment since 2001.  (Exh. D at 7:3-9)  She admitted that security plays a role in providing treatment in such an environment.  (Exh. D at 63:8-12)  She stated that inmates should use medical supplies as directed by corrections medical staff.  (Exh. D at 66:14-22)  She admitted

---

[5] Controlling contraband in an institution is very important.  See generally Florence v. Board of Chosen Freeholders of County of Burlington, 132 S.Ct. 1510 (2012).  Security staff must be always vigilant to make sure inmates do not have items smuggled in from the outside or use items found inside the prison for other purposes.  Contraband such as weapons and drugs puts the lives of officers and inmates in danger, can create an alternate underground currency, and creates a black market for goods within the prison.  Dollars smuggled into prison puts staff and inmates in danger as such funds can be used for such illicit activities as ordering assaults, buying contraband, or buying off officers.  (Exh. AA at ¶ 5)

that an inmate can be disciplined for misusing his medical supplies.  (Exh. D at 66:23 – 67:5)
She also admitted that an inmate's misuse of medical supplies is a legitimate reason to alter his
access to supplies.  (Exh. D at 67:11-21, 68:1-11)  Dr. Lubelczyk stated that if an inmate under
her care was misusing his medical supplies, she would require the inmate to "come down to the
medical department so that they can receive a limited number of supplies and return the other –
the used ones of supplies."  (Exh. D at 69:10 – 70:4)  She also noted that in high security
situations like segregation, inmates are provided a medical supply for use and must return it
immediately after its use.  (Exh. D at 161:1-14)

17.    Mr. Betancourt stated that he was provided adequate supplies when housed at
Lake Bulter (R.M.C.), Hamilton C.I., and Orlando (C.F.R.C.).  However, he was not suspected
of selling his supplies at those institutions.  (Exh. A at 114:20 – 115:20)

***Catheter Reuse***

18.    Mr. Betancourt always has access to catheters.  (Exh. G at 62:9-11; Exh. AA at ¶
4; Exh. BB at ¶ 3; Exh. DD at ¶ 3)  Mr. Betancourt's issue is the amount of catheters he was
being provided, not whether he was being deprived of catheters.  (Exh. A at 116:21 – 117:5; Exh.
G at 17:12-15)  According to Nurse Rhoden, the catheters Mr. Betancourt was provided are able
to be reused. (Exh. G at 17:18-20, 27:3-5; see also Exh. H[6] at 13:10 – 14:9)  The only person
who has told Mr. Betancourt that he cannot reuse a catheter is an orderly he once had by the
name of "Black."  (Exh. A at 71:5-9)  Plaintiff's expert admitted that some catheters may be
reused.  (Exh. D at 54:5 – 55:24)  She also stated that she had not read the professional literature

---

[6] Dr. LaFontant also acknowledged that Mr. Betancourt was regularly provided size 14
catheters so that no trauma was caused to his urethra.  (Exh. H at 16:2-16)  To the extent Mr.
Betancourt attempts to assert that he was always provided the exact brand of catheter discussed
at Mr. LaFontant's deposition, such an assertion is a misrepresentation of the testimony and in
contradiction with the testimony of Mr. Betancourt.  (Exh. A at 83:14 – 84:6; Exh. C; see also
Exh. D at 140:6 – 141:6)

on reuse of catheters and does not know whether the reuse of catheters is widespread in the United States.  (Exh. D at 62:6 – 63:3)

19.     According to the National Institutes of Health ("NIH"), urinary tract infections are the second most common infection in the United States (Exh. O at 2)[7]  Anyone with an abnormality of the urinary tract that obstructs the flow of urine is at risk for a urinary tract infection ("UTI").  (Exh. O at 2)  A common source for infection is catheters.  (Exh. O at 3)  Once a man has a UTI, he is likely to have another because bacteria can hide deep inside prostate tissue.  (Exh. O at 3)

20.     Even in hospitals, UTIs remain a persistent problem and account for 13% of all infections acquired by hospital patients.  (Exh. R)

21.     Prior to entering the custody of the Department, Mr. Betancourt had a history of UTIs.  (Exh. T at 1; Exh. U; Exh. D at 102:12-16, 106:8-18)  His Osceola Jail medical records note a history of chronic UTIs.  (Exh. U at 7)  Upon entering the Department in late 2010, Mr. Betancourt was prescribed Cipro to treat a UTI.  (Exh. A at 28:13-23; Exh. T at 4, 6)  In fact, when Mr. Betancourt was arrested on December 3, 2008, he had a UTI.  (Exh. J at 24:7-12)

22.     Mr. Betancourt acknowledged that he was provided Rusch catheters for his use while at Columbia Annex.  (Exh. A at 83:14-23; Exh. C) The Rusch catheters Mr. Betancourt was using do not state "for single use only"[8] on the package.  (Exh. A at 83:24 – 84:6)  Mr. Betancourt is currently being given seven Rusch catheters per week. (Exh. A at 85:11-12)

---

[7]  Records from government websites are generally considered admissible and self-authenticating.  See Williams v. Long, 585 F.Supp.2d 679, 686-88 & n. 4 (D.Md. 2008) (collecting cases indicating that postings on government websites are inherently authentic or self-authenticating).

[8]  To the extent it matters, Mr. Betancourt's medical expert stated merely that is was "better medical practice" for a patient to use a "single use" catheter per its instructions, not that it was unconscionable to reuse.  (Exh. D at 141:16 – 142:3)  Other than how they are labeled, Mr. Betancourt's medical expert could not name any difference between single use catheters versus

23.     Mr. Betancourt has access to soap and water.  (Exh. A at 40:11-12)  He has access to antibacterial soap.  (Exh. A at 40:13-24, 86:11-20)  Mr. Betancourt purchases wash cloths from the canteen.  (Exh. A at 53:16 – 54:25; Exh. V)  At one time, Mr. Betancourt had Betadine in his possession, but he no longer does as its possession by inmates is a security issue.  (Exh. A at 81:1-23; Exh. D at 118:23 – 119:2)

24.     Mr. Betancourt washes his catheters after each use.  (Exh. A at 87:2-5)  Mr. Betancourt washes and stores his catheters as follows: he rinses the used catheter off, he washes the catheter with antibacterial soap and boiling water, and he places the catheter in a sanitized bottle filled with hot and soapy water until the next time he needs it.  (Exh. A at 87:6 – 89:5)

25.     Cleaning and reusing a catheter is known as clean intermittent self-catheterization.  (Exh. I at 54:2-7; Exh. Q at 1)  The NIH[9] has published guidance for cleaning and reusing catheters.  (Exh. Q at 2-3)  The process advocated by the NIH is similar to the process used by Mr. Betancourt. (Compare Exh. Q at 2-3 with Exh. A at 87:6 – 89:5)  Mr. Betancourt's medical expert admitted that the NIH is a reputable organization.  (Exh. D at 126:18-20, 128:1-9)

26.     According to the NIH, a new catheter is needed about every month or when the catheter being used becomes brittle.  (Exh. Q at 2; Exh. I at 62:14 – 64:15)  Mr. Betancourt's

_____

reusable catheters.  (Exh. D at 142:22 – 143:15)  In fact, she stated that she has no knowledge as to whether there is any difference at all.  (Exh. D at 143:16-18)  Mr. Betancourt states he has never heard of a "reusable catheter."  (Exh. A at 108:9-10)  Dr. Do, the Department's expert, stated that his understanding of "single use only" refers to hospital use so that hospitals will not use a catheter on more than one patient.  (Exh. I at 76:9-16)  Dr. Do stated that in his three decades of practicing medicine, it is common practice for patients to clean and reuse catheters.  (Exh. I at 76:17 – 77:1)

[9] The Clinical Practice Guidelines for Adult Clean Intermittent Catheterization published by the Society of Urologic Nurses and Associates provides similar instruction as the NIH.  (Exh. P, available at http://www.suna.org/resources/adultCICGuide.pdf (last visited May 6, 2014))

medical expert acknowledged that the kind of catheter a patient uses is up to the patient's doctor or nurse.  (Exh. D at 132:8 – 134:8)

27.     In 2009, The Center for Disease Control ("CDC") released its "Guideline for Prevention of Catheter-Associated Urinary Tract Infections 2009."[10]  The CDC found that "[i]n the non-acute care setting, clean (i.e., non-sterile) technique for intermittent catheterization is an acceptable and more practical alternative to sterile technique for patients requiring chronic intermittent catheterization."  (Exh. N at 12)  The CDC also noted the following:

> Moderate-quality evidence suggested no benefit of using sterile over clean technique for intermittent catheterization. No differences were found in the risk of SUTI or bacteriuria/unspecified UTI. Study populations included nursing home residents and adults and children with neurogenic bladder/spinal cord injury.

(Exh. N at 38)  Dr. Do considers the CDC to be a reliable source of information.  (Exh. I at 75:7 – 9)  Further, a report published in Pediatrics, the official journal of the American Academy of Pediatrics, found that "[a] new, sterile catheter for each void did not decrease the high frequency of bacteriuria in patients with neurogenic bladder on intermittent catheterization."  (Exh. S)

***Causes of UTIs***

28.     Recurrent UTIs and urinary calculi are common complications of neurogenic bladder.  (Exh. I at 67:22 – 68:9)  Mr. Betancourt's medical expert admitted that UTIs are common for people who use catheters.  (Exh. D at 98:19 – 99:3)

29.     Failure to properly clean the catheter, failure to clean the penis prior to use, or failure to wash one's hands prior to use may lead to a UTI.  (Exh. I at 68:10 – 69:22, 72:18 – 73:10; Exh. D at 104:21 – 105:21)

---

[10] Entire report available at http://www.cdc.gov/hicpac/pdf/cauti/cautiguideline2009final.pdf (last visited May 6, 2014)

30.     Mr. Betancourt was at an increased risk for cross contamination due to his bowel incontinence.  (Exh. I at 70:22 – 71:7)  Fecal matter contains E. Coli bacteria, one to the bacteria that caused Mr. Betancourt's UTIs.  (Exh. I at 75:16 – 76:5; Exh. T at 4)

31.     Mr. Betancourt's medical expert admitted that even if a patient is given three catheters a day, he may still develop a UTI.  (Exh. D at 106:23 – 107:4)

### Treatment of Medical Issues

32.     When Mr. Betancourt acquired a urinary tract infection while in the Department, he was prescribed antibiotics to treat the infection, just as he was outside of prison.  (Exh. A at 102:9-19)  Mr. Betancourt admitted that he was seen by medical personnel when he submitted a sick call request.  (Exh. A at 63:3-6)  When he had a medical issue not treatable at Columbia Annex, staff there sent him to the Reception and Medical Center for treatment.  (Exh. A at 62:1 – 63:1)  Mr. Betancourt cannot name a specific date he was denied medical care.  (Exh. A at 65:1-9)  Mr. Betancourt acknowledged that his true complaint is not that he was denied medical care, but that he disagreed with the care he was given.  (Exh. A at 65:10-19)

33.     On or about September 1, 2012, Mr. Betancourt fell while changing his diaper and injured his right ankle.  (Exh. T at 8)  Mr. Betancourt was seen a number of times for this issue. (Exh. T at 8-15)  Plaintiff's expert opined that the care he received after the fall was not "grossly negligent."  (Exh. D at 95:10 – 96:7)

34. Warden Wellhausen is not aware on any widespread deliberate indifference to the medical care provided to inmates under his care and control at Columbia C.I. during the timeframe he was warden.  (Exh. Y at ¶ 4)

35.     Mr. Betancourt cannot name a single time prior to December 21, 2012 when he was denied medical care.  (Exh. A at 64:8 – 65:19)  Mr. Betancourt has no knowledge that any other inmate was being denied medical care.  (Exh. A at 117:23 – 118:8)

36.     Mr. Betancourt does not know who Warden Wellhausen is and cannot name any constitutional violation Warden Wellhausen has committed against him.  (Exh. A at 99:20 – 100:3)  Mr. Betancourt stated that he could not really remember who Nurse Uphaus was, but suspected that she failed to provide him sufficient diapers and catheters while he was in the "box." (Exh. A at 95:1 – 98:6)

37.     Nurse Uphaus was a psychological nurse.  She performed mostly office work. She also responded to grievances on occasion to assist her fellow nurses in their duties.  She did not work sick call, triage, doctor's clinic, or in confinement.  These are the places Mr. Betancourt would have had interaction with medical personnel based on his medical needs.  This is where he should have been getting his medical supplies as well.  Providing medical supplies was not among her primary duties.  (Exh. X at ¶ 2)  Mr. Betancourt admitted that psychiatric nurses are not the ones who provide supplies.  (Exh. A at 98:17-25)

*Grievances*

38.     Warden Wellahusen is not aware of any widespread inability of inmates to obtain grievance forms at Columbia C.I., Columbia Annex, or Columbia C.I. Work Camp during the timeframe he worked there.  As far he is aware, grievance forms were available to inmates as required under the rules of the Department.  (Exh. Y at ¶ 5)

39.     Columbia C.I. (including the Annex and Work Camp) has approximately 3,000 inmates.  (Exh. Y at ¶ 2)

40.     Columbia C.I. is consistently among the top five institutions in the state for the highest number of formal grievances received per month.  (Exh. CC)

## MEMORANDUM OF LAW

**I.      Mr. Betancourt failed to exhaust his administrative remedies for most of his claims.**

Mr. Betancourt's complaint must be partially dismissed because he failed to properly exhaust his available administrative remedies for many of his claims prior to initiating this litigation.[11]  Pursuant to 42 U.S.C. 1997e, "no action shall be brought" by a prisoner under any federal law until the prisoner has exhausted "all administrative remedies as are available."  This requirement is mandatory.  Alexander v. Hawk, 159 F.3d 1321, 1323 (11th Cir. 1998); Harper v. Jenkin, 179 F.3d 1311 (11th Cir. 1999).  Because Congress has specifically mandated exhaustion as a "pre-condition to suit," courts may not waive this requirement.  Alexander, 159 F.3d at 1326; Smith v. Terry, 491 Fed. App'x 81, 83 (11th Cir. 2012) (stating that whether or not plaintiff had exhausted his administrative remedies when the original action was filed is a "historical fact" and cannot be cured after the fact).  In Porter v. Nussle, 534 U.S. 516, 532 (2002), the United States Supreme Court held that 42 U.S.C. § 1997e(a) applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.  Further, "[t]he PLRA exhaustion requirement requires full and proper exhaustion."  See Woodford v. Ngo, 548 U.S. 81, 90 (2006).  Completion of the exhaustion requirement means properly completing each step of the prison's grievance procedures.  Jones v. Bock, 549 U.S. at 219; Johnson v. Meadows, 418 F.3d 1152, 1158 (11th Cir. 2005).

---

[11] Because exhaustion is a matter in abatement, "it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."  Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (citation and internal quotation omitted).

The Department's inmate grievance procedure requires the claimant to complete a three-step process in most instances.  First, the claimant must timely submit an informal grievance to the designated staff member.  See Fla. Admin. Code r. 33-103.005.  Once the informal grievance is logged, it is forwarded to either the staff member who is responsible in the particular area of the problem, the classification team, the appropriate section head, or other institutional staff.  Id. If the claimant is not satisfied with the response he receives to his informal grievance, the claimant must then file a timely formal grievance with the warden or assistant warden of the institution.  See Fla. Admin. Code r. 33-103.006.  Then, if the claimant believes that his formal grievance was not appropriately addressed, the claimant can file an appeal to the Bureau of Inmate Grievance Appeals by submitting the appropriate form, raising the same issues, and including proof of the formal grievance at the institutional level.  See Fla. Admin. Code r. 33-103.007.

Here, Mr. Betancourt filed four grievance appeals prior to the filing date of his complaint. (Exh. M)  The only issues properly exhausted occurred in grievances 12-6-32956 (regarding the number of catheters issued to him) and 12-6-33897 (regarding his care received after an alleged injury to his right ankle).  No other allegation in this lawsuit – i.e., the provision of and disposal of diapers, the lack of grievances, the widespread deliberate indifference to medical care, the ADA/RA – was exhausted prior to filing suit via the available[12] grievance process.

---

[12] Mr. Betancourt does not dispute the availability of grievances. (Exh. A at 94: 22-25)  To the extent he may argue that the delay of receiving a grievance in the "box" caused him to miss a deadline, Mr. Betancourt could have sought to file an out-of-time grievance as provided for in Rule 33-103.011(2), F.A.C.  Mr. Betancourt's prison procedure expert, a former FDOC warden, stated he would have accepted an out-of-time grievance from Mr. Betancourt.  (Exh. E at 129:6 – 130:14)  Mr. Betancourt filed numerous grievances while at Columbia Annex.  (Exh. M; Exh. EE (Exh. EE was exhibit D and E to Mr. McAndrew's deposition))  That he did not pursue any needed out-of-time grievance means he failed to exhaust his administrative remedies.  Myles v. Green, No. 13-12266, 2014 WL 776221 (11th Cir. Feb. 28, 2014); see also Higginbottom v.

Mr. Betancourt also failed to exhaust his administrative remedies regarding his ADA request. (Exh. A at 108:11 – 111:4; Exh. B) Ron McAndrew, Plaintiff's prison procedures expert, admitted that Mr. Betancourt never filed a request for accommodation (Exh. E at 36:18-24) and that Mr. Betancourt's only grievance appeal concerning the ADA was returned without action for non-compliance with the Department's grievance procedure. (Exh. E at 39:4 – 41:7).

"[E]xhaustion of available administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983." Woodford v. Ngo, 548 U.S. 81, 85 (2006); Haley v. Haynes, No. CV210–122, 2012 WL 112946 (S.D.Ga. Jan. 12, 2012) ("However, the undersigned notes that the very language of 42 U.S.C. § 1997e(a) requires a prisoner to exhaust all available administrative remedies before he can bring a cause of action pursuant to 42 U.S.C. § 1983. . . or any other Federal law, which would include the ADA and the RA.").  The law of the Eleventh Circuit is clear that the PLRA's exhaustion requirement requires proper exhaustion through the administrative grievance procedure created by the Department, including compliance with the Department's deadlines and other critical procedural rules. See Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) (holding that "when a state provides a grievance procedure for its prisoners, . . . an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit").

Mr. Betancourt's grievance appeals, his deposition testimony, and the deposition testimony of his prison procedures expert all demonstrate that Mr. Betancourt only exhausted his claims regarding the number of catheters issued to him and his care received after an alleged injury to his right ankle.  No other issue was properly exhausted using the available FDOC grievance procedure.  (Exh. M); Woodford v. Ngo, 548 U.S. 81, 90-91 (2006) ("Proper

_____

Carter, 223 F.3d 1259, 1261 ("[T]he exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile.").

exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings).   Accordingly, Count I, Count II in part, Count III, Count IV, and Count V must be dismissed.[13]

## II.     Even if Mr. Betancourt exhausted his ADA/RA[14] claims, the claims are moot or not properly brought under the ADA/RA.

To the extent Mr. Betancourt seeks injunctive relief from being placed in a non-ADA compliant cell, his claim is moot.  The Department has created new classification software which makes it impossible, absent an override by an authorized person at the FDOC's Central Office, for a person with a medical pass to be placed in a non-ADA compliant cell.  (Exh. F at 28:9 – 29:7, 32:7 – 34:18, 39:6-25, 46:16-23, 47:25 – 48:1, 50:23 – 54:23, 61:7-23, 62:25 – 65:13, 70:12 – 75:12)  Mr. Betancourt admits that he has not been in a non-ADA compliant cell since he was in N-Dorm at Colombia Annex.  (Exh. A at 77:1-22, 100:13-15)  He has not been assigned to N-Dorm at Columbia Annex since 10/22/12.  (Exh. L)  There is no reason to believe that the Department would spend all the time and effort to create this new system only to not use it after this case was over.  Brahe v. Publix Super Markets, Inc., No. 8:13–cv–02028, 2014 WL 1400657, at *2 (M.D.Fla. Apr. 10, 2014).   Thus, Mr. Betancourt's ADA/RA claims regarding cell assignment are moot.  Steelman v. Executive Suites of Stuart, Inc., No. 2:12–cv–14019–KMM, 2012 WL 4896820, at *2 (S.D.Fla. Oct. 15, 2012) ("As the ADA only provides for

---

[13] To the extent Mr. Betancourt may argue that he was not aware of the ADA request for accommodation form, such ignorance is no excuse.  Stamm v. Paul, 121 F.3d 635, 642 (11th Cir. 1997) (claimants had constructive notice not only via statute but also via administrative edict that administrative relief was available); see also Rule 33-210.201(3) and (5), F.A.C. (amended 11-22-06).

[14] "[C]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." Cash v. Smith, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000).

prospective injunctive relief for violations, the matter will be moot if the Facility is in compliance with the ADA" and citing cases).

Case law in the Eleventh Circuit has long established that a difference of opinion as to the provision of medical care does not state a claim under the ADA/RA. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005) (stating that the Rehabilitation Act, like ADA, was never intended to apply to decisions involving medical treatment); see also Iafornaro v. Mississippi, No. 6:08-CV-ORL-19, 2008 WL 2856649, at *2 (M.D.Fla. July 22, 2008) ("The Rehabilitation Act, however, does not apply to decisions involving medical treatment" and citing cases); Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005); Bryant v. Madigan, 84 F.3d 246, 248 (7th Cir. 1996).   Here, Mr. Betancourt's issue is the amount of catheters and diapers[15] he was being provided, not whether he was being denied catheters and diapers. (Exh. A at 116:21 – 117:5; Exh. G at 17:12-15)  Even Mr. Betancourt himself considers his catheter use a medical issue.  (Exh. A at 57:21-23)  At his deposition, Mr. Betancourt could not name a specific date he was denied medical care.   (Exh. A at 65:1-9)   Further, Mr. Betancourt acknowledged that his true complaint is not that he was denied medical care, but that he disagreed with the care he was given.  (Exh. A at 65:10-19)  Thus, as he was actually being provided care, Mr. Betancourt cannot claim that he was "denied" a service, *i.e.*, medical care.  In accordance with Schiavo, Mr. Betancourt fails to state a claim under the ADA/RA.

## III.   Mr. Betancourt has not established an Eighth Amendment violation amounting to a deliberate indifference to a serious medical need.

"To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  Mann v. Taser Intern., Inc., 588

---

[15] Plaintiff's medical expert, Rebecca Lubelczyk, admitted that Mr. Betancourt was receiving sufficient amounts of diapers.  (Exh. D at 162:20 – 163:22)

F.3d 1291, 1306-07 (11th Cir. 2009) (citing Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007)). A "serious medical need" is "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Id. For liability, the defendant must 1) have subjective knowledge of a risk of serious harm, 2) disregard that risk, and 3) display conduct beyond gross negligence. Id.

"A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta Cnty., 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris v. Thigpen, 941 F.2d 1495, 1507 (11th Cir. 1991) (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)). Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 107 (1976); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). In other words, a mere difference of opinion over matters of medical judgment does not give rise to a constitutional claim. Harris, 941 F.2d at 1505; Waldrop, 871 F.2d at 1033; White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) (no Eighth Amendment claim is stated when a doctor disagrees with the professional judgment of another doctor); Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

It is well-established that, when dealing with an Eighth Amendment deliberate indifference claim, a constitutional violation is present only where the medical treatment

received was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.'"  <u>Carroll v. Correctional Medical Services</u>, 160 Fed. App'x 848, 850 (11th Cir. 2005) (quoting <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991)). Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care. <u>Murrell v. Bennett</u>, 615 F.2d 306, 310 n. 4 (5th Cir. 1980).

Assuming all issues were actually exhausted, the Eighth Amendment deliberate indifference claims are as follows: 1) that Mr. Betancourt is not being provided sufficient catheters and diapers, 2) that Mr. Betancourt cannot dispose of his diapers, and 3) that Mr. Betancourt was not provided adequate treatment after a fall that occurred approximately on September 1, 2012.  Mr. Betancourt's medical expert admitted that Mr. Betancourt was provided an adequate number of diapers (Exh. D at 162:20 – 163:22) and that his care after the alleged fall was not more than "grossly negligent" (Exh. D at 95:10 – 96:7).  Mr. Betancourt admitted that he was able to dispose of his diapers.  (Exh. A at 99:5-18, 136:11 – 137:6; Exh. BB at ¶ 5)  Also, it is undisputed that Mr. Betancourt was being provided medical care.  (Exh. A at at 62:1 – 63:1, 63:3-6, 65:1-19, 102:9-19, 116:21 – 117:5; Exh. G at 62:9-11; Exh. Y at ¶ 3; Exh. BB at ¶ 3; Exh. DD at ¶ 3; Exh. T; Exh. W at responses)  Thus, the only issue in actual contention is whether the supply of catheters Mr. Betancourt received amounted to deliberate indifference.

Mr. Betancourt's deliberate indifference claim fails for the following reasons.  First, he sued the wrong individuals for the claims he is making.  Nurse Uphaus was not responsible for providing supplies to Mr. Betancourt. (Exh. X at ¶ 2)  Warden Wellhausen was not personally

involved in the treatment of Mr. Betancourt.  He relied on medical professionals to diagnose and provide treatment to the inmates at Columbia C.I.  (Exh. Y at ¶ 3).

Second, a medical practitioner's decision about the type of medicine that should be prescribed is generally "a medical judgment" that is "an inappropriate basis for imposing liability under section 1983." Adams v. Poag, 61 F.3d 1537, 1547 (11th Cir. 1995); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir.1989) (stating that "[m]ere medical malpractice, however, does not constitute deliberate indifference. Nor does a simple difference in medical opinion."). The decision by Mr. Betancourt's doctors as to how many catheters to provide him[16] is a classic example of medical judgment not appropriate for grounding liability under the Eighth Amendment.  Williams v. Barrow, No. 13-11735, 2014 WL 1758889, at *4 (11th Cir. May 5, 2014); Whitehead v. Burnside, 403 Fed. App'x 401, 403 (11th Cir. 2010) ("A difference in medical opinion does not constitute deliberate indifference so long as the treatment is minimally adequate.").

Third, the medical treatment Mr. Betancourt received was not grossly incompetent, but in line with common practice and scientific evidence. Mr. Betancourt always had at least one catheter available for his use.[17]  (Exh. A at 116:21 – 117:5; Exh. G at 17:12-15)  Cleaning one's catheter and reusing it is a legitimate technique known as clean intermittent self catheterization. (Exh. I at 54:2-7; Exh. N at 12, 38; Exh. P; Exh. Q)  The NIH has provided guidance on how one can properly clean and reuse a catheter.  (Exh. Q)  Mr. Betancourt had the supplies to clean his

---

[16] Considering Mr. Betancourt's suspected and actual misuse of his medical supplies, the provision of supplies also had a security component to it, a component deemed legitimate by Mr. Betancourt's medical expert.

[17] Mr. Betancourt's access to medical supplies was limited for a period of time due to legitimate security concerns.  (Exh. A at 107:7-17; Exh. G at 30:1-10, 59:21 – 61:9; Exh. K)  Mr. Betancourt acknowledged that staff had these concerns regarding his use of his supplies.  (Exh. A at 90:2-7, 93:5-13, 106:21 – 107:6; Exh. G at 23:10-20, 57:21-23; Exh. W at request dated July 13, 2012; Exh. DD at ¶ 4)

catheters and he has a process to clean and store them that is similar to the guidance provided by the NIH.  (Exh. A at 40:11-24, 53:16 – 54:25, 86:11-20; Compare Exh. Q at 2-3 with Exh. A at 87:6 – 89:5; Exh. V)  The Department's medical expert stated that it common practice to have patients clean and reuse their catheters.  (Exh. I at 76:17 – 77:1)  Also, scientific evidence suggests that using a sterile catheter for each catheterization does not decrease the risk of a UTI. (Exh. S)

Fourth, Mr. Betancourt has a causation problem as he cannot show that the reuse of his catheters led to any harm.[18]  Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir. 2000) ("For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue.").  Mr. Betancourt has a history of chronic UTIs dating from before his current incarceration with the Department.  (Exh. U at 7; Exh. T at 1, 4; Exh. D at 102:12-16 LUB)  UTIs are commonplace among catheter users (Exh. D at 98:19 – 99:3; Exh. I at 67:22 – 68:9) and once a man gets a UTI, he is likely to get another.  There are a variety of reasons why a person who requires use of a catheter may get a UTI (Exh. D at 103:13 – 105:21; Exh. I at 68:10 – 69:22, 72:18 – 73:10)[19] and Mr. Betancourt is at an increased risk due to his fecal incontinence. (Exh. I at 70:22 – 71:7)  Thus, there is no evidence showing that the reuse of catheters led to

---

[18]  If the use of a sterile catheter for each void kept one from getting UTIs, then Mr. Betancourt should have never had a UTI while a free man, as he asserted that he never reused a catheter outside of prison.  However, the evidence shows that Mr. Betancourt had a history of chronic UTIs outside of prison.  Whether he was using a sterile catheter for each void or cleaning and reusing his catheter, it made no difference.  The scientific evidence confirms this anecdotal evidence.  (Exh. S)

[19]  Mr. Betancourt's medical expert noted that failing to void enough times per day may lead to a UTI.  (Exh. D at 104 at 7-11)  The expert also noted that when Mr. Betancourt entered the FDOC, he stated that he was voiding two to three times per day.  (Exh. D at 116:5-13; Exh. T at 3, 5)  The NIH recommends voiding more often.  (Exh. Q at 1)

more UTIs as Mr. Betancourt always had a UTI problem and people that use catheters commonly get UTIs.  (Exh. A at 28:13-23; Exh. D at 98:19 – 99:3, 102:12-16, 106:8-18; Exh. I at 67:22 – 68:9; Exh. O at 2-3; Exh. T at 1, 4; Exh. U)  Mr. Betancourt's medical expert admitted that even if a patient is given three catheters a day, he may still develop a UTI.  (Exh. D at 106:23 – 107:4)  Further, there is no evidence that Mr. Betancourt suffered any permanent injury from the UTIs he acquired.  (Exh. D at 143:21 – 144:18, 148:12 – 149:11)

To survive summary judgment, a plaintiff must provide record evidence demonstrating that a defendant's response to a medical need was more than merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing Estelle, 429 U.S. at 105-06); see also Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) ("[G]ross negligence fails to satisfy [the] state-of-mind requirement for deliberate indifference.").  The record evidence demonstrates that Mr. Betancourt has failed to meet the high burden required to prove deliberate indifference.

## IV.   Remaining claims.

Count III should be dismissed as there is no evidence whatsoever of a widespread pattern at Columbia C.I.[20] of medical care that was so deficient as to amount to deliberate indifference. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (requiring a causal connection between the actions of a supervising official and the alleged constitutional deprivation and stating that the connection can be established by a history of widespread abuse putting the responsible supervisor on notice of the need to correct the alleged deprivation).  Mr. Betancourt cannot name a single time prior to December 21, 2012 when he was denied medical care (Exh. A at 64:8 –

---

[20]  It is noted that Columbia C.I. (which includes the Annex and Work Camp) houses approximately 3,000 inmates. (Exh. Y at ¶ 2)

65:19) and he has no knowledge that any other inmate was being denied medical care (Exh. A at 117:23 – 118:8).  Mr. Betancourt does not know who Warden Wellhausen is and cannot name any constitutional violation Warden Wellhausen has committed against him.  (Exh. A at 99:20 – 100:3)  Further, Warden Wellhausen is not aware on any widespread deliberate indifference to the medical care provided to inmates under his care and control at Columbia C.I. during the timeframe he was warden of Columbia C.I.  (Exh. Y at ¶¶ 3-4)  Lastly, Mr. Betancourt's medical expert, who has worked in the corrections field since 2001, stated that is would be unusual for a warden to alter a doctor's prescribed course of treatment of an inmate.  (Exh. D at 166:5 – 167:3)

Count V is frivolous as Mr. Betancourt admitted to receiving grievances whenever he asked for them.  (Exh. A at 94: 22-25)  That inmates have access to grievances at Columbia C.I. is buttressed by the fact that the institution is consistently in the top five institutions in the state for the highest number of formal grievances received per month.  (Exh. CC)  Lastly, Warden Wellhausen is not aware of any widespread inability of inmates to obtain grievance forms at Columbia C.I., Columbia Annex, or Columbia C.I. Work Camp during the timeframe he was warden at Columbia C.I.  As far he is aware, grievance forms were available to inmates as required under the rules of the Department.  (Exh. Y at ¶ 5)

## V. Nurse Uphaus, Warden Wellhausen, and Mr. Tucker are entitled to qualified immunity.

"The defense of qualified immunity represents a balance between the need for a damages remedy to protect the rights of citizens and the need for government officials to be able to carry out their discretionary functions without the fear of constant baseless litigation." GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998).  Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct "violates 'clearly established [federal] statutory or constitutional

rights of which a reasonable person would have known.'" Id. (alteration in original) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Supreme Court has established a two-part test for determining whether an officer is entitled to qualified immunity.  The court must determine "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citation omitted).  The court must also determine whether the constitutional violation was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151.  However, the district court has discretion to determine in what order to address each part. Pearson v. Callahan, 555 U.S. 223, 236 (2009).  As discussed above, Mr. Betancourt fails to state a claim for any constitutional violation and the second prong of the qualified immunity test need not be reached.

However, even if the first prong is met, the specific facts of this case – an inmate with a history of chronic UTIs who is provided catheters and the supplies to properly wash and reuse the catheters but continues to get UTIs – have not been determined to be a violation of the Constitution.  "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (quoting Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).  "[O]fficials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (quoting Adams v. St. Lucie Cnty. Sheriff's Dep't., 962 F.2d 1563, 1575 (11th Cir. 1992)).  Thus, without unambiguous notice of the possibility of violating the Constitution, Nurse Uphaus, Warden

Wellhausen, and Mr. Tucker are entitled to qualified immunity as to the claims against them in their individual capacities.  <u>Gilmore v. Hodges</u>, 738 F.3d 266 (11th Cir. 2013).

<u>**CONCLUSION**</u>

For the aforementioned reasons, Defendants requests that summary judgment be granted in their favor.

Respectfully submitted,

**PAMELA JO BONDI**
**ATTORNEY GENERAL**

<u>s/ Lance Eric Neff</u>
Lance Eric Neff
Senior Assistant Attorney General
Florida Bar Number 26626
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300 - Telephone
(850) 488-4872 - Facsimile
Email: <u>Lance.Neff@myfloridalegal.com</u>

## EXHIBIT LIST

Exhibit A:     Excerpts from the deposition of Adam Betancourt
Exhibit B:     Exhibit attached to the deposition of Adam Betancourt
Exhibit C:     Picture attached to the deposition of Adam Betancourt
Exhibit D:     Excerpts from the deposition of Rebecca Lubelczyk, M.D.
Exhibit E:     Excerpts from the deposition of Ron McAndrew
Exhibit F:     Excerpts from the deposition of Vicki Newsome
Exhibit G:     Excerpts from the deposition of Travis Rhoden, R.N.
Exhibit H:     Excerpts from the deposition of Rodolphe LaFontant, M.D.
Exhibit I:     Excerpts from the deposition of Long Do, M.D.
Exhibit J:     Excerpts from the audio tape recorded statement of Adam Betancourt
Exhibit K:     Disciplinary report for Possession of Negotiables
Exhibit L:     Internal movements for Adam Betancourt
Exhibit M:     Grievance appeals filed by Adam Betancourt
Exhibit N:     Guideline for Prevention of Catheter-Associated Urinary Tract Infections 2009
Exhibit O:     Urinary Tract Infections in Adults
Exhibit P:     Clinical Practice Guidelines: Adult Clean Intermittent Catheterization
Exhibit Q:     Clean Intermittent Self-Catheterization, Procedure for Men
Exhibit R:     Article from the Washington Post
Exhibit S:     Article from Pediatrics
Exhibit T:     Excerpts from the FDOC medical records for Adam Betancourt
Exhibit U:     Excerpts from the Osceola County Jail medical records for Adam Betancourt
Exhibit V:     Canteen purchases by Adam Betancourt
Exhibit W:     Inmate requests filed by Adam Betancourt
Exhibit X:     Declaration of K. Uphaus
Exhibit Y:     Declaration of S. Wellhausen
Exhibit Z:     Declaration of T. Boston
Exhibit AA:    Declaration of J. Wheeler
Exhibit BB:    Declaration of R. Register
Exhibit CC:    Declaration of L. Uphaus
Exhibit DD:    Declaration of R. Singletary
Exhibit EE:    Informal and formal grievances filed by Adam Betancourt

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished via CM/ECF

to counsel of record (John D. Mallah, Karen M. Marcell, and Michael O'Brien Colgan) on this

23rd day of May, 2014.


                                    s/ Lance Eric Neff
                                    Lance Eric Neff
                                    Senior Assistant Attorney General