**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**CASE NO.:**   3:13-cv-00287-HES-JRK

ADAM BETANCOURT,

                Plaintiff,

vs.

STATE OF FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

                Defendants.

_____/

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

       Plaintiff, ADAM BETANCOURT, hereby responds to the Defendants' Motion for Summary Judgment [DE 83]. There are genuine issues of material fact which would allow a reasonable jury to find that the Defendants violated the Plaintiff's civil rights under color of law.

## STATEMENT OF FACTS

       The Plaintiff's response to Defendants' Statement of Facts is attached and incorporated by reference.

## STANDARD OF REVIEW

       It is well established that when speaking of summary judgment, the 11th Circuit has said "We view the evidence and all factual inferences there from in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Kingsland v. City of Miami,* 832 F.3d 1220, 1226 (11th Cir. 2004).

       Summary judgments are appropriate only when there is no genuine issue of material fact. A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

1

for the nonmoving party and a fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

I.    The Plaintiff has exhausted his administrative remedies

The Defendants admit that the Plaintiff has exhausted his administrative remedies under the FDOC's grievance procedure with regard to catheters and with regard to an injury he received to his right ankle. The Plaintiff contends that he has also exhausted his administrative remedies with regard to the ADA noncompliance of his cell in N Dormitory. See **Exh P, Grievance 12-6-33897 with attachments.**

The Defendants object that the Plaintiff has not actually complied with the grievance procedure with regard to his ADA claim because he did not file a Form DC2-530. This argument is meritless because the DC2-530 form is not a part of the grievance procedure set forth by the Department of Corrections.

The regulations of the Florida Department of Corrections set forth a three-step process for administrative challenges to conditions of confinement. A "grievance" is defined as "[a] written complaint or petition, either informal or formal, by an inmate concerning an incident or condition within an institution, facility, or the Department which affects the inmate complainant personally." Fla. Admin. Code 33-103.002(6). Informal grievances are filed on a Form DC6-236, Inmate Request. Fla. Admin. Code 33-103.002(12). Formal grievances are filed through the use of Form DC1-303, Request for Administrative Remedy or Appeal. Inmates who wish to appeal a

response to a formal grievance are required to file a grievance appeal, also on Form DC1-303. Fla. Admin. Code 33-103.007. Inmates are allowed to skip the informal grievance step for some types of grievances, including medical grievances and grievances concerning the Americans with Disabilities Act. Fla. Admin. Code 33-103.006(3).

The only mention of the DC2-530 appears in a separate chapter, in 33-210.201 "ADA Provisions for Inmates." That section explicitly states "Inmates who have a complaint alleging a violation of the Americans with Disabilities Act or who want to appeal the denial of a request for accommodation shall follow the guidelines set forth in Chapter 33-103, F.A.C." [i.e. the informal-formal-appeal grievance procedure described above]. Fla. Admin. Code § 33.210-201(5).

There is an entire chapter of the administrative code dealing with the inmate grievance procedure, Fla. Admin. Code, ch. 33-103, and nowhere in that chapter does there appear any mention of DC2-530. There is no mention of DC2-530 or F.A.C. 33.210.201 in the Inmate Orientation Handbook. The Inmate Orientation Handbook explains that "a complete copy of the inmate grievance procedure can be found in Department of Corrections Rule 33-103." **Exh. Q, Inmate Orientation Handbook, at 21**. The Inmate Orientation Handbook states that "[t]here are two types of grievances, informal and formal." **Exh. Q, at 21**. No person explained that the DC2-530 was part of the inmate grievance procedure within the FDOC. **Exh. A, Declaration of Adam Betancourt, ¶ 34**.

The reliance on DC2-530 to argue that the Plaintiff has not exhausted his administrative grievances is not based on the inmate grievance procedure set up by the Department of Corrections, but is an ad hoc attempt to create new requirements to foreclose the Plaintiff's attempts to have his concerns under the Americans with Disabilities Act concerns addressed. The

grievance procedure does not require an inmate to file a DC2-530 Request for Accommodation in order to properly grieve a blatant violation of the Americans with Disabilities Act.

The Plaintiff clearly describes the ADA issue in the attachments to grievance appeal  12-6-33897. "Per: CH. 33-103.008(1) regarding the treatment and **violation of my ADA** here at C.C.I. Annex [Columbia Annex]. On August 30, 2012 I injured my right ankle while try to use the bathroom **in a cell with non-safety bars, due to me being a paraplegic**…" **Exh. P, Grievance Appeal #12-6-33897** (emphasis added). While it is true that the grievance also spoke about the injury to the ankle that resulted from noncompliance with the ADA, the grievance specifically invokes the violation of the Americans with Disabilities Act as the cause of the injury. The Plaintiff has therefore exhausted his administrative remedies with regard to ADA compliance with his cell in N-Dorm.

II.     <u>The ADA claims are not moot</u>

The Defendants vigorously argue that the Plaintiff's ADA and RA claims are moot because they have undertaken certain changes to their computer software that they claim prevent institutional employees from placing an inmate with a wheelchair pass into a cell which has been flagged by Facilities Services staff for the Department of Corrections. To do so, they rely upon the deposition testimony of Vicki Newsome, an employee of the Department of Corrections out of Tallahassee.

The Plaintiff appreciates the apparent efforts of the Department of Corrections to live up to its responsibilities under the Americans with Disabilities Act. The Defendants fail, however, to demonstrate that there are no genuine issues of material fact and that the Plaintiff's claims for injunctive relief under the ADA are now moot. First, Vicki Newsome does not have any personal knowledge about how cells were identified as ADA compliant. She does not know that the

4

quarters identified as ADA compliant are actually ADA compliant; all she knows is that other people, whom she cannot identify, were tasked with creating a list of quarters which were designated as ADA-compliant quarters and giving Vicki Newsome's office that list so that Newsome and her staff could help create software. **Exh. S, Deposition of Vicki Newsome, at 34:6 – 34:23**.

The software update identified by Vicki Newsome also relies upon the existence of wheelchair passes to determine which inmates are to be placed in beds identified as accessible as required under the Americans with Disabilities Act. **Exh. S, 39:6 – 39:10**.

This system would not have prevented the Plaintiff from being placed in a non-ADA accessible cell in confinement if it were in place in 2012 because the Plaintiff did not have a wheelchair pass for much of his time at Columbia Annex, even though he was prescribed a wheelchair on account of his disability. **Exhibit A, ¶ 33**. A review of the medical records provided by the Department of Corrections did not reveal a wheelchair pass for the Plaintiff's term of incarceration at Columbia Correctional Institution; it only revealed a wheelchair pass for the Plaintiff's previous term, for two months in 2005, **Exh. R, Health Slip/Pass,** and mentions of wheelchair pass renewals at Columbia on January 17, 2012, January 24, 2013, and February 27, 2013. **Exh T, Excerpts from Medical Record, Bates 133, 141, 178**. At Reception and Medical Center the Plaintiff received a wheelchair pass good for January 31, 2013 through February 17, 2013. ***Id.* at Bates 323**. From this pattern and from the testimony of the Plaintiff, a jury could reasonably find that there were periods of time for which the Plaintiff had no wheelchair pass despite the fact that he is wheelchair-bound.

Thus, even if the system works precisely as the Defendants state that it will, it is still possible for the Plaintiff to be placed in a non-accommodating bunk arrangement in the future

because the Department of Corrections has demonstrated that just because an inmate is confined to a wheelchair and provided a wheelchair by institutional staff, there is no guarantee that an inmate who is disabled will be provided with a wheelchair pass.

Even if the court finds that the injunctive claims in Counts I and IV are moot, the Plaintiff has stated claims for compensatory damages under Count I. The claim for compensatory damages for injury to his ankle is not moot because it does not require prospective relief.

Separately, the Defendants claim that the Plaintiff cannot state a claim for relief under the ADA and RA for failure to provide catheters because the ADA "was never intended to apply to decisions involving medical treatment." This is an attempt to reframe the Plaintiff's claim under the Americans with Disabilities Act as a claim for incomplete medical care. To the contrary, the Plaintiff's claim regarding catheters is not a claim that he does not have access to medical care, but is instead a claim about lack of access to services for relieving his bladder.

The Defendants focus on certain answers to objectionable questions calling for legal conclusions in order to shore up their argument. The Defendants claim that the Plaintiff "considers his catheter use a medical issue," which is another way of saying that the Plaintiff stated as a legal conclusion that he claim for catheters is not cognizable under the Americans with Disabilities Act. This court has ruled in the past that discovery which calls for a legal conclusion is improper. See e.g., *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1339 n.6 (M.D. Fla. 2006).  The Plaintiff is not a lawyer and the Defendants have not established that the Plaintiff is qualified to offer an opinion on whether his issues with catheters are more properly characterized as a "medical" issue or an "ADA" issue.

Inmates without neurogenic bladder are able to use the toilet in their dormitory or in other parts of the institution at any time they want, without approval by healthcare staff. **Exh. G,**

**Deposition of Adam Betancourt, 133:9 – 134:5**. The Plaintiff, however, has been required to go to medical every time he urinates in order to receive a fresh catheter. Inmates are not allowed to go to medical any time they want in order to exchange catheters. **See Exh. F, Deposition of Ron McAndrew, at 75:24 – 76:7, 76:23 – 76:25.** The Defendants raise that the Plaintiff admits that he was only allowed to have one catheter at a time while he was in county jails in the past, but in the county jails in question, the Plaintiff only had to knock on the window of his cell door and the on-duty nurse would provide him with a fresh catheter as needed. **Exh. A, at ¶ 18**.

Unlike an inmate without an impairment to urination, who can urinate at any hour he needs to, the Plaintiff, when he was under orders to receive one catheter and exchange for a new catheter as needed, had to wait for those times when he was able to travel freely to medical to exchange his used catheter for a new catheter. The Defendants admit that the Plaintiff received ample numbers of catheters for urination at other DOC facilities than Columbia, and then blame the Plaintiff for his inability to get sufficient catheters for urination on the fact that at Columbia he was caught with contraband and their unsubstantiated allegation that he was under suspicion of selling catheters for making prison wine or for use as a weapon[1]. They also allege that a doctor named Jan Gurney, whom the Plaintiff had never met, issued a restricted pass for one catheter at a time for security reasons. This belies the Defendants' argument that the decision to restrict the Plaintiff to one catheter at a time to be exchanged, or in the alternative 7 catheters per week, was a medical decision.

It was not even a security decision to restrict the Plaintiff's ability to get catheters. The Defendants freely admit that other institutions provide the Plaintiff with numerous catheters. Reception and Medical Center, where the Plaintiff is currently housed, provides the Plaintiff with as many catheters as he needs. **Exh. A, Declaration of Adam Betancourt, ¶ 23**. The Defendants

---

[1] Perhaps tellingly, the Plaintiff was never written up on suspicion of selling catheters or diapers.

offer no medical or even security explanation why the Plaintiff would be provided with unlimited catheters at other institutions but not at Columbia Annex, or why the alleged black-market sale of catheters at Columbia would not lead Reception and Medical Center to also inconvenience the Plaintiff every time he wished to urinate.

The Plaintiff was not denied adequate numbers of catheters for reasons of medical diagnosis, and the Plaintiff is not alleging that he has been denied access to medical services on account of his disability. He is alleging that he is being discriminated against by reason of his disability, by the withholding of access to catheters (which the Plaintiff has already been prescribed) and thus access to urination, though similarly situated individuals without a bladder impairment have ready access to toilets.

III.     **The Plaintiff has stated an Eighth Amendment claim**

The Plaintiff alleges two separate sources of Eighth Amendment violations: 1) Failure to provide prompt treatment for an ankle injury sustained during a fall while trying to transfer to a non-ADA-compliant toilet; and 2) failure to supply adequate catheters. The Plaintiff addresses each in turn.

a.     <u>Non-ADA cell/Treatment for the injured foot</u>

From the period of July – September 2012, K. Uphaus, R.N. frequently reviewed and responded to the Plaintiff's grievances. Although Nurse Uphaus states that she works primarily as a psychiatric nurse, she is also an "RN Specialist" who was designated to respond to numerous of the Plaintiff's grievances during the times in question in this lawsuit. **See Exh U, Grievances responded to by K. Uphaus, RN Specialist**. On August 30, 2012, the Plaintiff injured his right ankle while trying to use the bathroom in cell N2111, a confinement cell that did not have grab bars. See **Exh. V, Grievance 251-120912-06**. He was not seen until September 1,

2012, on a medical emergency basis. *Id.* On September 24, 2012, while the Plaintiff was in confinement, he declared a medical emergency because his legs were swollen and painful. **Exh W, Grievance 251-120928-01.** The nurse who saw him, whose name was unknown to the Plaintiff, told him that it was not a medical emergency. The Plaintiff grieved this and his grievance was denied by K. Uphaus, RN Specialist. *Id*. The Plaintiff did not receive any medical attention until a week later, on October 1, 2012, after he again declared a medical emergency because his legs and feet were swollen and causing him immense pain. **Exh T, Excerpt of Medical Records, at Bates 160 – 161**.

Nurse Uphaus, although she did not treat the Plaintiff directly for his injuries, was the person tasked by Columbia Annex to respond to the Plaintiff's medical grievances. Nurse Uphaus was subjectively aware of the Plaintiff's injuries but chose to do nothing to help the Plaintiff, even though she was the person tasked with responding to the Plaintiff's medical care concerns. Nurse Uphaus allowed the Plaintiff to suffer untreated for a week with swollen, painful legs. For this reason, she is properly named as a defendant and the Plaintiff has demonstrated that genuine issues of material fact exist which would allow a reasonable jury to find that she is liable for deliberate indifference to the serious medical needs of the Plaintiff in violation of the Plaintiff's rights under the Eighth Amendment to be free from cruel and unusual punishment.

It is unnecessary to show permanent injury from the Defendants' deliberate indifference; A long delay in providing medical attention can give rise to a constitutional claim for deliberate indifference to serious medical needs even where treatment is ultimately dispensed and the problem healed. See *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)

     b.    <u>Catheters</u>

The Defendants rely upon the testimony of Dr. Long Ngoc Do and a number of written materials from a wide variety of publications to support their argument that it was acceptable medical practice to wash and reuse catheters and that there is therefore no genuine issue of material fact showing that staff at Columbia Annex were deliberately indifferent to the Plaintiff's serious medical needs for unused catheters.

First, the Defendants' entire argument is premised on the notion that the Plaintiff received only one kind of catheter, a Rusch red latex catheter. The Defendants insist that the Plaintiff admitted that he only received Rusch catheters at Columbia and that the Department of Corrections's 30(b)(6) representative Dr. Lafontant was mistaken when he presented a clear plastic catheter manufactured by Coloplast as representative of the model of catheter provided by the Department of Corrections to Mr. Betancourt. The Rusch catheter, also known as a Red Robin, does not have a label on it which states that it is for single use only; the Coloplast catheter clearly indicates on the reverse that it is "Single Use Only." See **Exh B, Photograph of Coloplast catheter; Exh C, Photograph of Rusch catheter.**

A deposition of organization representatives of the Florida Department of Corrections was held on August 30, 2013. The deposition notice required that the representative be prepared to discuss "[t]he make(s), model number(s) and instructions for use of each catheter provided by the Florida Department of Corrections to the Plaintiff" and that he bring "copies of any instructions or notes and copies of the packaging which contain each type of catheter provided to the Plaintiff." **Exh X, Third Amended Notice of Deposition of 30(b)(6) Representatives, ¶ 5.** Dr. Rodolphe LaFontant was the designated representative for item number 5 on the notice. **Exh. E, Deposition of Rodolphe LaFontant, 8:22 – 8:24.** The only catheter which Dr. LaFontant brought with him was a Coloplast No. 14 French clear plastic straight tip catheter. ***Id.*, 18:9 –**

**18:19**. The coloplast catheter was the type of catheter regularly provided to Adam Betancourt. *Id.* **at 16:2 – 16:6**. All disposable catheters provided to Mr. Betancourt were of that brand. *Id.* **at 16:11 – 16:13**. The Defendants' protests that the Plaintiff is misrepresenting the testimony of Dr. LaFontant are misguided; it was up to the Department of Corrections to choose representatives to speak for itself about the subject matter of the deposition. The Department of Corrections did so by selecting Dr. LaFontant, who clearly answered that Coloplast catheters were the type of catheters used by the Department of Corrections from August 2010 through the time of the deposition in August 2013. They cannot now ask the Plaintiff and this court to completely disregard their own admissions because they have become harmful to the Department of Corrections, and call the Plaintiff dishonest for presenting Dr. LaFontant's testimony as evidence.

Counsel for the Defendants places great weight on a portion of Betancourt's deposition where he admits that he receives Rusch catheters. The Defendants exaggerate what Betancourt actually said by implying that Betancourt admitted to receiving only Rusch catheters. This misrepresents Mr. Betancourt's testimony for several reasons. First, the Plaintiff stated, before the Rusch catheter was produced, that the catheters he is given say on the package that they are one-time use only. **Exh. G, Deposition of Adam Betancourt, at 83:11 – 83:13**. This is consistent with the Coloplast catheters, which actually state on their packaging that they are "Single Use Only." **Exh. B**. The Plaintiff does state that he has used a Rusch catheter before, but he does not state that it was the only type of catheter he has been given. **Exh. G at 83:21 – 83:23**. He states that the Rusch catheters "aren't real," suggesting that the catheter presented by Defendants' counsel is not the type of catheter typically given to him. **Exh. G at 84:21 – 84:23**. The Plaintiff has received both types of catheters. **Exh. A at ¶ 24 – 27**.

11

The testimony of Dr. Long Do is premised on the incorrect fact that the Plaintiff only received Rusch catheters, which admittedly are not labeled for single use only, and not Coloplast catheters, which are clearly labeled for single use only. Dr. Do admits that the Department of Corrections is required to follow the labeling instructions on medical devices. **Exh. Y, Deposition of Dr. Do, at 51:4 – 51:6**. If the DOC instructs an inmate to disregard the instructions and labeling for a medical device, that violates the DOC's obligation to follow the labeling on its medical devices. **Exh Y, Do Deposition, at 51:7 – 51:14**.

Dr. Do is not properly qualified as an expert witness. He was surprised to find that he was designated as an expert witness, and his qualification for being an expert witness was that he was selected by his supervisor to testify in this case. **Exh. Y, Do Deposition, at 4:15 – 5:7**. He is an administrator at the Florida Department of Corrections whose job is to oversee the operations of two corporations to which the DOC has outsourced medical care of inmates. *Id.* **at 12:9 – 12:18**. He did not examine the Plaintiff or speak to any of the doctors or nurses who treated the Plaintiff. *Id.* **at 5:8 – 5:18**. Dr. Do did not perform any independent research into the reuse of catheters and into urinary tract infections and their causes; all of the articles referred to by Dr. Do were provided to him by the attorney for the Defendants, Lance Neff. *Id.* **at 18:13 – 18:20**.

Nor are the articles provided by opposing counsel vetted for their trustworthiness. Counsel for the Defendants essentially seeks to act as an expert on his own, researching medical articles, and then giving those articles to a Department of Corrections doctor-administrator in order to cloak his own research in the guise of an "expert opinion." The only qualifications provided for any of the articles used are statements of Dr. Do that the CDC and the NIH are reliable sources of information in Dr. Do's opinion. *Id.* **at 75:7 – 75:14**. Dr. Do does not give his opinion about the reliability of any of the other articles supplied to him by the DOC's attorney.

The Plaintiff has sufficiently demonstrated that genuine issues of material fact exist regarding the causation of the Plaintiff's urinary tract infections. The Plaintiff's expert, Dr. Lubelczyk, testifies that in her opinion the refusal to dispense sufficient catheters to the Plaintiff was the likely cause of the Plaintiff's urinary tract infections. **Exh. H, Deposition of Dr. Lubelczyk, at 149:12 – 150:12.**

It is unnecessary to show permanent injury from the Defendants' deliberate indifference; A long delay in providing medical attention can give rise to a constitutional claim for deliberate indifference to serious medical needs even where treatment is ultimately dispensed and the problem healed. See *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (claim that dentist was deliberately indifferent to serious medical need of inmate for dentures was cognizable even though dental condition did not cause permanent injury to Plaintiff).


IV.   <u>Remaining claims</u>

The Plaintiff withdraws Count III against Steven Wellhausen, because although it was thought that evidence might be revealed through discovery which showed that Mr. Wellhausen had personal involvement in the Eighth Amendment violations against the Plaintiff, that no longer appears to be the case.

Count V is not frivolous, as the Defendants contend. The Plaintiff testified at his deposition that he was unable to get grievance forms in a timely fashion while he was in confinement in Dormitory N. **Exh. G, Deposition of Adam Betancourt at 94:24 – 94:25** ("Q. When were you not provided grievance forms, Mr. Betancourt? A. Never. **In the box it took a while to get them**, but we got them.") The Defendants have focused on his admission that he

was able to get grievance forms after some time and persistence as an admission that he never had issues getting grievance forms and that Count V is a fabrication. This is stretching the Plaintiff's words and ignoring other evidence. While the Plaintiff's answer is less than clear, he does explicitly testify that he was not able to get grievance forms while he was in "the box" in a timely fashion. This is corroborated by the Plaintiff's grievances: On September 23, 2012, the Plaintiff notes in an informal grievance that he filed grievances on regular paper because he tried to obtain the forms "to no avail." **Exh I, Informal Grievance 251-120923-02**. These grievances were logged but no response was given, other than to return the grievances because they were not submitted on an official form. **Exh.  J, and K, Informal Grievances 251-120904-01, and 251-120904-02.**

In a grievance filed nearly contemporaneously by the Plaintiff's cellmate Cedric Gray on a sheet of paper rather than the official form, the assistant warden treated the grievance as a legitimate grievance rather than return it for being on the wrong form. **Exh. L, Cedric Gray Informal Grivance 251-120912-08**.

Prisoners have a fundamental constitutional right of access to the courts. See *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir. 1998); *Bounds v. Smith*, 430 U.S. 817, 828 (1977). While the Eleventh Circuit has held that prisoners have no independent liberty interest in a voluntary grievance procedure itself, *Thomas v. Warner*, 237 Fed. Appx. 435 (11th Cir. 2007), the denial of access to the grievance procedure set forth by an institution threatens to rob inmates of access to the courts because the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e, requires inmates to exhaust all available administrative remedies as a prerequisite for access to the courts to challenge their conditions of confinement.

This combination incentivizes prison officials to play games with the inmate grievance procedure in order to prevent inmates from being able to effectively challenge the conditions of their confinement in the courts. Grievance forms are not made available as they are supposed to be, or are not returned (or "lost") so that inmates cannot attach a copy of their grievances and their responses for an appeal. By interfering with the inmate's access to the grievance procedure, prison officials can discourage inmates from filing lawsuits or, if they do file lawsuits, their inability to complete a grievance procedure that wasn't available gives the defending attorneys ammunition to claim that the plaintiff inmate did not exhaust administrative remedies.

This interference with the means by which an inmate must complete his prerequisites is just as disruptive to access to the courts as denial of access to law libraries, *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir. 1998); confiscation of legal paperwork, *Denney v. Nelson*, 304 F. Appx. 860 (11th Cir. 2009); and interference with legal mail, *Al-Amin v. Smith*, 511 F.3d 1317 (11th Cir. 2008). The Plaintiff's is not an isolated incident of interference with the grievance procedure at Columbia Annex. See, e.g., **Exh. M, Affidavit of Dennis McAninch at ¶ 3c** ("On numerous occasions, officers would not answer formal grievances at all, and when I filed a formal grievance, it was denied because the informal was not attached, even though they knew I did not have the informal grievance because of their failure to answer."); **Exh. N, Declaration of Donald Knuckles** (inmates grievance appeals were never responded to or receipt given); **Exh. O, Memorandum re: Misplaced Formal Grievances** (admission by Assistant Warden of Operations that 26 separate grievances were misplaced and not responded to).

The Defendants note that Columbia CI is "consistently in the top five institutions in the state for the highest number of formal grievances received per month" in order to claim that any claim that the grievance procedure at Columbia is broken is frivolous. The Defendants overlook

the just-as-obvious implication that Columbia CI is an especially troubled institution. The mere fact that many grievances are filed at Columbia does not disprove that staff at Columbia have interfered with the Plaintiff's access to the courts.

V.      Qualified immunity

First, the Plaintiff notes that the Defendants do not claim qualified immunity to the claims of deliberate indifference to the Plaintiff's serious medical needs for treatment for his swollen, painful feet. They have limited their claim in their motion to the issue of catheters, claiming that the Plaintiff cannot show that it was clearly established that prisons and their employees have a constitutional duty not to interfere with access to urinary catheters.

The obligation of the Defendants not to intentionally deny an inmate access to care for his serious medical needs was well established long before the Plaintiff's present term of incarceration. See *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The Eleventh Circuit has ruled that correctional healthcare providers had a duty to ensure that an inmate who required a urinary catheter received changes to that catheter. See *Roy v. Correctional Medical Services, Inc.*, 522 Fed. Appx. 597, 600 – 601 (11th Cir. 2013). A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding may constitute deliberate indifference. *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994).

Even if it is found that the Defendants are entitled to qualified immunity for the Eighth Amendment claim for deliberate indifference to the Plaintiff's serious medical need for catheters, the Plaintiff has stated a claim for ADA discrimination on account of his disability.

**CONCLUSION**

For the foregoing reasons, the Plaintiff respectfully requests that the court deny summary

judgment on all counts except Count III.

Respectfully submitted,

THE PLAINTIFF
By    /s/ Michael O'Brien Colgan
Michael O. Colgan, Esquire
Florida Bar No.:  27625
**Katzman Garfinkel, P.A.**
300 North Maitland Avenue
Maitland, FL 32751
Phone:  (407) 539-3900
Fax:  (407) 539-0211
mcolgan@likeyourlawyer.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 10th day of June, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

/s/ Michael O'Brien Colgan
Michael O. Colgan, Esquire
Florida Bar No.:  27625
**Katzman Garfinkel, P.A.**
300 North Maitland Avenue
Maitland, FL 32751
Phone:  (407) 539-3900
Fax:  (407) 539-0211
mcolgan@likeyourlawyer.com
Attorney for Plaintiff