Rebecca Lubelczyk, M.D.
March 17, 2014

COPY



Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF FLORIDA

3                   JACKSONVILLE DIVISION

4                   CASE NO.: 3:13-cv-00287-HES-JRK

5

6         ********************************

7    ADAM BETANCOURT,                    *

8                      Plaintiff    *

9    vs.                                 *

10   STATE OF FLORIDA, et al,            *

11                     Defendants   *

12        ********************************

13

14

15

16       DEPOSITION OF: REBECCA LUBELCZYK, M.D.

17           CATUOGNO COURT REPORTING

18        155 South Main Street, 2nd Floor

19        Providence, Rhode Island  02903

20       March 17, 2014              9:50 a.m.

21

22

23           Brenda M. Ginisi

24           Court Reporter

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

EXHIBIT "H"

Rebecca Lubelczyk, M.D.
March 17, 2014

```
 1   APPEARANCES:

 2   Representing the Plaintiff:

 3   (present by telephone)

 4         ASSISTANT ATTORNEY GENERAL

 5         The Capitol PL-01

 6         Tallahassee, Florida  32399

 7         BY:  LANCE E. NEFF, ESQ.

 8         (850) 414-3637    FAX: (850) 488-4872

 9         E-mail: lance.neff@myfloridalegal.com

10   Representing the Defendants:

11   (present by telephone)

12         KATZMAN GARFINKEL

13         300 N. Maitland Avenue

14         Maitland, Florida  32751

15         BY:  KAREN M. MARCELL, ESQ.

16         (407) 539-3900    FAX: (407) 539-0211

17         E-mail: kmarcell@likeyourlawyer.com

18

19

20

21

22

23

24
```

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1                           I N D E X

2

3    WITNESS:                    REBECCA LUBELCZYK, M.D.

4

5    EXAMINATION BY:                        PAGE:

6    Mr. Neff                                 4

7    Ms. Marcell                             168

8

9

10   EXHIBITS:                              PAGE:

11   Exhibit A, Clean Intermittent

12   Self-Catheterization Article.................127

13   Exhibit B, Care of Reusable Catheters.........127

14   Exhibit C, Review of Intermittent

15   Catheterization and Current Best Practices....127

16   Exhibit D, Clean Intermittent Catheterization:

17   Safe, Cost-Effective Bladder Management for

18   Male Residents of VA Nuring Homes.............127

19   Exhibit E, Medical Documents.................175

20

21

22

23

24

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Electronically signed by Brenda Ginisi (401-014-954-6554)            351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1          REBECCA LUBELCZYK, M.D., Deponent, having

2     first been satisfactorily identified and duly

3     sworn, deposes and states as follows:

4

5

6          EXAMINATION BY MR. NEFF:

7

8          Q.     Good morning, Doctor.

9          A.     Good morning.

10         Q.     Can you please state your name for

11    me?

12         A.     Yes.  It's Dr. Rebecca Lubelczyk.

13         Q.     Lubelczyk.  I just want to make sure

14    I didn't mispronounce that.  Have you been deposed

15    before?

16         A.     I have.

17         Q.     Do you understand that you must

18    answer truthfully?

19         A.     I do.

20         Q.     Do you understand that you must

21    answer completely?

22         A.     I do.

23         Q.     If you need a break, will you please

24    let me know?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 5

1          A.      I will.

2          Q.      Ma'am?

3          A.      I will.

4          Q.      Okay.  And what is your age?

5          A.      Forty-three.

6          Q.      And, as to your education, is your

7    resumé complete and correct as to this aspect?

8          A.      It is correct with the March date of

9    March 6, 2014.

10         Q.      Okay.  There's been a change to some

11   of it, I'm going to assume?

12         A.      You might have gotten a previous

13   one.

14         Q.      I'm sorry, I must have missed a

15   portion of that.  A previous one of what?

16         A.      Oh, I'm sorry.  What is the date of

17   your CV that you have?

18         Q.      It says October 20, 2013.

19         A.      Okay.  There's only been one change

20   in the current employment.  There was a new

21   position I took in January of this year.  That's

22   on an updated CV that I sent just recently.

23         Q.      Okay.  And what employment did you

24   take?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 6

1      A.      I am now, currently, the utilization

2  review adviser physician.

3      Q.      And where at?

4      A.      MPCH, Massachusetts partners in

5  correctional health care.

6      Q.      Is that with the Massachusetts

7  Department of Corrections, or is that with a

8  private company?

9      A.      It's still a private company that

10  the Department of Corrections of Massachusetts has

11  hired as their vendor for their health care.

12      Q.      Okay.  Do you have any felony

13  convictions?

14      A.      Repeat, please.

15      Q.      Do you have any convictions?

16      A.      No felony convictions.

17      Q.      Do you have any convictions for a

18  crime of dishonesty?

19      A.      No convictions.

20      Q.      Have you ever been disciplined by

21  any medical board?

22      A.      No.  I have not.

23      Q.      Is your information on the

24  Massachusetts Board of Medicine's Web site up to

Rebecca Lubelczyk, M.D.
March 17, 2014

1  date?

2       A.     Yes, it is.

3       Q.     How many years have you worked in a

4  correctional environment?

5       A.     Let's see, I started my correctional

6  employment in 2001, and prior to that I did work

7  at the Rhode Island Department of Corrections

8  during my residency training at Rhode Island

9  Hospital.

10      Q.     So other than Massachusetts and

11  Rhode Island, have you worked for any other

12  departments of corrections?

13      A.     No.  I have not.

14      Q.     Why did you choose the corrections

15  field?

16      A.     Repeat, please.

17      Q.     Why did you choose the corrections

18  field?

19      A.     I'm sorry, repeat one more time.

20      Q.     Why did you choose the field of

21  corrections, ma'am?

22      A.     Oh.  I chose the field of

23  corrections because I enjoyed working with the

24  inmate patient populations and felt that it was a

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

1    excellent environment to practice medicine the way

2    I wanted to practice medicine.  Essentially,

3    practicing medicine without worrying about

4    insurance companies, ICD9 codes.  I wanted to

5    practice medicine.  I didn't want to worry about

6    the business.

7         Q.     I can relate to that.  I understand.

8    Now, what are your duties at your current job?

9         A.     I work eight hours a week in a

10   prison providing clinical care to an incarcerated

11   population, and I work 24 hours a week doing

12   utilization review and supervising other

13   physicians within our Massachusetts Department of

14   Correction state system.

15        Q.     Okay.  What does utilization entail;

16   what does that mean?

17        A.     Utilization is when we, as

18   providers, request outside consultations of

19   specialists.  So for a cardiology appointment, a

20   dermatology appointment, surgeries, and I review

21   those consultations to make sure that they're

22   accurate and complete, and whether or not they're

23   medically appropriate.  And I also help with the

24   inpatient utilization management of our patients

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

1    in the hospital, and where they can be properly

2    treated.

3         Q.    Now, how many times have you been an

4    expert witness?

5         A.    I have been an expert witness on --

6    I'm going to guess about five cases, but not all

7    those included depositions.

8         Q.    Okay.  And how many times as a

9    plaintiff's expert?

10        A.    This is my first case as a

11   plaintiff's expert.

12        Q.    So all of those five cases and all

13   the depositions were as a defendant's expert?

14        A.    Defendant's expert up 'til now, yes.

15        Q.    Okay.  Was that for the

16   Massachusetts Department of Corrections as a

17   defendant?

18        A.    I've never served as an expert

19   witness for a Massachusetts case.

20        Q.    And who were you serving as an

21   expert for, then?

22        A.    It would be --

23              MS. MARCELL:  Object to form.

24              THE WITNESS:  Repeat, please.

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 10

1      Q.      (By Mr. Neff)   You can go ahead and

2   answer that, ma'am.   She's just putting a

3   objection on the record.

4      A.      Oh, okay.   Honestly, I can't

5   remember all the specific jurisdictions that I've

6   served as expert for.   I just can't do it for

7   Massachusetts.   I believe, personally, it's a

8   conflict of interest.

9      Q.      Okay.   But it was for other

10  departments of correction or -- do you know,

11  generally, who you were being an expert for?

12     A.      It may have been a department, it

13  might have been a jail.   There's been several

14  cases, but they've all been defendant cases for

15  some sort of correctional facility.

16     Q.      Was that in state or federal court?

17     A.      I honestly don't know.

18     Q.      So according to your answers so far,

19  is it safe to say that you've never previously

20  testified for the firm representing the plaintiff?

21     A.      Can you repeat the question one more

22  time?

23     Q.      Have you ever previously testified

24  for the firm representing the plaintiff in this

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 11

1  case?

2       A.      I don't believe I have.

3       Q.      I'm sorry, that was partly cut off.

4  Did you say no?

5       A.      I don't believe that I have, no.

6       Q.      Have you previously consulted the

7  firm representing the plaintiff in this case?

8              MS. MARCELL:  Object to form.

9       Q.      (By Mr. Neff)  Go ahead, ma'am.

10      A.      I do not believe so.  I think this

11  is the first time that they've retained me as an

12  expert.

13      Q.      Do you do consulting work for them?

14      A.      Can you ask me in a different

15  manner, just so I can be clear?

16      Q.      I'm talking about as any consulting

17  work.  Not necessarily as an expert for court, but

18  have you ever given them any consulting?

19      A.      For this firm right now?

20      Q.      Yes, ma'am.

21      A.      Oh.  No.

22      Q.      So when were you first approached by

23  the plaintiff's firm for this case?

24      A.      Is your question when?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 12

1      Q.      Yes, ma'am.   When?

2      A.      Okay.   When was this?   I believe it

3  was January of this year, but they may want to

4  correct me on that.

5      Q.      All right.   What are the key

6  principles that a person without educational or

7  experience in the medical field would need to

8  grasp in order to understand this case?

9              MS. MARCELL:   Object to form.

10     Q.      (By Mr. Neff)  Go ahead, ma'am.

11     A.      Could you ask me that one more time?

12     Q.      What are the key principles that a

13 person without education or experience in the

14 medical field would need to grasp in order to

15 understand this case?

16             MS. MARCELL:   Object to form.

17             THE WITNESS:   I'm going to have you

18         ask me one more time, just because I want

19         to make sure I've got all of the -- it's

20         kind of a long question.

21     Q.      (By Mr. Neff)  I understand.   And

22 just for the record, Ms. Marcell may make

23 objections, but that's just for the record.   You

24 are to answer the question, unless Ms. Marcell

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

```
 1    instructs you not to answer.  Okay, Doctor?

 2         A.      Okay.  Thank you.

 3         Q.      What are the key principles that a

 4    person without education or experience in the

 5    medical field would need to grasp in order to

 6    understand this case?

 7              MS. MARCELL:  Maintain the

 8         objection.

 9              THE WITNESS:  Okay.  I'm still

10         working through the question.  Okay, hold

11         on.  Okay.  I understand the question, but

12         I'm not quite sure exactly what you're

13         asking.  Can you rephrase?

14         Q.      (By Mr. Neff)  What would a

15    layperson need to know, someone without the

16    medical knowledge that you have, what would they

17    need to know about this case in order to

18    understand it?

19              MS. MARCELL:  Object to form.

20              THE WITNESS:  Okay.  I guess a

21         layperson would need to understand basic

22         human needs in regards to toileting, as

23         well as what is considered, I guess,

24         appropriate use of supplies and materials.
```

Rebecca Lubelczyk, M.D.
March 17, 2014

1    Q.      (By Mr. Neff)  Is there anything

2  else?

3    A.      We may find some more as we go

4  through.  But, like I said, I'm obviously having a

5  little bit difficulty trying to answer the

6  question.

7    Q.      Okay.  Well, let me ask you this

8  way, do you believe your testimony will aid the

9  jury in understanding the facts of this case?

10    A.      I believe it would.

11    Q.      In what way?

12           MS. MARCELL:  Just going to object

13       to form.

14           THE WITNESS:  In helping the jury

15       walk through an understanding of how a

16       person who can't toilet themselves

17       independently is relying on medical staff

18       and medical supplies to do it properly.

19    Q.      (By Mr. Neff)  And by "person," you

20  mean Mr. Betancourt, right?

21    A.      I believe Mr. Betancourt, yes.

22    Q.      Okay.  Did any part of the opinion

23  that you have given so far, either in your

24  affidavit or any other that you say today -- let

Rebecca Lubelczyk, M.D.
March 17, 2014

1    me rephrase that.  Has any of the part of the

2    opinion in your affidavit that you relied on fact

3    in the documents that you reviewed to make your

4    affidavit, did that require subjective

5    interpretation of data?  Let me just be specific.

6    Does any part of the opinion you gave require

7    subjective interpretation of data?

8              MS. MARCELL:  Object to form.

9              THE WITNESS:  There was one part

10        that could be construed as subjective.

11        Q.    (By Mr. Neff)  What part is that,

12   ma'am?

13        A.     In my affidavit I mention that two

14   antibiotics had to be used for a urinary tract

15   infection that Mr. Betancourt had.  The subjective

16   part could be that the two antibiotics were used

17   because there could be resistant bacteria.

18             In the documentation I was given, I

19   did not see a culture that showed a resistant

20   bacteria, but that was something that one could

21   certainly suppose because two antibiotics were

22   required.

23        Q.     Is there any other portion of your

24   affidavit that requires a subjective

Rebecca Lubelczyk, M.D.
March 17, 2014

1    interpretation of data?

2          A.      Not to my knowledge at this time

3    now.

4          Q.      **And at this point that you did say**

5    **required subjective interpretation of data, do you**

6    **believe another professional might interpret the**

7    **same data differently?**

8          A.      I'm sure somebody could.

9          Q.      **Were the opinions you provided in**

10   **your March 7, 2014 affidavit based on a reasonable**

11   **degree of medical certainty?**

12         A.      Yes.

13         Q.      **And were your opinions based solely**

14   **on the documents you stated you reviewed in**

15   **paragraph four of your affidavit?**

16         A.      Yes.  They're based solely on the

17   documents that were supplied to me.

18         Q.      **Which were what?**

19         A.      The medical record of

20   Mr. Betancourt.

21         Q.      **Okay.  Anything else?**

22         A.      I was also given previous

23   depositions on a similar case that this -- I

24   believe this facility has also been involved with.

Rebecca Lubelczyk, M.D.
March 17, 2014

1       Q.      And what is that -- I'm going to

2    read -- do you have your affidavit in front of

3    you, Doctor?  It should have been sent over to you

4    by my office.

5       A.      No.  I should have a copy of it

6    right here.  Hold on.

7       Q.      Okay.  Take a look at paragraph four

8    on the first page.

9       A.      Paragraph four on the first page.

10   Where is it?  Paragraph four.

11      Q.      What does paragraph four state?

12      A.      "I have reviewed the following

13   material specific to this case, lawsuit filed,

14   inmate request and grievances from

15   Adam Betancourt, as well as what has been

16   presented as the complete medical chart provided

17   by the Florida Department of Corrections."  Yes.

18      Q.      Is that statement complete?

19      A.      I guess I'd have to include that I

20   was also given segments of a deposition to review

21   by --

22      Q.      Deposition of who, ma'am?

23      A.      -- by Marcell's office.  Hold on.

24   Let me see.  It was Romano, a Romano case.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1        Q.        Do you have that with you?

2        A.        I do.

3        Q.        Was that a yes?

4        A.        Yes.

5        Q.        Okay.  What other documents do you

6    have with you today?

7        A.        I have my affidavit; I have my CV;

8    and I have that document that I mentioned --

9                  MS. MARCELL:  Hey, Lance, just so

10                 you know, it was not a subpoena duces tecum

11                 for this depo.

12                 MR. NEFF:  Okay.

13       Q.        (By Mr. Neff)  And, Doctor, what

14   other documents do you have?

15       A.        And I have the medical record that's

16   been provided to me on Mr. Betancourt.

17       Q.        Okay.  Anything else?

18       A.        That would be it.

19       Q.        Anything else, Doctor?

20       A.        Oh, I'm sorry, that would be it.

21       Q.        Okay.  That number four of your

22   affidavit, is that complete, once you add in there

23   some deposition by Mr. Romano?

24       A.        Yes.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 19

1    Q.    Is there any other document that you

2   base your opinion on?

3    A.    Nope.

4    Q.    That is the ones that we just went

5   over?

6    A.    The ones we just went over.

7    Q.    So that's the complete checklist of

8   all the documents that you relied on to make your

9   opinion?

10    A.    Yes, I believe it is.

11    Q.    Okay.  Now, are you familiar with

12   Mr. Betancourt's Florida Department of Corrections

13   medical records?

14    A.    I am familiar with his medical

15   records, yes.

16    Q.    From what time period?

17    A.    I have reviewed the medical records

18   from his current incarceration starting

19   August 23, 2010 to records that were presented to

20   me, it looks like they were up to March, maybe.  I

21   think it was March -- no, July -- no -- yeah,

22   March of 2013, I think is where the records ended.

23    Q.    Okay.  So none from his prior

24   incarceration with the FDOC?  And by FDOC, I mean

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 20

1    Florida Department of Corrections.

2            A.      I do have some records from, it

3    looks like 2004 to 2005 of a prior incarceration.

4    I don't know how complete those were.

5            Q.      Okay.  Any from his outside doctors?

6            A.      Let me look.  There was some

7    information from the outside hospital treating him

8    for a GI bleed at the beginning of this

9    incarceration, the 2010 incarceration, and some

10   from, I believe, his urology procedure that

11   occurred in the beginning of 2013.  Those were the

12   outside hospital.

13           Q.      Nothing else?

14           A.      Not that I can remember right at

15   this minute.

16           Q.      Okay.  Any from his time in county

17   jail, any medical records from a county jail?

18           A.      Any records from the county jail.

19   I'm trying to remember if I saw anything from the

20   county jail, and I don't believe I have.  I think

21   everything that I've reviewed, so far, came from

22   the -- from this current facility.  And, also,

23   there was a previous facility he was at.  There

24   was -- I think this one's the Columbia Annex.

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      Okay.

2      A.      But he was at intake at the Central

3   Florida Reception Center, and there were those

4   documents that I reviewed, also, as part of his

5   2005 incarceration, and also his 2010

6   incarceration.

7      Q.      Mm-hmm.  Do you feel like you have a

8   complete picture of his medical treatment?

9      A.      I think I have a -- a good, general

10  idea of his medical treatment.  I'm not quite --

11  I'm not quite sure if I've got the full

12  documentation from the medical perspective.

13     Q.      Would your opinions be different, if

14  you had more and different information?

15             MS. MARCELL:  Object to form.

16             THE WITNESS:  I don't believe so at

17      this time.

18     Q.      (By Mr. Neff)  Okay.  As to the --

19  nevermind.  How many inmates are in the custody of

20  the Massachusetts Department of Corrections?

21     A.      I believe we have about 10,000

22  inmates right now in this --

23     Q.      How many prisons does the

24  Massachusetts Department of Corrections have?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 22

1      A.      We have about 13 facilities.

2      Q.      **Okay.  How many major, medical**

3 **facilities?**

4      A.      When you say major medical facility,

5 what are you asking about?

6      Q.      **Does your DOC differentiate between**

7 **major medical facilities and just less major ones,**

8 **I guess?**

9      A.      We have different levels of health

10 care resources regarding staff time and coverage

11 at different facilities throughout the state.  So

12 we have four facilities that are -- have a

13 physician or a nurse practitioner, advanced

14 practitioner that goes to that facility seven days

15 a week including holidays.  We have four of those

16 in our state, but none of our facilities can be

17 listed as a hospital.  We are not hospital level.

18      Q.      **So you possess no institution that**

19 **is primarily focused on medical care?**

20      A.      Correct.  We have no state facility

21 that's primarily focused on medical care, unless

22 you count the locked ward at our indigent hospital

23 in Massachusetts that takes care of most of our

24 incarcerated populations.  And it is staffed by

Rebecca Lubelczyk, M.D.
March 17, 2014

1    Massachusetts DOC, but not staffed by the vendor,

2    MPCH.

3          Q.      Okay.  All right.  Do you know what

4    the overall budget is for Massachusetts DOC?

5          A.      I honestly don't.

6          Q.      Do you know how many medical

7    personnel per institution the MDOC has?

8          A.      Repeat one more time.  Can you

9    please repeat the question one more time?

10         Q.      Do you know how many medical

11   personnel per institution the Massachusetts DOC

12   has?

13         A.      That greatly varies depending on the

14   type of institution, the security level, and the

15   level of resources for that institution.

16         Q.      Does the average institution have,

17   in the Massachusetts DOC, have medical staff on

18   duty 24 hours a day, seven days a week?

19         A.      I'm not sure if it's the majority.

20   We do have several facilities that have some sort

21   of medical staff, including nursing 24 hours a

22   day, seven days a week, but I don't know if it's

23   the majority.

24         Q.      Okay.  Does the Massachusetts

Electronically signed by Brenda Ginisi (401-014-954-6554)                                      351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 24

1    Department of Corrections abide by the best

2    practices of providing medical care to its

3    inmates?

4         A.    Yes, they do.  Yes, they do.

5         Q.    **Are they required to abide by the**

6    **best practices?**

7              MS. MARCELL:  Object to form.

8              THE WITNESS:  Yes, they are.

9         Q.    **(By Mr. Neff)  Pardon me?**

10        A.    I believe they are.

11        Q.    **Are prisons required to abide by the**

12   **latest practices?**

13             MS. MARCELL:  Object to form.

14             THE WITNESS:  We have several

15         guidelines in the Massachusetts department.

16        Q.    **(By Mr. Neff)  We have what**

17   **guidelines?**

18        A.    We have several guidelines that we

19   refer to, to determine what our best practice is

20   and what our care is.

21        Q.    **And does a sufficient level of care**

22   **require best practices?**

23             MS. MARCELL:  Object to form.

24             THE WITNESS:  Repeat question one

Electronically signed by Brenda Ginisi (401-014-954-6554)                                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    more time.

2         Q.    (By Mr. Neff)   Does a sufficient

3    level of care require best practices?

4              MS. MARCELL:   Same objection.

5              THE WITNESS:   I think that a

6         sufficient level of care should be able to

7         provide what's considered best practices.

8         Q.    (By Mr. Neff)   And by "best

9    practices," what do you mean, ma'am?

10        A.    Best practices, in my opinion, would

11   be what's medically necessary for the patient, an

12   understanding from literature, or from guidelines

13   as to what's appropriate for the care of the

14   patient.

15        Q.    And what are those guidelines?

16        A.    We use several different guidelines

17   to create our own best practices, including

18   guidelines by the National Commission on

19   Correctional Health Care.  We often look at the

20   U.S. Department Federal's guidelines for the --

21   for their -- what they do.  We also refer to

22   national societies for their guidelines, and we

23   also make up, kind of, our own internal

24   guidelines, as many guidelines out there do not

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    specifically address unique issues within

2    corrections.

3         Q.      And you said the "U.S. Department."

4    What department?  Are you talking about bureau of

5    prisons?

6         A.      I'm sorry, Federal Bureau of

7    Prisons, yes.

8         Q.      And how many inmates are in the

9    custody of the Florida Department of Corrections?

10        A.      That, I'm not aware.

11        Q.      How many prisons does the Florida

12   Department of Corrections have?

13        A.      That, I'm not aware.

14        Q.      How many major, medical facilities

15   does the Florida Department of Corrections have?

16        A.      That, I am not aware.

17        Q.      What is the budget for the Florida

18   Department of Corrections?

19        A.      That, I'm not aware of.

20        Q.      How many medical personnel per

21   institution does the Florida Department of

22   Corrections have?

23        A.      That, I'm not aware of.

24        Q.      What ways may a Florida Department

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 27

1    of Correction's inmate access medical care?

2                    MS. MARCELL:  I'm sorry, I didn't

3          hear that question.

4          Q.      (By Mr. Neff)  In what ways may a

5    Florida Department of Correction's inmate access

6    medical care?

7          A.      Reading through the medical

8    documentation provided to me, I have an idea of

9    how a inmate patient may access medical care, but

10   I can't say it's complete.

11         Q.      And what are your ideas as to that?

12         A.      Can you repeat one more time?

13         Q.      What are your ideas as to that?

14         A.      It seems that, in order to access

15   medical care, one can put themselves on a sick

16   call list in order to be seen by the medical

17   staff.  It also seems that one can write a -- on a

18   particular form that's designed to request medical

19   or other departments within corrections on that

20   form, and then there is a grievance process, I

21   believe.

22         Q.      Do you know of any other ways?

23         A.      I would say that someone could alert

24   their officer, and the officer could access care

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 28

1    for the inmate patient, if they were unable to do

2    any of those.  But I can't say that I've seen

3    direct information in the medical record provided

4    to me about that.

5           Q.       So is this a guess, from your

6    experience in correction field?

7                  MS. MARCELL:  Object to form.

8                  THE WITNESS:  Yes.  One would hope

9           that if someone was having an emergency,

10          that the officer would be notified and the

11          officer could make the decision of -- of

12          the patient coming down to medical.

13          Q.       (By Mr. Neff)  How does an inmate in

14   the Florida Department of Corrections custody get

15   medical supplies?

16          A.       Looking at the documentation

17   provided to me, it appears that they come down to

18   a medication line or a supply line that's

19   predesignated to pick up supplies.

20          Q.       Do you know of any other way they're

21   able to get supplies?

22          A.       Not from the documentation I was

23   provided.

24          Q.       Does the Florida Department of

Electronically signed by Brenda Ginisi (401-014-954-6554)                     351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1   Corrections medical have medical staff on duty 24

2   hours a day, seven days a week?

3           A.      Are you asking in general; are you

4   asking for this particular facility where

5   Mr. Betancourt's at?

6           Q.      We'll start offer in general.  Do

7   you know if that's a true statement, or do you

8   know if that's true in general?

9           A.      I would imagine that they would, but

10  that would be, actually, supposition, because I

11  don't have that documentation.

12          Q.      What about Columbia Annex, do they

13  have medical staff working 24 hours a day, seven

14  days a week?

15          A.      I would have to look specifically

16  through the documentation about times and dates to

17  make sure they did, but I have no documentation

18  that specifically addresses that.

19          Q.      Well, ma'am, I would like you to

20  look at paragraph Q of your statement -- of your

21  affidavit, I'm sorry.

22          A.      Okay.

23          Q.      Are you looking at it?

24                  MS. MARCELL:  Lance, just a

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    clarification, are you at paragraph two or

2    paragraph B?

3              MR. NEFF:  Q.

4              MS. MARCELL:  Okay.  Q, I'm sorry.

5              THE WITNESS:  All right.  The

6    affidavit at paragraph two that starts that

7    "I am presently the"?

8        Q.    (By Mr. Neff)  No, ma'am.  Q as in

9    queen, Quebec?

10       A.    Oh, Q.  Sorry, I misheard.  All

11   right, Q, "As a prison physician," yes.

12       Q.    "I know that access to medical

13   supplies is not available to an inmate 24 hours a

14   day, seven days a week."  How do you know that, as

15   for the Florida Department of Corrections, that is

16   correct?

17       A.    I know that's correct because I do

18   not know if they have staff 24 hours, seven days a

19   week to comply with that statement.  And, also, if

20   they did, that a inmate patient is not allowed to

21   come down anytime during the day, early morning,

22   evening just to get medical supplies.

23       Q.    Can supplies be brought to an inmate

24   in the Florida Department of Corrections?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 31

```
1         A.     That, I do not know.
2         Q.     You don't know.  You don't know if Q
3    was a true statement, do you?
4         A.     I do not -- I know that an inmate
5    patient cannot request, at anytime, to come down
6    for medical supplies.  It has designated -- they
7    have designated times to get supplies.
8         Q.     Ma'am, that's not what I'm asking.
9         A.     Oh, sorry.
10        Q.     At Columbia Annex, may an inmate
11   request medical supplies from medical and they be
12   brought to them any time of the day, 24 hours a
13   day, seven days a week?
14             MS. MARCELL:  Object to form.
15             THE WITNESS:  I am not aware that
16        they can.
17        Q.     (By Mr. Neff)  Are you aware that
18   they cannot?
19        A.     It does not appear that they can,
20   no.
21        Q.     What do you base that on?  You say
22   "It does not appear they can."  How do you know
23   that?
24             MS. MARCELL:  Object to form.
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 32

1           THE WITNESS:  Because of the
2       documentation that's --
3           Q.    (By Mr. Neff)  Doctor, how do you
4   know that?
5           A.    Because of the documentation that I
6   reviewed that's presented to me.
7           Q.    What documentation?
8           A.    The grievances that I've read, the
9   response to the grievances that I've read.
10          Q.    And what specific grievance you're
11  talking about?
12          A.    When there was a -- there was a
13  documentation from one of the nurses saying that
14  they can't have catheters whenever they want.
15          Q.    That doesn't necessarily mean they
16  can't have them when they need them, does it?
17          MS. MARCELL:  Object to form.
18          Q.    (By Mr. Neff)  Does it, Doctor?
19          MS. MARCELL:  Object to form.
20          THE WITNESS:  Hold on one second.
21      It does not appear that he can -- the
22      patient can come down and get the required
23      supplies.
24          Q.    (By Mr. Neff)  That's not the

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 33

1    question, Doctor.   The question is, can supplies

2    be --

3              MS. MARCELL:  Can you let her finish

4         her answer?  She was still continuing.

5         Q.    (By Mr. Neff)  Doctor, that was not

6    the question.  The question was, were they able to

7    acquire supplies, either would get them or be

8    brought to them from medical?  Do you know whether

9    or not they're able to have supplies brought to

10   them whenever they need them?

11             MS. MARCELL:  Object to the form.

12             MR. NEFF:  On what basis,

13        Ms. Marcell?

14             MS. MARCELL:  First of all, it's

15        been asked and answered.  Secondly, it's

16        ambiguous.  Are you talking about when

17        they're in open bay?  Are you talking about

18        when they're in confinement?  Are you

19        talking about all times?  It's ambiguous

20        and it's argumentative, and it's been asked

21        and answered.

22             MR. NEFF:  She hasn't answered it

23        yet, Ms. Marcell.

24        Q.    (By Mr. Neff)  Doctor, do you know,

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 34

1    if any inmate needs medical supplies, may they be

2    brought to them from medical by medical staff; do

3    you know that, yes or no?

4              MS. MARCELL:  Object to form.

5              THE WITNESS:  Can you repeat the

6         question one more time?  I'm sorry.

7         Q.    (By Mr. Neff)  If an inmate needs

8    medical supplies at any time of the day, will

9    medical bring those supplies to them within the

10   Florida Department of Corrections, specifically at

11   Columbia Annex, do you know if they will or if

12   they will not?

13             MS. MARCELL:  Object to form.

14             THE WITNESS:  So just to make sure,

15        will medical bring medical supplies anytime

16        of the day to a patient at the

17        Columbia Annex?

18        Q.    (By Mr. Neff)  Yes, ma'am.

19        A.    Okay.  Are you speaking in general

20   population, or if they have a medical ward?

21        Q.    Will they do it at all; do you know,

22   yes or no, Doctor?

23             MS. MARCELL:  Object to form.

24             THE WITNESS:  I am not aware that

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 35

1          they will bring medical supplies to an

2          inmate patient.

3               Q.     (By Mr. Neff)   Are you aware that

4     they will not?

5                    MS. MARCELL:   Object to form.

6                    THE WITNESS:   Am I aware that they

7          will not bring medical supplies?

8               Q.     (By Mr. Neff)   Yes.   Are you aware

9     that they will not bring medical supplies to an

10    inmate?

11              A.     I am not aware of what their stated

12    policies are regarding that particular

13    circumstance, but I have not seen that happen with

14    the records that I have been given to review.

15              Q.     In other words, you do not know,

16    correct?

17              A.     I have not seen it happen in the

18    records that I were given to review.

19              Q.     So you do not know, correct?

20              A.     I do not know that -- what their

21    policy is.

22              Q.     You don't know what their policy is?

23              A.     I do not know what that -- the

24    policy at the Columbia Annex is regarding bringing

Electronically signed by Brenda Ginisi (401-014-954-6554)                351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 36

1   supplies to a inmate patient.  I have not seen it

2   in the records I have seen.  But I do not know

3   what their policy is.  I have not read their

4   policy.

5         Q.      And if they were bringing supplies

6   to an inmate as he needed them at anytime of the

7   day, would that change any of your opinions?

8         A.      I'm sorry.  Repeat, please, one more

9   time.

10        Q.      If it is true at the Columbia Annex

11  that the medical personnel bring to inmates

12  whatever supplies they need at anytime of the day,

13  would that change any of your opinions?

14        A.      If I had documentation in front of

15  me that showed that they were bringing medical

16  supplies to the inmate anytime of the day, that

17  would change my opinion.

18        Q.      In what way would it change your

19  opinion?

20        A.      If I saw documentation that the

21  patient was being brought medical supplies anytime

22  of the day, then I would consider that the patient

23  was getting supplies, possibly, when they needed

24  them.

Rebecca Lubelczyk, M.D.
March 17, 2014

1       Q.     Do you know how many Florida

2  Department of Corrections inmates require the use

3  of catheters?

4       A.     I do not.

5       Q.     Who drafted your affidavit?

6       A.     Ms. Marcell helped me with my

7  affidavit.

8       Q.     Ms. Marcell assisted you?

9       A.     Yes.

10      Q.     Did she do the first draft and you

11  approved it, or did you do the first draft?

12      A.     She did the first draft, I revised

13  it and then approved it.

14      Q.     She did the first draft?  I'm sorry,

15  you broke up there.

16      A.     She wrote the first draft, I revised

17  it, and then I approved it.

18      Q.     Were you asked to include any

19  information in your affidavit?

20      A.     Please repeat.  Can you please

21  repeat the question?  I'm sorry.

22      Q.     Were you asked to include any

23  information in your affidavit?

24           MS. MARCELL:  Object to form.

Electronically signed by Brenda Ginisi (401-014-954-6554)

351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 38

1              THE WITNESS:  You mean, asked to

2        include information in my affidavit, in

3        addition to what was drafted for me?

4        Q.     (By Mr. Neff)  Yes, ma'am.

5        A.     No --

6        Q.     Other than the first draft that you

7   got from Ms. Marcell, were you asked to include

8   any information in your affidavit?

9        A.     No.

10       Q.     Were you asked to exclude any

11  information in your affidavit?

12       A.     No.

13       Q.     Were you asked to include any

14  opinion in your affidavit?

15             MS. MARCELL:  I'm sorry, can you

16        repeat the question?  I did not hear you.

17       Q.     (By Mr. Neff)  Were you asked to

18  include any opinion in your affidavit?

19       A.     Sorry, I'm just looking.  Yes.  I

20  was asked to include an opinion about -- about

21  whether or not the level of care was -- was

22  reasonable.

23       Q.     And what paragraph are you referring

24  to, ma'am?

Rebecca Lubelczyk, M.D.
March 17, 2014

1      A.      I am looking at --

2      Q.      **What paragraph are you referring to?**

3      A.      Sorry, I just lost it.  Hold on.

4  Hold on.  Oh, okay, sorry.  I'm looking at number

5  -- paragraph 5B, and there was also opinion on

6  paragraph M regarding the antibiotic resistant

7  bacteria.

8      Q.      **And you were specifically asked to**

9  **include both of those opinions?**

10     A.      I'm sorry, can you ask one more

11 time?

12     Q.      **Were you specifically asked to**

13 **include both of those opinions?**

14     A.      I included paragraph M.

15     Q.      **You included M?**

16     A.      I included M, the resistent

17 bacteria.  Yes, I included M.

18     Q.      **The question was, Doctor -- and I**

19 **apologize for interrupting.  The question was, was**

20 **there any opinions that you were asked to include?**

21     A.      Oh, you're right.  I'm sorry.  I'm

22 just reviewing one more time.  I'm sorry.

23     Q.      **Sure, no problem.**

24     A.      I misunderstood, I'm sorry.  All

Electronically signed by Brenda Ginisi (401-014-954-6554)                              351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    right.  It was actually paragraph five, letter R.

2    I was requested to include an opinion about the

3    deliberate indifference that no change was made,

4    despite the knowledge of the catheters, and that

5    he continued to experience adverse events to his

6    health, those being the urinary tract infections.

7    That was a clarification.  I'm sorry.

8          **Q.      Were you asked to exclude any**

9    **opinion that you gave?**

10         A.    No.  I was not asked to exclude.

11         **Q.    Okay.  Now paragraph X, x-ray, of**

12   **your report speaks to documents for Romano; is**

13   **that correct?**

14         A.    I'm sorry, can you repeat that --

15   there's a little muffle here so it's sometimes

16   hard to hear.

17         **Q.    Paragraph X you talked about a**

18   **Romano, correct?**

19         A.    X, yes.

20         **Q.    Okay.  Who was this Mr. Romano?**

21         A.    Repeat one more time?

22         MS. MARCELL:  I'm sorry, you guys

23         blanked out.  I don't know if there was a

24         question or an answer.

Rebecca Lubelczyk, M.D.
March 17, 2014

1          THE WITNESS:  I'm sorry.  Can you

2    repeat the Romano question one more time?

3          Q.    (By Mr. Neff)  I said, who is this

4    Mr. Romano?

5          A.    Oh, Mr. Romano was the other

6    deposition.  I believe he's a plaintiff in another

7    deposition that I was provided.

8          Q.    And what's his first name?

9          A.    I'm looking it up.  Sorry, my

10   computer --

11         Q.    Are you having to look that up,

12   ma'am?

13         A.    Yep, it's Tony.  T-O-N-Y.  Tony

14   Romano.

15         Q.    Did you have to look that up?

16         A.    I'm looking at the document, yes.

17         Q.    Okay.  And where is he incarcerated

18   at?

19         A.    I don't have where he's incarcerated

20   at all.  The only information that I have is the

21   deposition that has the Tony Romano versus.

22         Q.    Okay.  And during what time frame

23   was he incarcerated?

24         A.    I don't have that information.  It

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 42

1   was not the whole deposition I was provided.

2          Q.      And how do you know about him; is it

3   through the deposition given to you?

4          A.      It was a portion of the deposition

5   provided by Ms. Marcell's office.

6          Q.      Okay.  And what else were you told

7   about him, anything?

8          A.      I was given the deposition -- the

9   portion of the deposition to review as that it

10  pertained to similar instances regarding what

11  Mr. Betancourt had dealt with.  That was all I was

12  told.

13         Q.      * Ma'am, when we talked about the

14  FDOC earlier, you didn't know how many

15  institutions there were, you didn't know how many

16  inmates there were, you didn't know very much, at

17  all, about the Florida Department of Corrections.

18              So my question for you, without

19  knowing more information about the Florida

20  Department of Corrections, particularly how many

21  inmates use catheters, how can you say there's a

22  systemic problem within the Florida Department of

23  Corrections?

24              MS. MARCELL:  Object to form.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 43

1    Q.      (By Mr. Neff)  Doctor?

2    A.      Yes.  I'm phrasing my answer.

3            MS. MARCELL:  Actually, can you

4    repeat that question, Madam Court Reporter,

5    please?

6

7            *  (Question read)

8

9            MS. MARCELL:  Okay.  And then I'm

10   going to object to form as a

11   mischaracterization of her statement.

12           THE WITNESS:  Shall I answer?

13   Q.      (By Mr. Neff)  Yes, ma'am.

14           MS. MARCELL:  Yes.

15           THE WITNESS:  Okay.  Portions of the

16   deposition include a time period.  I do not

17   know his full incarceration date.  I was

18   not provided with that for Mr. Romano.  But

19   the time period for Mr. Romano that the

20   questioning is centering on is 2008, and

21   this is prior to where Mr. Betancourt

22   incarceration in question is, which is

23   2010.  And having two cases, looking at

24   this kind of sequentially, it does call to

Electronically signed by Brenda Ginisi (401-014-954-6554)                351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 44

1           my mind if there is a -- that there is a
2           problem, and that this problem's not being
3           addressed, since they're sequential cases
4           regarding the same problem.
5           **Q.     (By Mr. Neff)  And how many inmates**
6      **does the FDOC have, ma'am?**
7                   MS. MARCELL:  Objection.
8                   THE WITNESS:  I believe I've
9           answered that question, have I not?
10          **Q.     (By Mr. Neff)  You don't know, do**
11     **you?**
12          A.     No.  I do not.
13                  MS. MARCELL:  Object to form.
14          **Q.     (By Mr. Neff)  Do you know --**
15                  MS. MARCELL:  You know what, you're
16          coming across very belligerent and
17          argumentative.  Please just be respectful
18          and ask the witness questions.
19                  MR. NEFF:  I'm being very
20          respectful.  I would thank you not to add
21          any commentary in the record.  I would
22          appreciate that very much.
23                  MS. MARCELL:  Just --
24          **Q.     (By Mr. Neff)  Doctor -- Doctor --**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 45

1          MR. NEFF:  Ms. Marcell, please, let
2      me ask my questions.
3          Q.     (By Mr. Neff)  Doctor, do you know
4      that the Florida Department of Corrections is the
5      third largest correctional institution in the
6      United States?
7          A.     That doesn't surprise me.
8          Q.     Would it surprise you that that had
9      a hundred thousand inmates at any given time?
10         A.     No.
11         Q.     Pardon me?
12         A.     I guess not, no.
13         Q.     So over a five- to six-year period,
14     if there's two cases, you'd classify that as
15     systemic?
16             MS. MARCELL:  Object to form.
17             THE WITNESS:  I think it just could
18         be a potential indicator of a problem,
19         because only a certain amount of cases
20         would rise to the level where I would be
21         involved in to review those depositions or
22         those cases.
23         Q.     (By Mr. Neff)  But, ma'am, the
24     question was, if, over a six-year period, whether

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 46

1    it's a hundred thousand inmates at any given time,

2    in your world, in your opinion, is two cases

3    systemic?

4         A.      I think it's significant?

5         Q.      Is it systemic?

6                 MS. MARCELL:   Object to form.

7                 THE WITNESS:   I think it could be an

8         indicator of a systemic problem, yes.

9         Q.      (By Mr. Neff)   Two cases is a

10   systemic problem?

11        A.      It could be considered one.

12        Q.      Are there any differences in

13   providing medical care in a prison environment as

14   opposed to a nonprison environment?

15        A.      Can you repeat one more time?   I'm

16   sorry.

17        Q.      Are there any differences of

18   providing medical care in a prison environment as

19   opposed to nonprison environment?

20        A.      Yes.   There are differences.

21        Q.      What are those differences?

22        A.      There's several differences that

23   come to mind, but one thing I can think of is the

24   fact that you have to deal with the different

Rebecca Lubelczyk, M.D.
March 17, 2014

1  security levels, or a security level, and be

2  cognizant of that where you work and what you can

3  and cannot provide, based on the patient's

4  security.

5      Q.    Is there any difference in the

6  patients themselves?

7      A.    I'm considering the question, please

8  wait.  From what I've seen in my practice, the

9  prison population inmates are not altogether that

10  different from the patients that I would see in my

11  urban medical clinics.

12      Q.    Okay.  And forgive me, I just want

13  to back up for a second.

14      A.    Yep.

15      Q.    I'm looking up the definition here

16  of systemic.  And it says on the Merriam Webster

17  dot com dictionary, "of or relating to common to a

18  system."  Is that a fair definition of systemic?

19          MS. MARCELL:  Object to form.

20      Q.    (By Mr. Neff)  And, again, that was

21  "of, relating to, or common to a system."  Is that

22  a fair definition of systemic?

23      A.    That would be.

24      Q.    So we're talking about the same word

Rebecca Lubelczyk, M.D.
March 17, 2014

1    here, when you say two cases out of a hundred

2    thousand inmates at any given time over a six-year

3    period is systemic?

4                    MS. MARCELL:  Object to form.

5                    THE WITNESS:  Well, no.  You

6            couldn't go for two inmate patients for a

7            hundred thousand.  You'd have to look at

8            the amount of patients that require the

9            same level of medical supplies to those two

10           cases.  If those would be --

11       Q.     Did you look at that?

12       A.     I'm sorry, can you repeat that?

13       Q.     Did you look at that?

14       A.     No.  I did not.

15       Q.     And under your own definition,

16   Doctor, you can't really say it's systemic, can

17   you?

18                   MS. MARCELL:  Object to form.

19                   THE WITNESS:  I didn't -- hold on

20          one second.  I was commenting that it may

21          be a systemic problem, not that it was

22          systemic problem.  That it may be systemic

23          problem, based on the information that I

24          had.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      (By Mr. Neff)  Well, it is
2    speculation, then, correct?
3          A.      I believe may be a systemic problem
4    could be considered speculation.
5          Q.      It had no basis in anything that you
6    looked at, in any of the records that you looked
7    at, right, it was a speculatory comment?
8                MS. MARCELL:  Object to form.
9                THE WITNESS:  I was concerned seeing
10              two cases with similar patterns of problems
11              in a fairly close time pattern that there
12              may be a problem.  That was all that I
13              meant.
14          Q.      (By Mr. Neff)  So you really have no
15    basis of saying that based on fact, right?
16                MS. MARCELL:  Object to form.
17                THE WITNESS:  Just the facts that
18              were presented to me in the information
19              I've given you.
20          Q.      (By Mr. Neff)  Would two cases put
21    someone on notice that it is a systemic problem,
22    in the Florida Department of Corrections with a
23    hundred thousand inmates?
24                MS. MARCELL:  Object to form.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 50

1        THE WITNESS:  I don't know what the
2     Florida Department of Corrections considers
3     a systemic problem.  I said it may be.
4        Q.    (By Mr. Neff)  In your experience as
5  a prison doctor -- and you said you've done this
6  since 2001, correct, so you have approximately 12
7  years in the prison environment as a doctor?
8        MS. MARCELL:  2001 to 2014?
9        THE WITNESS:  Yes.  2001 to the
10     present time, yes.
11        Q.    (By Mr. Neff)  Okay.  And all that
12  time was in the correctional environment, that's
13  my understanding, correct, from your resumé?
14        A.    Yes.
15        Q.    In your experience as a prison
16  doctor, do inmates always file truthful
17  grievances?
18        MS. MARCELL:  Object to form.
19        THE WITNESS:  No.  I don't believe
20     that they always do, but I don't have any
21     specific examples where they haven't.
22        Q.    (By Mr. Neff)  Do all prisoners
23  cooperate in their treatment?
24        MS. MARCELL:  Object to form.

Rebecca Lubelczyk, M.D.
March 17, 2014

1          THE WITNESS:  No.  I can't say that

2      all patient inmates cooperate.

3          Q.    (By Mr. Neff)  Have you ever had a

4      prisoner not follow your recommended treatment?

5          A.    I have.

6          Q.    Pardon me?

7          A.    I have, yes.  I have.

8          Q.    Have you ever known a prisoner to

9      seek medical treatment in order to pursue

10     secondary gain?

11         MS. MARCELL:  Object to form.

12         THE WITNESS:  I believe that has

13     happened, yes.

14         Q.    (By Mr. Neff)  How many times have

15     you known it to happen?

16         A.    I'd be speculating.

17         Q.    Well, please do.  Doctor?

18         A.    I'm trying to quantify.  I would

19     say, on average, probably an encounter like that,

20     that I personally have experienced, probably, two

21     to three times a month.

22         Q.    I'm sorry, you broke up.  I didn't

23     hear the answer.

24         A.    I think I could average it,

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 52

1    possibly, two to three times a month seeing

2    patients in clinic at the prison.

3         Q.      That's two to three seeking

4    secondary gain?

5         A.      Yeah.  That's -- again, I'm

6    speculating.  It happens.  It's not every patient,

7    it's not a rare occurrence, but it's not every

8    encounter by any means.

9         Q.      Have you ever been sued by a

10   prisoner?

11        A.      I have.

12        Q.      How many times?

13        A.      I want to give a --

14               MS. MARCELL:  Was there a question?

15               THE WITNESS:  I want to give an

16        honest answer as I can, but I don't have

17        that exact number in front of me.  My best

18        guess would be two to three times.

19        Q.      (By Mr. Neff)  Okay.  And what were

20   the claims in those cases?

21        A.      One was regarding gender identity

22   disorder; the second was, I believe, footwear; and

23   I'm not -- I can't remember specifics about a

24   third, if there was a third.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 53

1          Q.      And were these delivered in
2    different claims in federal court?
3          A.      I do not know.
4          Q.      Have you ever had a judgment against
5    you?
6          A.      I have not.
7          Q.      Did you actually provide grossly
8    inadequate medical care to the prisoners that sued
9    you?
10         A.      Please repeat one more time.
11         Q.      Did you actually provide grossly
12   inadequate medical care medical care to the
13   prisoners that sued you?
14         A.      Inadequate or adequate?
15         Q.      The prisoners that sued you, did you
16   provide grossly inadequate, inadequate care to
17   them?
18         A.      No.  I did not.
19         Q.      Were you deliberately indifferent to
20   the inmate's care?
21              MS. MARCELL:  Object to form.
22              THE WITNESS:  No.  I was not.
23         Q.      (By Mr. Neff)  Is it common for
24   prisoners to complain about their medical care,

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    even when the complaint has no basis in fact?

2                    MS. MARCELL:  Object to form.

3                    THE WITNESS:  I believe that has

4            happened.

5            Q.    (By Mr. Neff)  May catheters be

6    reused?

7                    MS. MARCELL:  Object to form.

8                    THE WITNESS:  It depends.

9            Q.    (By Mr. Neff)  What does it depend

10   on, ma'am?

11           A.    It depends, if it's designed to be

12   reusable, or if it's designed to be one use only

13   and then disposed of type of catheter.  There's

14   different kinds of catheters available.

15           Q.    And if you reuse a catheter, what's

16   the process in orders to be able to reuse it?

17           A.    Are we talking reusable ones?

18           Q.    At this time, yes, ma'am.

19           A.    Okay.  As far as reusable catheters

20   go, I believe there's information in the package

21   for the patient to be able to clean and properly

22   store their catheters.  I'm not aware of any

23   particular materials that are specific for

24   purchase for the cleaning of those materials.  I'd

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 55

1   have to review the package insert.

2        Q.      What manufacturer sells reusable

3   catheters?

4        A.      I don't know.  I'd have to -- I'd be

5   guessing from the suppliers that are -- that are

6   known to make medical supplies.  I don't know

7   specific ones.

8        Q.      What are the actual differences

9   between the ones that are sold as reusable and the

10  ones that are sold as disposable catheters; what's

11  the actual difference between the two?

12       A.      I don't know, factually, what's the

13  difference between their manufactured properties.

14       Q.      Could they be the same just labeled

15  differently?

16       A.      I don't know.  I'd have to look at

17  the packages independently and see how their --

18  what their description is.  I don't know.

19       Q.      Is it common for people outside of

20  prison to reuse catheters?

21            MS. MARCELL:  Object to form.

22            THE WITNESS:  If they are reusable

23       catheters, then, yes.  They would be --

24       that would be part of their care.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 56

1    Q.      (By Mr. Neff)   And do you know how
2  many catheters per month most insurance companies
3  provide patients in the United States?
4        A.      No.   I don't have that information.
5        Q.      Is it common for people without
6  insurance to reuse catheters, medical insurance,
7  that is?
8              MS. MARCELL:   Object to form.
9              THE WITNESS:   I don't have any facts
10        based on that.   No.   I do not know.
11        Q.      (By Mr. Neff)   Is it common for
12  people in developing countries to reuse catheters?
13              MS. MARCELL:   Object to form.
14              THE WITNESS:   Again, I do not know.
15        Q.      (By Mr. Neff)   Pardon me, Doctor, I
16  didn't get the answer.
17        A.      I'm sorry.   No.   I do not have any
18  facts to base my opinion on them.   I do not know.
19        Q.      Has it ever been the policy of the
20  United States government to have veterans under
21  their care to reuse catheters?
22              MS. MARCELL:   Object to form.
23              THE WITNESS:   I am unaware of that
24        policy.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 57

1      Q.      (By Mr. Neff)  Has it ever been the
2  policy of the United States Government to have
3  Medicaid recipients reuse catheters?
4               MS. MARCELL:  Object to form.
5               THE WITNESS:  I'm unaware of that
6          policy.
7      Q.      (By Mr. Neff)  Has it ever been the
8  policy of the United States Government to have
9  Medicaid recipients reuse catheters?
10              MS. MARCELL:  Object to form.
11              THE WITNESS:  I am unaware of
12          that -- any policy for that too.
13     Q.      (By Mr. Neff)  You don't know for
14  any of those?
15     A.      No.  I have not looked those up, no.
16     Q.      Have you ever prescribed a prisoner
17  to use a catheter?
18     A.      Yes, I have.
19     Q.      How many times?
20     A.      Are you asking the time period
21  duration or how many?
22     Q.      How many prisoners.
23     A.      Oh, I'm sorry.  How many prisoners?
24  I can think of two right now.

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 58

1        Q.      Okay.  And what time frame was this?

2        A.      I'm thinking.  I'm thinking of one

3   particular patient, who I've known has had to

4   self-catheterize for at least the past six or

5   seven years.  However, various providers,

6   physicians and advanced practitioners, have

7   prescribed him his supplies, in addition to me.

8        Q.      Have you ever instructed a patient

9   to clean and to reuse catheters?

10       A.      No.

11       Q.      No?

12       A.      No.  I have not instructed them on

13  how to do that, no.

14       Q.      Has it ever been done in the

15  Massachusetts Department of Corrections?

16       A.      No.  We use single-use catheters

17  only.

18       Q.      Do you know of any inmates that

19  clean and reuse their catheters in the

20  Massachusetts Department of Corrections?

21       A.      No one has told me that they do.

22       Q.      Are you familiar with the clean,

23  intermittent, self-catheterization?

24              MS. MARCELL:  Object to form.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 59

1          THE WITNESS:  Are you referring to

2      something in particular?

3          Q.    (By Mr. Neff)  Yes.  Well, just the

4  process of clean, intermittent

5  self-catheterization, are you familiar with that?

6          A.    I'm familiar with that.  I don't

7  instruct the patients on that.  The nurses will do

8  that for me.

9          Q.    Okay.  But you know what that is?

10          A.    I have a general -- yeah, I know --

11  I believe I know what it is.

12          Q.    Can you explain to me what that is?

13          A.    To intermittent self-cath oneself?

14          Q.    Yes.  Clean, intermittent

15  self-catheterization.  What is that?  It's

16  referred to CIC and CISC on all the literature

17  I've read.

18          MS. MARCELL:  Object to form.

19          THE WITNESS:  My understanding is

20      that the patient uses -- well, in

21      Massachusetts the patient gets a single-use

22      catheter, they have a packet of

23      lubrication, they have Betadine swab, and

24      they are provided gloves.  I am not quite

Rebecca Lubelczyk, M.D.
March 17, 2014

1    sure if they are provided a -- like a

2    covering like a towel, a disposable towel

3    to lay their equipment on.  I'm not sure

4    how that's done with the nurses.

5         But the patient is instructed to

6    clean the area of the urethra with the

7    Betadine to apply lubrication to the

8    catheter, after they've opened the

9    catheter, wearing gloves.  Sorry.  They've

10    put on their gloves to keep things as clean

11    as possible.  And then they -- once the

12    catheter has lubrication on it, they use

13    the catheter to insert into the urethra to

14    empty out their bladder, they wash their

15    hands prior to putting on their gloves and

16    prior to opening any other packets, and

17    then they wash their hands after they've

18    removed their gloves.

19         They're not necessarily to put

20    anything in a biohazard bag, but they can

21    dispose of it in regular trash bags in

22    their unit, and then they clean up their

23    materials and throw it away.

24    Q.    (By Mr. Neff)  Is that your

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 61

1    understanding of clean, intermittent

2    self-catheterization and not -- I'm sorry, let me

3    stop there.  Is that your understanding of clean,

4    intermittent self-catheterization?

5                    MS. MARCELL:  Object to form.

6                    THE WITNESS:  I might have missed a

7              step or two.  But, in general, that's what

8              I think of, washing hands, gloving, opening

9              up new materials, and then the process, and

10             then cleaning up after themselves.

11         Q.    (By Mr. Neff)  That's not the

12   sterile process?  Let me ask you this, Doctor, is

13   there a difference between clean, intermittent

14   self-catheterization and sterile?

15         A.    Yes.  There's a difference.

16         Q.    What's the difference?

17         A.    Well, with sterile technique you use

18   sterile gloves and all sterile equipment, and you

19   probably have to have a second person in order to

20   be your nonsterile hands to do sterile because you

21   can't --

22         Q.    Is clean self-cath ever involved

23   reusing the same catheter?

24         A.    Are you still talking Massachusetts?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 62

1      Q.      I'm talking about in general.

2      A.      Oh, okay.  It would be reusable

3  self-catheters.  But, like I said, that's not what

4  we have in Massachusetts.  Massachusetts we have

5  the single-use catheters.

6      Q.      Has any reputable organization

7  provided instructions for reusing catheters?

8              MS. MARCELL:  Object to form.

9              THE WITNESS:  I imagine that there

10      probably is.  I know there's a package

11      insert for most of these supplies.

12      Q.      (By Mr. Neff)  Have you read any

13  professional literature regarding reusing

14  catheters?

15      A.      No.  Not for this case, no.

16      Q.      Have you ever read any?

17      A.      No.  I don't believe so.

18      Q.      Is reusing catheters widespread in

19  the United States?

20              MS. MARCELL:  Object to form.

21              THE WITNESS:  Could you please

22      repeat the question one more time?

23      Q.      (By Mr. Neff)  Is reusing catheters

24  widespread in the United States?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 63

1              MS. MARCELL:  Form.

2              THE WITNESS:  I can't say.  I do not

3      know.

4          Q.    (By Mr. Neff)  In the prison

5   environment, does security ever play a role in how

6   a medical professional provides treatment?

7          A.    Can you repeat the question again?

8          Q.    In the prison environment, does

9   security ever play a role in how a medical

10  professional provides treatment?

11         A.    I think I would have to say yes to

12  that question.

13         Q.    Well, you did in your affidavit,

14  didn't you?

15         A.    Oh, sorry.  Are you looking at

16  something in particular?

17         Q.    Yeah.  I'm going back to Q that

18  we've already looked at.

19         A.    Q.  Okay.  Sorry.  Oh, okay.  Yep.

20  Got it.

21         Q.    Well, would the security play a

22  role?

23             MS. MARCELL:  Object to form.

24             THE WITNESS:  So in the prison

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 64

1          system you have a provider, physician,

2          advanced practitioner, we're always

3          cognizant of where we were.  And that, in

4          order to really access our patients we have

5          to do it in accordance with whatever

6          security measures are in place, depending

7          on the patient's level of security, where

8          they are, even if they're in general

9          population.  We have to work with security

10         in order to do various things for our

11         patients.

12              Q.     (By Mr. Neff)   Okay.   And what

13    situations have you taken security implications

14    into consideration when providing treatment to an

15    inmate?

16              A.     Well, if I wanted to see a patient

17    and call down somebody for an unscheduled visit, I

18    have to be cognizant of what time of day it is,

19    because there is count times, chow times, times

20    where the patients aren't available.  I also have

21    to be cognizant, if they're in a segregation area,

22    area of the times that are available to see

23    patients over there.  It's basically working a lot

24    with security so that the care can be coordinated.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 65

```
 1   Whereas, out in the outpatient world you don't
 2   have that level of security to -- to coordinate
 3   with.
 4         Q.      Are there any other times when
 5   you've taken into consideration security
 6   implications when providing care?
 7         A.      Yeah.  There's also medical supply
 8   products that have to be considered that
 9   security'd like to know about when patients have
10   them.  Canes, walkers, braces.  Those sort of
11   equipment, those definitely have to be made aware
12   of to the department security so that they know
13   that the patient's allowed to have them, and that
14   they aren't what they consider contraband for any
15   reason.
16         Q.      Are there any other supplies that
17   you can think of that might be used as contraband?
18         A.      Usually, in our system the biggest
19   problem is with metal, metal items.
20         Q.      And what are the metal items used to
21   do; what do they do with the metal items, I guess
22   should say?
23         A.      I'm sorry, do you mean the medical
24   providers do with the metal items, or the patients
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 66

1   do with the metal items?

2          Q.      **What do the inmates do with the**

3   **metal items?**

4          A.      Oh.  We've had instances where the

5   metal items have been removed from whatever

6   product it is and used as weapons.

7          Q.      **As a shank?**

8          A.      As a shank or other -- yeah, as a

9   shank or whatever other things they call those

10  items, to inflict harm on somebody else.

11         Q.      **Should an inmate use medical**

12  **supplies as prescribed by a medical professional?**

13         A.      Can you repeat the question again?

14         Q.      **Should an inmate use medical**

15  **supplies as prescribed by the medical**

16  **professional?**

17         A.      We ask them to do that, yes.

18         Q.      **You ask them, and they should do it,**

19  **correct?**

20         A.      We ask them that they should use

21  their supplies as we direct them to and we

22  instruct them to, yes.  They should.

23         Q.      **So in the Massachusetts Department**

24  **of Corrections, can an inmate be disciplined for**

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    not using his medical supplies as prescribed?

2        A.      I'm considering the question.  Yes.

3        Q.      Yes?

4        A.      Yes.  They can be disciplined in the

5    Massachusetts Department of Corrections.

6        Q.      Is using a medical supply to smuggle

7    contraband a legitimate reason to alter inmate's

8    access to medical supplies?

9        A.      I think we had trouble hearing.  Can

10   you say that again?

11       Q.      Sure.  Is using a medical supply to

12   smuggle contraband a legitimate reason to alter an

13   inmate's access to medical supplies?

14           MS. MARCELL:  Object to form.

15           THE WITNESS:  Yeah.  I would think

16       that the security would have an issue with

17       somebody using supplies to smuggle, yes.

18       Q.      (By Mr. Neff)  So it would be a

19   legitimate reason to alter the inmate's access to

20   medical supplies?

21       A.      Yes.

22       Q.      I'm sorry, you're breaking up.  Is

23   that a yes?

24       A.      Yes.  I'm sorry.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 68

```
 1          Q.      Is improperly hoarding medical

 2   supplies a legitimate reason to alter an inmate's

 3   access to medical supplies?

 4                  MS. MARCELL:  Object to form.

 5                  THE WITNESS:  Yes.

 6          Q.      (By Mr. Neff)  Is using medical

 7   supplies as an alternate prison currency, a

 8   legitimate reason to alter an inmate's access to

 9   medical supplies?

10                  MS. MARCELL:  Object to form.

11                  THE WITNESS:  Yes.  It can be.

12          Q.      (By Mr. Neff)  Is there any law that

13   allows the inmate to do whatever he wants with his

14   medical supplies?

15          A.      I'm sorry, can you restate the

16   question again?

17          Q.      Is there any law that allows an

18   inmate to do whatever he wants with his medical

19   supplies?

20          A.      Is there any law?  Okay.  That's

21   what he said.  All right.  I am not aware of any

22   law.

23          Q.      Is Mr. Betancourt a known smuggler

24   of contraband?
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 69

```
 1              MS. MARCELL:  Object to form.
 2              THE WITNESS:  The only documentation
 3       I saw was that he had taken a sandwich, or
 4       he had taken sandwiches.
 5          Q.    (By Mr. Neff)  Did Mr. Betancourt
 6   attempt to smuggle currency in his diapers?
 7              MS. MARCELL:  Object to form.
 8              THE WITNESS:  I am not aware of
 9       anything of that incident.
10          Q.    (By Mr. Neff)  If the inmate is
11   improperly using his provided medical supplies,
12   what would you recommend doing?
13          A.    So you're asking, if the patient was
14   using their medical applies for something, other
15   than their medical use, what would I recommend?
16          Q.    Yes, ma'am.
17          A.    Okay.  And are we saying that this
18   documented and that the staff are aware of it and
19   documenting this?
20          Q.    If you're aware that he's improperly
21   using his medical supplies, an inmate that's under
22   your care, what would you recommend doing?
23              MS. MARCELL:  Object to form.
24              THE WITNESS:  We have asked that the
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

1          patient come down to the medical department

2          so that they can receive a limited number

3          of supplies and return the other -- the

4          used ones of supplies.

5          Q.     (By Mr. Neff)  Why does

6  Mr. Betancourt need to use a catheter?

7          A.     Can you repeat the question again,

8  it was fuzzy?

9          Q.     Why does Mr. Betancourt need to use

10 a catheter?

11         A.     My understanding from the

12 documentation is that he cannot void or empty his

13 bladder on his own, based on an old injury.

14         Q.     Is there any indication that he's

15 able to urinate without the use of catheters?

16         A.     I haven't seen anything in the

17 documentation that would suggest that, no.  Can we

18 take a quick break for a second?

19              MR. NEFF:  Absolutely.  Of course.

20 Of course.  How much time do you need?

21              THE WITNESS:  Five-minute break?

22              MR. NEFF:  Yes, ma'am, that's fine.

23

24              (A recess was taken)

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 71

1

2          Q.        (By Mr. Neff)   Doctor, can you hear

3    me?

4          A.        Yes.  Can you hear me again?

5          Q.        Yes, ma'am.  I believe the question,

6    and I don't remember if I got an answer to it so

7    if I did I apologize.  My question was, is

8    Mr. Betancourt able to urinate without the use of

9    a catheter?

10         A.        According to the documentation I

11   reviewed, I did not see any information that

12   suggested he could.

13         Q.        Do you know how long he's been using

14   catheters?

15         A.        I did see that in his records.

16   He's -- do I have a chance to look through the

17   notes of the -- from the records?

18         Q.        Sure.

19         A.        Okay.  So he suffered the injury

20   that caused him to lose some of his bladder

21   function was back in 1986.  And the documentation

22   that I reviewed suggested that he had to use

23   catheters at that time.  I can't comment on

24   whether he was fully dependent on catheterization

Electronically signed by Brenda Ginisi (401-014-954-6554)          351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 72

1   at that point, or if it was partial dependence,

2   but I believe he's been using them since that

3   injury in 1986.

4          Q.      And prior to 2010, has

5   Mr. Betancourt ever reused his catheters?

6                  MS. MARCELL:  Object to form.

7                  THE WITNESS:  Prior to 2010?

8          Q.      (By Mr. Neff)  Yes, ma'am.  Prior to

9   his current incarceration, has he ever reused his

10  catheters?

11         A.      I did not see documentation that he

12  was reusing catheters prior to 2010.

13         Q.      And did you see any documentation,

14  prior to 2010, that he ever complained about

15  reusing catheters?

16         A.      I'd have to look back at the

17  incarceration materials from 2004 to 2005, I

18  believe, if he did.  I do remember, from those

19  documentations, that they were providing him with

20  two to three catheters a day.  I do not remember

21  seeing documentation where he was reusing any of

22  those.

23         Q.      Has Mr. Betancourt ever attempted

24  suicide?

Rebecca Lubelczyk, M.D.
March 17, 2014

1          MS. MARCELL:  Object to form.

2          THE WITNESS:  I believe I saw

3     documentation in his record that he did in

4     the past.

5          Q.     (By Mr. Neff)  Did you see how many

6     times he's attempted?

7          A.     I don't recall how many times.

8          Q.     Did it say for what reasons?

9          A.     I don't recall, from the record, the

10    explicit reason.

11         Q.     Has Mr. Betancourt ever had

12    pneumonia?

13         MS. MARCELL:  Object to form.

14         THE WITNESS:  I'm just trying to

15    recall of his admissions, if pneumonia was

16    one of them.  I can't remember if that was

17    one of them.

18         Q.     (By Mr. Neff)  Well, assume that he

19    has, would a antibiotic treatment be recommended

20    for someone with pneumonia?

21         A.     Yes.  With pneumonia, yes.

22    Antibiotics would be recommended in most cases,

23    yes.

24         Q.     Would those antibiotic treatments be

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    pronged?

2          A.     Can you repeat the question?

3          Q.     **Would this antibiotic treatment for**

4    **pneumonia be prolonged?**

5                 MS. MARCELL:  Object to form.

6                 THE WITNESS:  Not necessarily.  You

7          could have a treatment for a pneumonia with

8          as a little as five days of a particular

9          antibiotic.  It could be prolonged,

10         depending on the patient's clinical

11         presentation and severity of disease.

12         Q.     (By Mr. Neff)  **If it was a recurrent**

13   **problem and they were unable to get a grasp on the**

14   **pneumonia, would the antibiotic regimen be**

15   **prolonged?**

16                MS. MARCELL:  Object to form.

17                THE WITNESS:  Did you say grasp?

18         Sorry, did you say grasp?

19         Q.     (By Mr. Neff)  **Yeah.  If they were**

20   **unable to get the pneumonia under control.**

21         A.     Oh.

22         Q.     **Would you describe more antibiotic,**

23   **different antibiotic; what would you do, Doctor?**

24         A.     Yes.  If the pneumonia was not

Rebecca Lubelczyk, M.D.
March 17, 2014

1  responding to your initial treatment, you would

2  reassess it and determine what change in treatment

3  needed to be implemented, yes.

4       Q.     How many times does one have to be

5  treated with antibiotics before resistance

6  develops?

7       A.     You know, there's no specific

8  number.  The risk factor for developing a

9  resistant bacteria is being treated numerous

10  times, or partially treated for infection with

11  antibiotics, but there's no set number.

12       Q.     How many times has Mr. Betancourt

13  been prescribed antibiotics?

14       A.     The documentation that I've been

15  provided, I counted 10 times, at least.  And that

16  was during his, I believe -- I think it was a

17  30-month incarceration that I looked at, from

18  August 2010 to March 2013.  Yeah.

19       Q.     Can you say that -- you talked about

20  in a -- I think it's paragraph M, you discussed

21  any alleged resistance, antibiotic resistance

22  bacteria is now an issue?

23       A.     I see paragraph M, yes.

24       Q.     How can you say that this is solely

Rebecca Lubelczyk, M.D.
March 17, 2014

1   **from the treatment of his UTIs?**

2          A.      The documentation for October 2nd

3   and October 6th show that, like I said, there was

4   two different antibiotics, and the notes suggested

5   it was for his urinary tract infection.  I

6   don't -- I was going to say I don't have specific

7   cultures because you don't do cultures every

8   single time, so that's why I said it was an

9   opinion.  It suggested it.

10         Q.      **But you're not sure?**

11         A.      Well, the only way to be sure would

12  be if the documentation was there, that they sent

13  it for culture, and the culture came back saying

14  it was resistant to the antibiotic that had been

15  chosen, and so there was change in the antibiotic

16  to cover the bacteria, but that documentation's

17  not in there.  I can't say that it wasn't done.

18  I'm just saying it wasn't provided for me to

19  review.

20              And so, to see a quick change like

21  that in an antibiotic from one to another in a

22  period of, I believe it was four or five days,

23  suggests that the original antibiotic wasn't

24  working, and it was an antibiotic he's been on in

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 77

1    the past and now it's not working for some reason

2    so they decided to change it to a different one.

3         Q.    Does that always suggest that it's

4    a -- a resistant to an antibiotic when there's a

5    change from one antibiotic to another?

6         A.    Usually, it's because the patient's

7    not getting better with your initial treatment so

8    you decide to try a different antibiotic.

9              There was no documentation for other

10   reasons, which could include that he was having a

11   reaction to the initial antibiotic, but I haven't

12   seen that he's had problems with that particular

13   antibiotic in the past, and I believe they used

14   that same antibiotic in subsequent infections too,

15   but that I am not sure.  I'd have to doublecheck

16   on that one.

17             But there's other reasons why you

18   would change an antibiotic, because the patient's

19   gotten a side effect from it, or that it's not

20   working, presumably, the possibility of a

21   resistance developing.

22        Q.    But if they use the same antibiotic

23   in a later infection, wouldn't that lessen the

24   suggestion that it was the cause of any

Rebecca Lubelczyk, M.D.
March 17, 2014

1   resistance?

2        A.      If he was infected with another

3   strain that wasn't of a bacteria that's

4   susceptible to that antibiotic but a different

5   strain from the one back -- that we're talking

6   about, it could still work again.

7        Q.      Okay.  So it's not necessarily

8   resistance; it might just been a different strain

9   of bacteria?

10       A.      Well what -- I just want to clarify

11  my answer.  So there's different bacteria that can

12  infect the urinary tract.  And the one that he has

13  two different treatments for, that could have been

14  something that had developed resistance like we

15  spoke about because they had to change their

16  antibiotic that used to work and now it no longer

17  works, possibly.

18            If he was prescribed that in future

19  urinary tract infections, it may be because the

20  second antibiotic killed that -- that resistant

21  bacteria and it's no longer in his system so that

22  when he gets infected again he's infected with a

23  susceptible bacteria again.

24       Q.      So the resistance wouldn't have been

Rebecca Lubelczyk, M.D.
March 17, 2014

1    a long-term issue, then, right; it's just that one

2    time that he got it?

3         A.    Correct.  The idea is that you kill

4    all that bacteria, resistant or not, but you kill

5    all that bacteria with that antibiotic.  And,

6    unfortunately, you can get reinfected, but it's

7    not necessarily that.  It's because it was still

8    there in his bladder.

9         Q.    Now, is bacterial -- is bacteria

10   that's resistant to antibiotic becoming an issue

11   across --

12        A.    Oh, can you repeat the question.  We

13   had trouble on this end.

14        Q.    I said, is bacteria that is

15   antibiotic resistant, is that a emergent issue

16   across the United States, and, in fact, across the

17   world?

18             MS. MARCELL:  I'm sorry, object to

19        the form.

20             THE WITNESS:  Right now, we do have

21        problems across the nation, and across the

22        world, with specific strains of bacteria

23        that are becoming -- that have become,

24        actually, resistant to common antibiotics

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 80

1      we use, yes.  Did you hear my answer?

2      Q.      (By Mr. Neff)  Yes, ma'am, I got it.

3      A.      Okay.  Good.

4      Q.      Is Mr. Betancourt paralyzed?

5      A.      According to the documentation that

6   I reviewed, it looks like he's got partial

7   paralysis.  He's not fully paralyzed from the

8   waist down.  He's got movement on his left leg,

9   but it's his right leg that he doesn't have much

10   function of.

11      Q.      Do you know what the cause of the

12   paralysis is?

13      A.      I believe he was accidentally shot

14   in 1986.

15      Q.      Has he been continuously paralyzed

16   since 1986?

17      A.      I believe the initial injury caused

18   him to have, like I said, that partial paralysis

19   on that right leg.  It also interrupted his

20   urinary bladder function requiring a straight

21   cath.  I believe he had to have -- oh, I have to

22   go -- I have to look a little more carefully about

23   this, but sometimes when the patients get shot in

24   the area where he was shot, they have a colostomy

Rebecca Lubelczyk, M.D.
March 17, 2014

1    at the time, and they can get reversed.  But I --

2    actually, for Mr. Betancourt, I can't remember

3    specifically, if he had a colostomy in the past,

4    but now he does not.

5         Q.     **And has he made any improvement in**

6    **his ability to move since the original incident?**

7         A.     Actually, reviewing the

8    documentation that I was provided, I was actually

9    getting concerned that he's been worsening over

10   time instead of improving.

11        Q.     **Has Mr. Betancourt ever complained**

12   **of leg spasms prior to April of 2011?**

13        A.     I'd have to review the record in

14   regards to leg spasms.  I know he had complained

15   of them during his incarceration from 2010 to

16   2013, but I can't specify if it was before 2011 or

17   not.  I'm sorry.

18        Q.     **And has he had back spasms since**

19   **1986?**

20        A.     I believe that was one of his --

21   part of his intake physical, yes.

22        Q.     **Do you know what size catheter**

23   **Mr. Betancourt uses?**

24        A.     Do I know what size catheter he

Electronically signed by Brenda Ginisi (401-014-954-6554)                                           351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    uses?

2         Q.      Yes.

3         A.      I believe the most common one that I

4    saw him being prescribed was a 14 French, but I

5    don't know if that's the one he is typically

6    prescribed by his outpatient.

7         Q.      And in reviewing Mr. Betancourt's

8    medical records, did you notice that he had stated

9    he fell on August the 30th 2012?

10        A.      Yes.  I did see that.

11        Q.      How did the medical records reflect

12   that he was doing when he fell?

13        A.      August 30th, you said?

14        Q.      Yes, ma'am, 2012.

15        A.      2012.

16        Q.      He might have been seen on

17   September 1, 2012.

18        A.      August 30, 2012.  I want to make

19   sure I'm accurate.  August 2012, was that -- I'm

20   just trying to find the right paper, but was that

21   the one where he was transferring?

22        Q.      I don't know.  I need to see the

23   September 1, 2012 medical record.  Do you have

24   that in front of you?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 83

```
 1          A.     I'm trying to look -- call it up
 2   right now.
 3          Q.     Okay.
 4          A.     All right.  The date you got was
 5   August, and you said he was seen September?
 6          Q.     September 1, I believe.
 7          A.     Okay.  I do find a note that said
 8   that it was -- he fell while putting on his,
 9   quote, unquote, diaper.
10          Q.     Was that was the inmate told the
11   nurse?
12          A.     That's the sick call slip.
13          Q.     And what, specifically, does that
14   say before that; what does that document say on
15   that line?
16          A.     Do you have it in front of you,
17   because I'm still trying to find the exact?
18          Q.     I'm looking, Doctor.  One moment.
19          A.     Okay.  I'm trying to get the
20   exact --
21          Q.     I have a fracture dislocation sprain
22   protocol dated 9-1-2012, 9:40 a.m.
23          A.     Was that --
24          Q.     With a Nurse Singletary?
```

Rebecca Lubelczyk, M.D.
March 17, 2014

```
 1        A.     Repeat again, I'm sorry.
 2        Q.     9-1-12, fracture dislocation sprain
 3   protocol form, DC -- by a Nurse Singletary; do you
 4   see that?
 5        A.     I've got to call it up right now.
 6   I've got to find the right one.  Do you have a
 7   page number, by chance?
 8        Q.     I don't know what document you're
 9   looking for.  I don't know if you received a
10   Bates-stamped copy.  I only recently Bates stamped
11   mine, so I don't know that I would have a number
12   that would coincidence with yours.
13        A.     Yeah.  I don't think I have Bates
14   stamps, I'm sorry.  All right.  Let me look.
15        Q.     It should be in chronological order,
16   ma'am.
17               MS. MARCELL:  Lance, if we can go
18          off one second?
19               MR. NEFF:  Sure.
20
21               (Off record discussion)
22
23               MS. MARCELL:  You can go back on.
24          I'm still looking for it myself in the
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 85

1    documents that I was provided and I can't

2    find it.

3        THE WITNESS:  Yeah, I was going off

4    of some of the -- there's different files

5    here, and I don't know exactly in which

6    file -- which exhibit it's in.  I just have

7    to go through the exhibits to find it.  If

8    someone finds it before me, tell me where

9    it's at.

10       MR. NEFF:  Okay.  Can we just take,

11   like, a five-minute break, we'll have it

12   scanned and sent over to her?

13       THE WITNESS:  We can do that.

14       MS. MARCELL:  I just found 9-6-12,

15   9-10-12.

16       THE WITNESS:  Do you have it, Karen

17   -- Ms. Marcell?

18       MS. MARCELL:  I'm looking.  Hold on

19   one second.  I think they're actually

20   provided to us in backwards chronological

21   order.

22       THE WITNESS:  Well, some of them

23   were backwards, some of them were forwards.

24       MR. NEFF:  Let's just take a break

Rebecca Lubelczyk, M.D.
March 17, 2014

1    and we'll send over the documents I would

2    like to have her look at.  Okay?  That way

3    we're looking at the same pieces of paper.

4          MS. MARCELL:  I don't have a nurse's

5    note, but I have a Department of

6    Corrections Office of Health Services

7    Fracture/Dislocation Sprain Protocol.  Is

8    that what you're referring to?

9          MR. NEFF:  Initially, yes.

10         MS. MARCELL:  That's signed off by

11    Singletary, but I have no 9-1-12 note.

12         MR. NEFF:  Well, that's what I'm

13    talking about, the dislocation and sprain

14    protocol.

15         MS. MARCELL:  Okay.  That's the form

16    I have, but I don't have, like, a nurse's

17    note from 9-1-12, that I can see.

18         MR. NEFF:  Okay.  And what's the

19    mechanism of injury on that piece of paper,

20    under Subjective?

21         MS. MARCELL:  "Chief complaint,

22    swollen right foot, ankle, fell attempting

23    to change diaper."  It say the, you know,

24    Delta diaper, mechanism of injury.

Electronically signed by Brenda Ginisi (401-014-954-6554)         351a2e11-c383-4597-9152-4a6f51767501

**Q. (By Mr. Neff) So, Doctor, how do you think someone fell attempting to put on a diaper?**

A. Okay. Are we back -- I'm sorry, can you repeat the question?

**Q. His subjective complaint to the nurse was he fell attempting to change diaper, correct?**

A. That's what I've got right now, yes.

**Q. Okay. How do you imagine he did that?**

MS. MARCELL: Object to form.

THE WITNESS: How do I imagine he fell, or how did I imagine that he was --

**Q. (By Mr. Neff) If he fell changing his diaper, wouldn't that suggest that he was standing up doing it?**

MS. MARCELL: Object to form.

THE WITNESS: Well, the way that I was interpreting it was that he was somehow out of his wheelchair where he's in, and using some sort of support. He does have full use of that left leg, based on the neuro exams that I reviewed that were done.



Electronically signed by Brenda Ginisi (401-014-954-6554) 351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      And he's got partial use of the right leg,

2      though not full use of that right leg.

3          And so, I interpret it as he was

4      putting his weight on his left leg and

5      using what he had to do to try and get his

6      diaper on, as well as whatever he does to

7      change his clothes on a daily basis.

8      Q.     (By Mr. Neff)  Was it unreasonable

9  to think that he might have been standing here and

10 fell while trying to change his diaper?

11             MS. MARCELL:  Object to form.

12             THE WITNESS:  Based on what his

13      physical description is, I can't imagine he

14      was standing independently able to do that.

15      I'm assuming he must be using some sort of

16      assistive device.  Currently, he's in the

17      wheelchair during this incarceration

18      period, but prior to that he was able to

19      walk with a cane and a AFO-type brace to

20      keep his right foot from dragging on the

21      ground.

22      Q.     (By Mr. Neff)  Okay.  Do you know

23 how long after this incident he was taken in

24 x-ray; do you know when the x-ray was done?

Rebecca Lubelczyk, M.D.
March 17, 2014

1       A.      What I've got from my notes say

2    September 5th there was a sick call slip.

3    September 6th, I believe is a exam by the

4    physician, and the x-ray was ordered, I believe,

5    on the 6th.

6       Q.      Okay.  Do you know when it was done?

7       A.      Well, you know, the trouble is, is I

8    have to go to a different part of the record to

9    find that x-ray because that's -- it's a divided

10   chart, and it's in a different section of the

11   record.

12      Q.      Okay.  From my records, I have that,

13   you know, he was seen on the 1st, and that was the

14   fracture dislocation sprain protocol.

15      A.      Okay.  Is that the one that's done

16   by the nurse, that you have in front of you?

17      Q.      Let's just do this, Doctor --

18      A.      Okay.

19      Q.      Let me get this scanned.  Let's go

20   off the record, let me get this scanned so we're

21   all looking at the same documents.  Okay?  And

22   I'll send it to you as well, Karen, all, right?

23               MS. MARCELL:  All right.  Thank you.

24               MR. NEFF:  All right.  Just give me

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 90

1      five minutes, I'll have it scanned to you.

2              (Off record discussion)

3

4              THE WITNESS:  (By Mr. Neff)  All

5      right.  I've got the October 1, 2012

6      continued note there.  Was there a form you

7      wanted me to look at from September?

8          Q.      (By Mr. Neff)  Yes.  Look at 9-1-12

9   at 9:40, look at Nurse Singletary.  And it says,

10   "Swollen right foot, ankle, fell attempting to

11   change diaper," correct?  And that's Bates stamped

12   167.

13          A.      167.  Okay.  Yep.  It's the last

14   page.  Okay.  Gotcha.  All right.  Yep.  I have

15   that up.

16          Q.      On Bates stamp 166 at 9-4 -- on

17   9-4-12 at eight o'clock he was seen by

18   Nurse McQuay and Chief Health Officer J. Morales,

19   Dr. Morales, correct?

20          A.      All right.  And that's, you said,

21   166?  166.  Okay, got it.  It looks like

22   Dr. Morales saw the patient, yeah, is that 9-4 --

23   9-4-12, 8:00 a.m.

24          Q.      And then a Nurse McQuay?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 91

1         A.        And Nurse McQuay notes it.  It looks

2    like she's -- she's taking it off as an order for

3    the x-ray.

4         Q.        Okay.  And then he was seen in

5    mental health later in the day?

6         A.        Yes.

7         Q.        All right.  9-5 there's another

8    fracture sprain, dislocation protocol, correct,

9    that's 165, Bates stamp 165?

10        A.        Bates stamp 165, it's a fracture

11   dislocation sprain protocol, yes.

12        Q.        And it says chief complaint is, "My

13   right ankle hurt.  And mechanism of injury it

14   says, "Per inmate, fell while putting on brief,"

15   and in quotes diaper.

16        A.        Yep.  I see that.

17        Q.        Okay.  164, he went to a doctor's

18   clinic on 9-6-12, and diagnosis was swollen to

19   right foot.  Then he was also seen on 9-6-12 at

20   9:40, Dr. Hernandez, and it was noted by

21   Nurse McQuay?

22        A.        Yeah.  I don't know what the

23   doctor's clinic 9-6-12 stamp -- that stamp means.

24   I don't know if that was -- they were referring to

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 92

1    it, or if that actually -- he entered the clinic.

2    Oh, yeah.  Kind of looks like a -- all right.

3    Looks like a nurse check-in preop, because, the

4    vital signs are done, and the chief complaint's

5    done.  Okay.  So then -- then he actually sees the

6    physician at 9:40.  He sees Dr. Hernandez at 9:40.

7    I see that, yep.

8         Q.    Okay.  Then 163 there's a grievance

9    that been documented that it was returned, that's

10   9-10, that's 163?

11        A.    Yep.  That's the September 10, 2012

12   notation that you're referring to?

13        Q.    Yes.  And then on 162 we have an

14   entry for 9-13-12, an entry from 9-17-12, an entry

15   from 9-18-12, and an entry from 9-19-12; do you

16   see those?

17        A.    Yes.  You're saying those are

18   entries, right?

19        Q.    Those are entries, yes.

20        A.    Okay.  Yes.  I see those.

21        Q.    On the 18th on page 162, 162 on the

22   18th, there's an entry by Nurse Uphaus?

23        A.    All right.  162.

24        Q.    What does that entry say?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 93

1          A.     Which entry are you looking at

2     again?  I'm sorry, which entry are you referring

3     to?

4          Q.     9/18/12, Nurse Uphaus, Bates stamp

5     162.

6               MS. MARCELL:  Actually, I think

7          Uphaus is 9-17-12.

8               THE WITNESS:  Yeah.  The nurse thing

9          is Uphaus.

10          Q.     (By Mr. Neff)  You're right.

11     You're right.  Nurse -- I can't read the scribble

12     but there's a --

13               MS. MARCELL:  I have no idea who

14          that --

15          Q.     Maybe by Nurse McQuay, but there was

16     an entry there for 9-18-12.

17          A.     Yes.  I see the 9-18-12 that's noted

18     by Nurse McQuay, so, yes, I see that one.

19          Q.     Okay.  And what does that say?

20          A.     * All right.  X-rays, R circle,

21     meaning right foot, R circle, right ankle, done

22     9-11-12, foot, old trauma to first MT bone, it

23     looks like, exostosis, mid shaft, first MT bony

24     space, parentheses, joint, space, narrowing first

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 94

1    MTP, no acute fractures.  Ankle, osteoporosis

2    noted, no acute fracture -- it looks like

3    dislocation or disloca (phonetically), sublux, no

4    joint effusion, no spurs, signature.

5         Q.    Okay.  Now, if a inmate falls the

6    same number of times by medical personnel and they

7    have given an x-ray as it rules out a fracture, in

8    your opinion, is that care grossly negligent?

9         A.    I'm sorry, can you ask one more

10   time?  I just want to make sure I heard everything

11   clearly.

12        Q.    All right.  I said, if an inmate

13   falls --

14        A.    Yep.

15        Q.    -- complains that he fell, he goes

16   to medical a number of times and x-ray is ordered

17   and done, the x-ray shows no fracture, is that

18   treatment grossly negligent?

19             MS. MARCELL:  Object to form.

20             THE WITNESS:  I don't know if I

21        could comment fully on the question, if

22        it's grossly negligent.  I don't -- they

23        did do an x-ray.  I don't know if this

24        is -- I don't know if they've seen this

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 95

1    patient.  I think this is a notation in the

2    chart of reporting the x-ray for

3    documentation purposes, but I don't think

4    the patient's being seen at this visit,

5    currently, to get the x-ray results.

6        Q.    I'm not talking about just that

7    visit, Doctor.  I'm talking about the entire

8    collection of medical records I gave you.

9        A.    Okay.

10       Q.    In your review of his medical

11   records, would you say that his treatments for his

12   fall was grossly negligent?

13            MS. MARCELL:  Object to form.

14            THE WITNESS:  I'm just going go back

15       and review those notations that you pointed

16       out to me; is that okay?

17       Q.    (By Mr. Neff)  Sure.  And we're

18   talking about Bates stamped 160 through 167, so

19   we're all on the same page.

20       A.    Yep.  Okay.  Thank you.  Okay, thank

21   you for the time.  I don't think I can say that it

22   was grossly negligent.

23       Q.    You're saying it's not grossly

24   negligent?

Electronically signed by Brenda Ginisi (401-014-954-6554)
351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 96

1         A.      I don't think it's grossly
2    negligent, no.
3         Q.      Okay.
4         A.      I don't see a follow-up to the
5    patient after the x-ray was taken to go over the
6    results, but that doesn't constitute grossly
7    negligent.
8         Q.      Okay.  Can extended sitting cause
9    swelling in the lower extremities?
10              MS. MARCELL:  I'm sorry, I didn't
11              hear the question.
12         Q.      (By Mr. Neff)  Can extended sitting
13    cause swelling to the lower extremities?
14              MS. MARCELL:  Thank you.  I'm sorry,
15              I couldn't hear you.
16              THE WITNESS:  Yes, it can.
17         Q.      (By Mr. Neff)  And what would one
18    recommend a patient do, who had swelling in the
19    lower extremities, due to extended sitting?
20         A.      Are you referring specifically to
21    Mr. Betancourt's case, or are you talking in
22    general?
23         Q.      In general, what would you do, if
24    someone came and presented with those issues?

Electronically signed by Brenda Ginisi (401-014-954-6554)                                351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 97

1      A.      We would, one, recommend that they

2   try and limit their amount of sitting, if they

3   were physically able do, but we'd also want to

4   make sure that the swelling isn't caused by, also,

5   a complication from extended sitting for a long

6   period of time, like a blood clot developing in

7   the leg, which could cause swelling also.

8      Q.      **Would you recommend, if they're able**

9   **to do so, lay exercises, range of motion exercises**

10  **to the extent of their ability?**

11     A.      Yes.  If we determined that the

12  swelling isn't caused by something else more

13  problematic, like a deep vein thrombosis or a DVT,

14  and that the only cause was extended period of

15  sitting and not caused by other systemic problems,

16  heart failure, kidney failure, liver failure, et

17  cetera, then, like I said, moving out of the

18  sitting position to try and increase the

19  circulation to get the fluid out of the

20  subcutaneous tissues back into the regular

21  circulation could be helpful.  But I would only do

22  that after all the other, potentially, more

23  serious causes were ruled out.

24     Q.      **Would the provision of compression**

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

1    hoses be appropriate in such situations?

2          A.      Yeah.  I'm trying to think if

3    there's any contraindications to compression

4    hoses.  We generally wouldn't give those to

5    patients who are having swelling because they're

6    having, actually, poor circulation down to the

7    feet, because that could compromise the blood flow

8    to the extremity even more.  But if that's fine

9    and it's more of a venous return problem, then

10   tent stockings, compression stockings can be

11   helpful in those situations.

12         Q.      Okay.  And, Doctor, I'm not trying

13   to insult your intelligence with this next

14   question, so please forgive me in advance, do you

15   know what a UTI is?

16         A.      I do know what a UTI is, yes.

17         Q.      And what is that, for the record?

18         A.      Urinary tract infection.

19         Q.      And are UTIs common for people that

20   use catheters?

21         A.      Are they common for people who use

22   catheters?  Unfortunately, yes, they are common.

23         Q.      Are they more common in people who

24   use catheters than those who don't?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 99

1          A.      They are more common in people who

2     use catheters than in people who don't use

3     catheters, yes.

4          Q.      **And why are they more common?**

5          A.      Because of the physical

6     instrumentation of the urethra, which is a sterile

7     space, with an instrument that could be carrying

8     bacteria on it.

9          Q.      **Is urine sterile?**

10          A.      Urine is supposed to be sterile,

11     yes.  And, actually, the flow of the urine out

12     through the urethra keeps the bladder, the

13     kidneys, the ureter and urethra in a sterile

14     environment.  When you have to put instrumentation

15     up there, or when you don't have that natural flow

16     outward that kind of clears the urethra of any

17     bacteria on the tip, or even on the inside of the

18     orifice of the urethra, it can cause urinary tract

19     infections in people who just don't have that

20     ability to void or to clear their urine on their

21     own.

22          Q.      **Did Mr. Betancourt enter the Florida**

23     **Department of Corrections this current time with a**

24     **urinary fract infection?**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 100

1          A.      You mean, during his intake did he

2     enter with a urinary tract infection?

3          Q.      **Yes, ma'am.**

4          A.      May I take a second to review?

5          Q.      **Sure.**

6          A.      Okay.  I think I found it.  It looks

7     like he had an evaluation by Dr. Nguyen.  I don't

8     see him ordering any antibiotics at that time.  I

9     have, as his plan, a wheelchair pass, baclofen,

10    Lisinopril, blood pressure check, to medical for

11    urinary cath daily, diaper care PRN, and follow up

12    at IPE, I believe is what that said.

13         Q.      **What I'm looking for here -- looking**

14    **at here, Doctor, is an Osceola County Corrections**

15    **Department Medical Transfer Summary 8-22-10.  It**

16    **says, "Current medical problems, paraplegic from**

17    **waist down, straight catheter when needed,**

18    **neurogenic bladder, history UTI and HTN.  Current**

19    **medications are baclofen, 10 milligrams, looks**

20    **like PO BID times 30 days, start 8-12-10.  What is**

21    **baclofen?**

22         A.      Baclofen is a muscle relaxer for

23    patients who have spinal cord injuries.

24         Q.      **What is Mavik?**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 101

1        A.     Can you repeat that?  What is --

2        Q.     **Mavik, 4 milligrams, M-A-V-I-K?**

3        A.     I got to write that one down.  Spell

4   that one more time.

5        Q.     **It's spelled M-A-V-I-K.**

6        A.     Mavik?  How many milligrams again?

7        Q.     **4 milligrams?**

8        A.     That one's a brand name I'm not

9   familiar with.  I'd have to go look up the generic

10  for that one.

11       Q.     **And Imipramine, maybe, 100**

12  **milligrams, I-M-I-P-R-A-M-I-N-E.**

13       A.     Oh, Imipramine.

14       Q.     **Yes.**

15       A.     Imipramine.  That's a tricyclic

16  antidepressant.  It could be use for depression or

17  chronic pain.

18       Q.     **Okay.  Well, in the current medical**

19  **problems that they have the history of UTI, in**

20  **your experience, how many UTI episodes would you**

21  **need to have before you're considered a history of**

22  **UTI?**

23       A.     So how many separate episodes of UTI

24  in the past do you think you need to have to have

Rebecca Lubelczyk, M.D.
March 17, 2014

1    a caring history of UTI, correct?

2         Q.    Yep.

3         A.    Well, for me, I could give you a

4    number.  I don't know if that would be ubiquitous

5    to all physicians, that, that would be the same

6    number.

7         Q.    Well, I don't expect you to speak

8    for all physicians, ma'am, just your own opinion.

9         A.    Okay.  In a man, when UTIs are not

10   terribly common, I would say three or more would

11   give me a -- I would put down a history of UTI.

12        Q.    Were you aware, when you gave your

13   opinion, that he had a history prior to coming to

14   the Department of Corrections in 2010 of UTIs?

15        A.    Yeah.  He had a UTI, actually,

16   during his incarceration in 2004, 2005.

17        Q.    What are the causes of a UTI for a

18   catheter user?

19        A.    So the causes of a catheter user

20   having a UTI would be all bacterial, for the most

21   part.  Meaning, like, you don't get a UTI from a

22   virus.  You wouldn't anticipate, like, a micro

23   bacteria like tuberculosis causing a UTI, even in

24   a paraplegic or a partial pelagic person, so

Rebecca Lubelczyk, M.D.
March 17, 2014

1    mostly be bacteria.

2            And the mechanism of infection would

3    be, like I said, the stagnant urines in the

4    bladder, because you have lost that outward flow

5    to cleanse the urethra, so bacteria from the

6    outside are flushed out, because they can migrate

7    up the urethra and come into the bladder, if it's

8    stagnant, as well as the instrumentation that

9    paraplegics or people who have neurogenic bladders

10   have to implement.  And that's a entry of

11   infection or a bacteria into the urinary tract

12   also.

13        Q.      **Is poor personal hygiene a factor in**

14   **getting UTIs?**

15            MS. MARCELL:  Object to form.

16            THE WITNESS:  You know, I don't know

17        specifically, if poor personal hygiene is

18        considered a risk factor for UTIs.  It

19        could -- like I said, if there was somebody

20        who had a neurogenic bladder and the urine

21        was stagnant and they had poor hygiene,

22        possibly that could be a contributing

23        factor too.  But I am not aware of that

24        particularly being a risk factor, mostly

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 104

1      because people have that -- their continent

2      of urine.  They're able to do that outflow,

3      and that process of peeing out through the

4      urethra should flush out the bacteria from

5      coming up into the urethra into the

6      bladder.

7          Q.    (By Mr. Neff)  In your opinion, are

8  you saying that not emptying your bladder enough

9  is the primary cause of UTI?

10         A.    I don't know if it's the primary

11 cause.  I said it's a potential cause.

12         Q.    In your experience, what's the

13 primary cause?

14         A.    Oh, I don't know if I could say one

15 versus another.  I kind of say they're kind of --

16 they're equal risk factors for either stagnation

17 or for instrumentation.  Maybe instrumentation has

18 gotten more of a higher risk of infection than the

19 stagnation, but I don't know the specific data on

20 that.

21         Q.    Is failure to wash one's hands a

22 factor in getting UTIs?

23         A.    If you don't wash your hands, I

24 suppose it doesn't help prevent the UTI.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      Is the patient required to clean the

2   area before inserting the catheter, does that play

3   a part in the instances of UTI?

4      A.      Yes.  So the idea is that you clean

5   the outside orifice of the urethra to decrease the

6   risk of introducing any bacteria that's on the

7   surface.  So, typically, we will provide some

8   Betadine or some sort of cleanser to the area for

9   local cleaning.

10      Q.      Is failure to properly handle your

11   catheter a risk factor in UTI -- in getting a UTI?

12      A.      I'm sorry.  Could you repeat that

13   question one more time?

14      Q.      I said, is failure to properly

15   handle your catheter a possible factor in getting

16   a UTI?

17      A.      So, yes.  So if you're not treating

18   your catheter in a clean manner, could it

19   introduce an infection?

20      Q.      Yes, ma'am.

21      A.      Yes.  That could happen.

22      Q.      What causes bladder stones to

23   develop?

24      A.      Bladder stones are most commonly the

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 106

1    kidney stones that just get passed down from the

2    kidney as they -- and they enter the bladder.

3         Q.    Have you ever heard or read that

4    introduction of a pubic hair by a catheter into

5    the bladder can cause a stone?

6         A.    I don't think I've actually heard

7    that, no.

8         Q.    How many UTIs did Mr. Betancourt

9    average per year, prior to his most recent

10   incarceration?

11        A.    Oh, I don't know if I can comment on

12   a prior year.  His previous incarceration -- give

13   me one second, please.  So prior to August 2010,

14   that incarceration, the only other documentation I

15   had to review was from October 2004 to May of

16   2005.  And during that time period of seven

17   months, he had one UTI that I could find that was

18   treated.

19        Q.    Do you have any idea how many UTIs

20   he was averaging on the outside, not in prison?

21        A.    No.  I don't have that documentation

22   to comment on.

23        Q.    Can a patient that's being given

24   three catheters a day still develop UTIs?

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

```
 1         A.      Yeah.  They could still, possibly,
 2    develop a UTI, if they were given three catheters
 3    a day.  They could still.  The risk would be less,
 4    but they could still.
 5         Q.      Is there any evidence in
 6    Mr. Betancourt's medical records that he was being
 7    provided catheters on an as-needed basis from the
 8    nurses on duty?
 9         A.      I'm sorry, what was the question
10    regarding the documentation of the nurses?
11         Q.      Is there any evidence in
12    Mr. Betancourt's medical records that he was being
13    provided catheters on an as-needed basis from the
14    nurses on duty?
15         A.      There's some documentation,
16    intermittently, about an as-needed basis for
17    Mr. Betancourt at times, yes.
18         Q.      Is there any evidence in
19    Mr. Betancourt medical records that Nurse Uphaus
20    was providing him catheters on an as-needed basis?
21              MS. MARCELL:  Object to form.
22              THE WITNESS:  I don't recall
23         specifically, anything about a particular
24         nurse.  If you want me to look at something
```

Rebecca Lubelczyk, M.D.
March 17, 2014

1          in particular, I'd be happy to.

2          Q.     (By Mr. Neff)   In your review of the

3     medical records, do you recall what type of nurse,

4     Nurse Uphaus was?

5          A.     Can I ask what her first name was,

6     or his first name was?  I'm sorry, repeat.

7          Q.     Do you recall, from your review of

8     Mr. Betancourt's medical records, what type of

9     nurse Kelly Uphaus was?  I don't mean, like, RN.

10    Like, what department was she working for?

11         A.     Oh, I thought you were asking if she

12    was an RN or LPN.

13         Q.     No, ma'am.  No ma'am.

14         A.     Oh, okay.  The way I was reading the

15    documentation, I thought she worked with the

16    physicians in the medical area.

17         Q.     You don't recall her being primarily

18    assigned as a mental health nurse?

19         A.     You know, I didn't read the

20    documentation that way.  No.

21         Q.     Okay.  Did you review

22    Mr. Betancourt's mental health records as well?

23         A.     I did look through some of them,

24    yes.  I remember seeing notes about how he was

Rebecca Lubelczyk, M.D.
March 17, 2014

1    doing.  He made some comments about how he was

2    trying not to eat certain things that would make

3    him go to the bathroom because he was concerned

4    about supplies.  He was sharing some information

5    with mental.

6           Q.      Yeah.  Look at the mental health

7    records and see if you see any of the areas where

8    all the signatures were put down, and tell me if

9    you have those.

10          A.      Oh, boy.  So what did you want me to

11   look for again?

12          Q.      Mental health records.  Well, let me

13   ask you this, instead of flipping through the

14   records --

15          A.      Yep.

16          Q.      -- Doctor, let me ask you this way,

17   let's say, theoretically, that Nurse Uphaus's

18   primary responsibility was a mental health nurse,

19   okay?

20          A.      Okay.

21          Q.      Would it be her responsibility, or

22   other nurses' responsibility to provide catheters

23   to Mr. Betancourt as he needed them particular?

24                  MS. MARCELL:  Object to form.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 110

1          THE WITNESS:  Well, I'm a little

2     confused as to what the qualifications that

3     makes you a mental health nurse versus a

4     medical nurse are.  I'm not quite sure what

5     the differences are.

6          Q.    (By Mr. Neff)   There in the

7     Massachusetts Department of Corrections, do you

8     have mental health staff that are separate from

9     the other medical staff?

10         A.    We have separate mental health staff

11    as in licensed social workers and psychiatrists,

12    and psychologists, but we don't have specific

13    mental health nurses.  I think that's where I'm

14    getting confused.

15         Q.    Do the mental health staff in the

16    Massachusetts Department of Corrections provide

17    medical supplies that aren't mental health

18    related?

19         A.    No.  They wouldn't be doing that.

20         Q.    So assuming that a mental health

21    nurse primary responsibility in the Florida

22    Department of Corrections is providing mental

23    health services, do you think that she should be

24    held accountable for not providing medical

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 111

1    supplies?

2                MS. MARCELL:  Object to form.

3         Q.     (By Mr. Neff)  And let me qualify

4    that.

5         A.     Okay.

6         Q.     That she should be held accountable

7    for not providing medical supplies that aren't

8    mental health related?

9                MS. MARCELL:  Object to form.

10               THE WITNESS:  Well, I mean, if she's

11               a nurse and there's an order, then they

12               should -- then she can give out the

13               supplier of the medication, as there's an

14               order.  But if her job description is not

15               such that, that she's medical, and that

16               she's only to take off and do mental health

17               orders, then she probably would not be

18               expected, unless she was asked to help out

19               or to help advocate for the patient, if he

20               was telling her about this.  She could --

21               she could -- what am I trying to say?  She

22               could try and inform the corresponding

23               medical nurse about the issue.

24        Q.     (By Mr. Neff)  Yep.  And what if

CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 112

1    Nurse Uphaus, even though it wasn't her primary

2    responsibility, was listening to his concern and

3    providing him catheters on an as-needed basis,

4    would that be a good thing or a bad thing by

5    Nurse Uphaus?

6              MS. MARCELL:  Object to form.

7              THE WITNESS:  If it was within the

8         scope of her practice, based on what her

9         license is and she could do it, she could.

10        But, then, that would be regarding what the

11        policy is at the Florida Department of

12        Corrections as to what her job description

13        is, that's something she could do.

14        Q.    (By Mr. Neff)  If she was doing it

15   and it wasn't necessary for her, would you say

16   that was above and beyond, that it was admirable?

17             MS. MARCELL:  Object to form.

18             THE WITNESS:  If there's an -- so I

19        just want to be clear.  If there's an order

20        for the supplies, and she was filling the

21        order as written, then I think --

22        Q.    (By Mr. Neff)  Even though it wasn't

23   her primary responsibility as a mental health

24   nurse?

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 113

1    A.    But as a nurse?  I just want to make
2  sure, she is a nurse, right; she's got a
3  registered license of some sort?
4        Q.    Yes.  She is a nurse.
5        A.    Okay.  Okay.  Yeah.  Unless it's
6  against -- if it's in the policy it says that she
7  could do it or, you know, I don't think there's
8  anything that says she couldn't do it.  As a
9  nurse, that's still -- in the scope of her
10  practice, she's able do that.
11        Q.    But what I -- my question is,
12  Doctor --
13        A.    Oh.
14        Q.    -- is even though it wasn't her
15  responsibility as a mental health nurse, it was
16  someone else's but she was doing it anyway, was
17  that an admirable thing that she was doing?
18            MS. MARCELL:  Object to form.
19            THE WITNESS:  So is the question, if
20        she's doing somebody else's job because the
21        other person's not doing it?
22        Q.    (By Mr. Neff)  Yes, theoretically.
23  Would that be an admirable thing by Nurse Uphaus?
24            MS. MARCELL:  Same objection.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 114

```
 1              THE WITNESS:  I think that the
 2       expectation is that the nurse should be
 3       doing the orders, medical or mental
 4       healthwise.
 5          Q.    (By Mr. Neff)  Even though that's
 6   not her responsibility, it's someone else's?
 7          A.    I guess I'm having trouble with the
 8   responsibility word, because I think as a nurse
 9   that she has a responsibility to the patient.  And
10   unless it's separated out by policy that, that's
11   the expectation of her job, is to -- to fulfill
12   the orders that are written for the patient.  I
13   think I'm having trouble with that word.
14          Q.    All right.  Theoretically, it wasn't
15   the expectation of her job to do that.  It was
16   someone else's expectation, but she was doing it
17   anyway --
18          A.    Okay.
19          Q.    -- would that be an admirable thing?
20              MS. MARCELL:  Object to form.
21              THE WITNESS:  I guess that would be
22       something that would be of benefit to the
23       patient, if somebody else wasn't doing that
24       for the patient, at least somebody was
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 115

1   doing it.  And, then, that should be

2   conveyed that it's not happening.

3        Q.    (By Mr. Neff)  Was it an admirable

4   thing, Doctor?

5             MS. MARCELL:  Object to form.

6             THE WITNESS:  I don't know.  I think

7   I'm stuck on the word admirable.  But I

8   think, is it helpful to the patient?  Yes.

9   I think it's helpful to the patient that

10  he's getting the supplies that he's ordered

11  for.

12       Q.    (By Mr. Neff)  Is Mr. Betancourt

13  meticulous in his catheter routine?

14       A.    I don't think I can comment on that,

15  as the documentation that I had to review doesn't

16  describe that specifically.

17       Q.    Does he have a routine?

18       A.    I didn't see anything in the

19  documentation that describes his particular

20  routine.

21       Q.    Were you provided any evidence from

22  his attorneys that he had a routine?

23       A.    Nothing that stated it explicitly,

24  no.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 116

1          Q.      Well, explicitly or unexplicitly
2    [sic], Doctor, were you given any information?
3    And by "any," I mean any information that he had a
4    routine?
5          A.      The routine that was documented was
6    that when he came into the intake facility he
7    describes his self-cath frequency as two to three
8    times per day.  That was his routine.
9          Q.      Beyond that information, you have no
10   more information regarding his routine?
11         A.      I do not have anything other -- more
12   specific, other than he self-caths two to three
13   times a day.
14         Q.      Have you ever met Mr. Betancourt?
15         A.      No.  I have not met Mr. Betancourt?
16         Q.      Does Mr. Betancourt access to soap
17   and water?
18         A.      You know, there's no specific
19   documentation about access to soap and water, but
20   I would just -- my opinion would be that everybody
21   should have access to soap and water, so I'm going
22   to assume he does.
23         Q.      Do you know if it's the policy of
24   the Florida Department of Corrections to provide

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 117

1    soap to their inmates?

2         A.      I haven't seen any specific

3    policies, but I think that that would make sense.

4         Q.      **That a common practice in the**

5    **correctional facility, is to provide soap to**

6    **inmates?**

7         A.      Yep.   Exactly.

8         Q.      **Do you know if Mr. Betancourt washed**

9    **his hands before using his catheter?**

10        A.      Yeah.   I don't have specific

11   documentation of that.

12        Q.      **Do you know if Mr. Betancourt washed**

13   **his genitals before using a catheter?**

14        A.      I'm just trying to recall if there's

15   documentation of anyone who witnessed him doing a

16   self-catheterization, and I don't believe that

17   anyone had a witness one to describe what his

18   procedure was so no.

19        Q.      **Did Mr. Betancourt drink sufficient**

20   **amounts of water per day?**

21        A.      I'm trying to recall some of the

22   documentation, if there was a statement by him

23   about him limiting his use of water so that he

24   didn't have to urinate so frequently.   I want to

Rebecca Lubelczyk, M.D.
March 17, 2014

1    say that was part of his record, but I can't

2    recall exactly where that was.  If that was a

3    mental health note, or if that was a sick call or

4    grievance.

5            **Q.      If one doesn't drink a certain**

6    **amount of water a day, does it affect the**

7    **occurrence of the UTIs with someone who has to use**

8    **a catheter?**

9            A.      You know, I don't know if it causes

10   an increased frequency in UTIs in someone who has

11   to use a catheter, because the idea of drinking

12   plenty of fluids is to flush both the kidneys and

13   the bladder, and the ureter.  And since he's lost

14   that ability to flush naturally, I don't know if

15   it actually would make a difference as to how much

16   fluid he drank on the urinary tract infection

17   because he would have to catheterize anyway, and

18   have those risk factors any way.

19            So I don't really know if drinking

20   plenty of water is actually going to help prevent

21   infection or cause more problems, because now he

22   has to catheterize more.

23           **Q.      Did Mr. Betancourt have access to**

24   **Betadine?**

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 119

1    A.      At times, he did.  He was given some
2  Betadine with his supplies.
3        Q.      **What is Betadine?**
4        A.      Betadine is an antiseptic.
5        Q.      **How would it be used in relation to**
6  **catheter usage?**
7        A.      It comes in a disposable packet.
8  You open up the packet, and it's usually like a
9  swab larger than a Q-tip, and it's covered in this
10  Betadine solution or iodine solution, the
11  disinfectant, and it's applied to the surface of
12  where you're going to be putting the catheter.  So
13  it'd be only used for the outside of the urethra.
14  It's not designed to be used internally at all.
15        Q.      **Was Mr. Betancourt given**
16  **instructions on how to clean and care for his**
17  **catheters?**
18        A.      I don't recall that from the
19  documentation.
20        Q.      **Did you ever see that he was printed**
21  **instructions on how to clean and care for his**
22  **catheters?**
23        A.      The printed instructions on clean
24  and care for the catheters was not included in the

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 120

1    record I've been reviewing.

2         Q.      You don't know if he followed these

3    instructions?

4         A.      I don't know what his routine was.

5         Q.      You said, previously, Mr. Betancourt

6    was able to walk, according to your review of the

7    medical document?

8         A.      With assistive device such as a

9    cane, and with a foot brace to keep his foot from

10   dragging on the ground.  He was able to do that in

11   the past.

12        Q.      Was he able to drive a car?

13        A.      You know, it appears like he was

14   able to drive a car, because I think I saw

15   documentation of an accident of some sort.

16        Q.      Do you know why Mr. Betancourt is in

17   prison?

18        A.      I'm trying to think.  My review

19   wasn't focusing on that, but I think it was,

20   maybe, a motor vehicle violation.

21        Q.      DUI manslaughter ring a bell?

22        A.      Oh, I think it was.

23        Q.      Safe to assume that he can drive a

24   car?

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 121

1        A.        I think you can.

2        Q.        **Mr. Betancourt able to stand,**

3   **according to your review of medical records?**

4        A.        Balancing on his left leg, he can

5   stand for, I would assume some period of time.   I

6   don't know for how long.   But he does have full

7   use of that left leg.   That's documented.

8        Q.        **Is Mr. Betancourt able to ride a**

9   **bicycle?**

10       A.        That I am not -- I do not know.   He

11  does have some --

12       Q.        **If he was able to ride a bicycle,**

13  **would that change any of your opinions?**

14       A.        I don't think so.   He does have

15  partial use of that right leg, and full use of his

16  left leg.   I think it would be difficult to ride a

17  bicycle, but maybe not impossible to ride a

18  bicycle.

19       Q.        **Is Mr. Betancourt able to stand and**

20  **urinate without the use of a catheter?**

21       A.        That I could not find documentation

22  of in the record, that he could urinate

23  independently.   I looked -- I could not find that.

24       Q.        **You couldn't find documentation one**

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 122

1    way or the other?

2         A.      I couldn't find documentation that

3    said he was fully dependent on a catheter, but I

4    could not find documentation that said he was

5    independent -- that he could urinate without one

6    either.

7         Q.      * If Mr. Betancourt could stand and

8    urinate without the use of a catheter, would it

9    change any of your opinions?

10        A.      * I'm considering the question.

11   Hold on.  So if he could stand and independently

12   urinate, is what you're asking, correct?

13        Q.      * Yes, ma'am.

14        A.      Okay.  Without the use of a

15   catheter?

16        Q.      * Without the use of a catheter.

17        A.      * I would imagine he would decrease

18   his risk of urinary tract infections because now

19   you have some of that flow that I've talked about,

20   where he's actually clearing the bacteria that can

21   get inside the urethra with the flow of the urine.

22              If he still has to instrument or

23   self-cath, he still has risk of urinary tract

24   infections, because, again, there's that

Electronically signed by Brenda Ginisi (401-014-954-6554)                351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 123

1   instrument and some stagnation of the urine, more

2   so than a person who is independent and can

3   urinate on their own.  But he would have less risk

4   of infection than somebody who is wholly dependent

5   on catheterization because of a neurogenic

6   bladder.

7          Q.     * Have you ever known anyone to make

8   or fake the extent of his paralysis?

9          A.      * Can you repeat that again?

10         Q.     * Have you ever known anyone to make

11  or fake the extent of his paralysis?

12         MR. NEFF:  Hold on a second.  I

13      think Ms. Marcell has lost the connection.

14      Ms. Marcell, are you there?  She sent me an

15      e-mail.  Can we go on hold a second,

16      please?

17         THE WITNESS:  Yes.  Actually, if we

18      could take a five-minute break, that would

19      be great.

20         MR. NEFF:  Yeah, that's fine.

21

22         (A recess was taken)

23

24         MR. NEFF:  I guess we need to figure

Electronically signed by Brenda Ginisi (401-014-954-6554)        351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 124

```
 1        out what we need read back to you, I guess.
 2             MS. MARCELL:  They told me everybody
 3        was knocked off.
 4             MR. NEFF:  Once I got the e-mail, I
 5        stopped and I informed the court reporter
 6        that you were no longer with us, and then
 7        we got disconnected, everybody got
 8        disconnected.
 9             THE COURT REPORTER:  Right.  Right.
10        After that.
11             MS. MARCELL:  I tried to call the --
12        office, but they kept sending me to voice
13        mail.
14             THE COURT REPORTER:  Do you
15        remember, at all, Ms. Marcell, where you
16        were last listening and heard us?
17             MS. MARCELL:  The last question I
18        have my notes on was, you know, was there
19        any documents -- that Dr. Lubelczyk was
20        indicating that she didn't see any
21        documentation that he should catheterize
22        100 percent of the time, nor is there
23        documentation that he could urinate without
24        catheters, basically.
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 125

```
 1
 2                  * (Questions and answers read)
 3
 4              MS. MARCELL:  I'm just going to put
 5         an objection on the record regarding the
 6         fake of paralysis, and then we can move
 7         forward from there.
 8         Q.      (By Mr. Neff)  Okay.
 9         A.      So I just want to clarify, am I
10    answering the question that I was asked prior to
11    the confusion?
12         Q.      I just have you ever known an inmate
13    to fake the extent of his paralysis?
14         A.      I have known.
15              MS. MARCELL:  Objection.
16         Q.      (By Mr. Neff)  I'm sorry, I did not
17    hear you.
18         A.      I have known.
19         Q.      You have known an inmate to do that?
20         A.      Yes.
21         Q.      And how many times has that occurred
22    in your corrections experience?
23         A.      Again, I'm trying to think.  I'll
24    say about four or five times, that I'm aware of.
```

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 126

1        Q.        Have you ever known an inmate to not

2    cooperate with medical staff, and the instructions

3    from medical staff, in order to further a lawsuit?

4              MS. MARCELL:  Object to form.

5              THE WITNESS:  I'm sorry, can you

6         repeat the last part of that question, it

7         got muffled again?

8        Q.        (By Mr. Neff)  Have you ever known

9    an inmate to not cooperate with the instruction of

10   medical staff in order to further a lawsuit?

11             MS. MARCELL:  Object to form.

12             THE WITNESS:  I'm trying to think.

13   I can't think of any specific examples.

14       Q.        (By Mr. Neff)  Have you ever heard

15   of that happening?

16       A.        I could imagine that could happen,

17   but I can't think of anything particular.

18       Q.        Is the National Institute of Health

19   a reputable organization?

20       A.        Yes, it is.

21       Q.        Were you provided the documentation

22   that I e-mailed over regarding -- there's a few

23   documents.  They were Bates stamped one through 36

24   as Exhibits A, B, C, and D; do you have a copy of

Rebecca Lubelczyk, M.D.
March 17, 2014

1   those in front of you?

2       A.    I don't think I have anything from

3   your office.  What are they regarding, just so I

4   know what I'm looking for?

5       Q.    **They should say in the bottom**

6   **right-hand corner.  I sent them over to the court**

7   **reporter's office, and I thought they would be**

8   **printed out for you.  I could be wrong.**

9       A.    Oh, hold on a second.  She's

10  checking.

11          MR. NEFF:  I'd like these attached

12      as exhibits, all of them, pages one through

13      36.

14          MS. MARCELL:  I'll just object to

15      them.

16          THE COURT REPORTER:  Just bear with

17      me one second, while I do this.

18

19          (A recess was taken)

20

21          MR. NEFF:  Are we back on the

22      record?

23          THE COURT REPORTER:  Yes.

24      Q.    **(By Mr. Neff)  Now, Doctor, you said**

Rebecca Lubelczyk, M.D.
March 17, 2014

1    that the National Institute of Health is a

2    reputable organization?

3         A.    Yes.

4         Q.    And that's a division of the federal

5    government?

6         A.    Yes, it is.

7         Q.    United States Department of Health

8    and Human Services, I believe?

9         A.    I think you're right.

10        Q.    Would you look at pages that are

11   Bates stamped one through three, which should say

12   Clean Intermittent Self-Catheterization Procedure

13   for Men?

14        A.    Yes.  I that in front of me now.

15        Q.    Okay.  And for the record, this is

16   found at

17   www.cc.nih.gov/ccc/patient_education/pepubf/bladde

18   r/discmen5_22.pdf.  On the top, what does it say,

19   Doctor, Patient Information Publications?

20        A.    Patient Information Publications,

21   yep.

22        Q.    Hello?

23        A.    Oh.  Yes.  Patient Information

24   Publications, yes.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      And Clinical Center National

2    Institute of Health?

3      A.      Yes.

4      Q.      Have you ever seen these

5    instructions before?

6      A.      No.  I haven't had the opportunity

7    to look at these before.

8      Q.      Did you know they existed?

9      A.      No.  I didn't know they specifically

10   existed, no.

11     Q.      Do you know if these were the

12   instructions that were printed and given to

13   Mr. Betancourt?

14     A.      No.  I have no idea.  There is no

15   copy of this in his record.

16     Q.      Okay.  Does it say anywhere on page

17   one through three of this procedure, this

18   information given from -- given by the National

19   Institute for Health, that they're talking about

20   catheters that can be reused as opposed to

21   catheters that can't be reused?

22           MS. MARCELL:  Object to form.

23           THE WITNESS:  So -- I'm sorry.

24   You're asking one through three, correct?

Electronically signed by Brenda Ginisi (401-014-954-6554)

351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      (By Mr. Neff)  That's right.

2      A.      All right.  Can I take a moment to

3  look at them?

4      Q.      Absolutely.

5      A.      Okay.

6      Q.      I guess my question wasn't properly

7  stated.  Does the article, any way, differentiate

8  between the types of catheters that they are

9  talking about?

10     A.      Okay, I'll look for that.  Okay.

11  I've read pages one through three.

12     Q.      Does it note any differentiation as

13  to what catheter was used?

14     A.      On page two, Item No. 1 it says,

15  your doctor -- "Your nurse or doctor will let you

16  know which type of catheter you need."

17     Q.      Okay.  And what was the process for

18  cleaning after use; what do they use, was it soap

19  and water?

20     A.      They used cold water first, then

21  liquid soap, then hot water, and then completely

22  dry -- completely air dry.

23     Q.      Okay.  And what does it say -- and

24  that was on page two, correct?

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

1        A.      That was page two.  That was article

2    No. 11 and 12.

3        Q.      Okay.  And then on page three it

4    talks about replacing catheters and how often must

5    they be replaced, according to the article?

6                MS. MARCELL:  Objection.

7                THE WITNESS:  This article says you

8            discard them when they become discolored,

9            hard, brittle, no longer drain or become

10            too soft to insert.

11        Q.      (By Mr. Neff)  And it says at the

12    very top of that, the very first sentence, what

13    does that say?

14                MS. MARCELL:  Object to form.

15                THE WITNESS:  "A catheter may be

16            used for up to two to four weeks."

17        Q.      (By Mr. Neff)  Does the article say

18    anything about drinking liquids?

19        A.      It did.

20        Q.      Specifically, looking at the last

21    bullet point under the liquid heading on page

22    three?

23        A.      Oh, page three, yep.

24        Q.      Does it say by drinking enough and

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 132

1   emptying your bladder, you can help prevent

2   urinary tract infections?

3        A.    Yes.   That's the last bullet point

4   on page three.

5        Q.    Okay.   And what's the date of this

6   thing, it says it in the gray block?

7        A.    2007.

8        Q.    Okay.   Did you disagree with the

9   information provided by the National Institute of

10  Health on this document?

11            MS. MARCELL:   Object to form.

12            THE WITNESS:   Well, I'm a little

13        confused because it doesn't comment on

14        which kind of catheter they're referring

15        to.   All it says is, "Your nurse or doctor

16        will let you know which type of catheter

17        you need."   So it doesn't specify if this

18        is for any one of the reusable catheters

19        that's out on the market, or if this is --

20        also applies to any single-use catheter out

21        on the market.

22            It also mentions some products and

23        stuff, which is accessible for patients who

24        aren't incarcerated, but some of these

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 133

1     things a incarcerated patient might not be

2     able to access easily.

3          Q.     (By Mr. Neff)  Would you say that if

4     the National Institute of Health meant for this to

5     be solely for one type of catheter over another,

6     that they would state that?

7               MS. MARCELL:  Object to form.

8               THE WITNESS:  I think it's more of a

9          generic document that's provided for the

10         benefit of the patient, but I think they do

11         put in here that your doctor or nurse will

12         be more specific about the instructions

13         regarding what type of catheter you have.

14         This is more of a generic --

15         Q.     (By Mr. Neff)  According to the NIH,

16    it's up to the doctor or the nurse --

17              MS. MARCELL:  Object to form.

18         Q.     (By Mr. Neff)  -- as to what

19    catheter to use?

20         A.     Right.  It says on that page, it

21    says, "Your doctor or nurse will let you know

22    which type of catheter you need."  So this is kind

23    of just a generic information sheet that they put

24    out, but they always make a note in here, like on

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    that statement, that any other specific

2    instructions pertaining to your particular type of

3    catheter, that depends on your -- that you have to

4    go to your doctor or nurse for.

5            Q.      So it's up to your doctor, correct?

6            A.      Yeah.  Doctor or nurse, yeah.  A lot

7    of times, in the outpatient world, a lot of times

8    the teaching is done by the nurse.

9            Q.      Have you ever heard of the Society

10   of Urologic Nurses and Associates?

11           A.      No.  I don't think I can say I have

12   heard of that group.

13           Q.      Okay.  Have you ever heard of the

14   group, the National Association for Continence?

15           A.      No.  I'm not aware of that group

16   either.

17           Q.      Okay.  Have you ever heard of the

18   Journal of Urologic Nursing?

19           A.      Journal of Urology, but not urologic

20   nursing.

21           Q.      Okay.

22           A.      Did you find any documents in the

23   NIH regarding corrections' populations, I'm just

24   wondering?

Rebecca Lubelczyk, M.D.
March 17, 2014

1       Q.      Not yet, no.

2       A.      Okay.

3       Q.      Now, Doctor will you please refer

4   back to your -- your affidavit for a moment?

5       A.      Yep.  Let me find that document.

6   Okay, I've got it.

7       Q.      Paragraph C --

8       A.      Paragraph C, yep.

9       Q.      Okay.  What's the basis for this

10  opinion?

11      A.      Is it seems that the -- well the

12  information and the documentation that I've gotten

13  is that the catheter that he's been dispensed from

14  the nurses has been single-use catheters, it looks

15  like, not reusable type catheters.  And I was

16  going along with the thought process that they're

17  labeled single use because the manufacturer

18  recommends them for single use only.

19      Q.      Do you know if he was ever given

20  reusable catheters, if Mr. Betancourt was ever

21  given reusable catheters?

22      A.      I have not been given that

23  information that he was ever given reusable

24  catheters.  The only information that I've got was

Rebecca Lubelczyk, M.D.
March 17, 2014

1   the single-use catheters.

2          Q.      **Where was that documented?**

3          A.      I have an exhibit that was provided

4   to me to review.  It's a -- I believe a photograph

5   of a catheter.

6          MS. MARCELL:  Lance, just for your

7          reference, Exhibit 8 of Dr. Lafontant's

8          depo, he brought the catheter to the

9          deposition, the 30(b)(6) rep. so --

10         Q.      **(By Mr. Neff)  So, Doctor, is this,**

11  **yet, another exhibit that you've looked at that**

12  **you haven't disclosed until this time, because I'm**

13  **not seeing it in your affidavit?**

14         A.      Oh, I'm sorry, I thought that was

15  part of the -- it's not part of the medical

16  record, then?

17         Q.      No, ma'am.  And we were pretty

18  thorough in the beginning -- in the beginning of

19  the deposition where you say that you saw the

20  lawsuit file, the image request and grievances

21  from Adam Betancourt, as well as the complete

22  medical chart provided by the Florida Department

23  of Corrections.  And you also added during this

24  deposition, that you had seen part of a depo of a

Rebecca Lubelczyk, M.D.
March 17, 2014

1   Tony Romano.  And I asked you if that was

2   everything.  You said, yes, that was everything,

3   and now you're telling me more.

4              Ma'am, can you please give me a

5   complete recitation of all the things that you're

6   basing your opinions on.

7        A.    All right.  I've got the medical

8   record.  I, for some reason, thought that was part

9   of it.  I'm am very, very sorry.  The deposition

10  that I've mentioned.

11       Q.    And that was the deposition of

12  Tony Romano?

13       A.    The deposition of Tony Romano that I

14  mentioned.

15       Q.    This deposition, he was the one

16  giving his testimony?

17            MS. MARCELL:  If you have the

18            deposition, just read the caption.  It

19            was -- that's who the deponents is, not the

20            title of the lawsuit.

21            THE WITNESS:  Yeah.  Right, right.

22            right.  Deposition of Carl Balmir.

23       Q.    (By Mr. Neff)  So you're telling me

24  now this is the deposition, not of Tony Romano,

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    but of Carl Balmir?

2         A.        B-A-L-M-I-R.  Yes.  I'm sorry.  Yes.

3    It was regarding Tony Romano's case.

4         Q.        **Is there anything else you'd like to**

5    **disclose to me that you haven't previously**

6    **disclosed that I've asked you, Doctor?**

7         A.        I just want to check and make sure

8    I've done everything, because I want to make sure

9    I've got everything for you.  I do have a document

10   from Ms. Marcell's office that she provided me

11   regarding the definition of deliberate

12   indifference.

13        Q.        **Okay.  And what is that definition?**

14        A.        It's kind of like -- it's like a

15   four-page document that kind of goes over the

16   deliberate indifference and how it differentiates

17   from medical malpractice since --

18        Q.        **Your understanding of reading the**

19   **document, how does it differentiate from medical**

20   **malpractice?**

21        A.        My understanding is, is that other

22   than medical malpractice, in deliberate

23   indifference there has to be a knowing of a

24   serious medical condition.

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 139

1    Q.    Anything else?

2    A.    Yeah.  And, then, it just doesn't --

3  people don't provide appropriate medical care,

4  because even though they understand there's a

5  need, they choose to dismiss the need

6  deliberately.

7    Q.    Do you know what the medical

8  standards that is required in the 11th Circuit

9  Court of Appeals in order for deliberate

10 indifference to be found?

11        MS. MARCELL:  Object to form.  You

12        can still answer the question.

13        THE WITNESS:  It's considered that

14        it's a medical need that's so obvious a

15        layperson could recognize the need for a

16        doctor's attention.

17   Q.    (By Mr. Neff)  And that's your

18 understanding of deliberate indifference?

19   A.    Yes.

20   Q.    That was a yes, I'm sorry?

21   A.    I'm sorry, yes.

22   Q.    Okay.  All right.  That picture that

23 you saw -- now, at this point we've gone over

24 everything that you've reviewed in order to make

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 140

1    your opinions, correct, Doctor?

2         A.     I think we have, yes.  I think we

3    have, yes.

4         Q.     Okay.

5         A.     I think we got it.

6         Q.     What was in the picture that you

7    saw?

8         A.     It was a single picture of a package

9    of a Coloplast catheter.  I don't -- I can't tell

10   from the picture if it's opened or unopened, if

11   it's the catheter that's still in there or not.

12        Q.     Okay.  Is it your understanding that

13   this is the type of catheter that Mr. Betancourt

14   was provided each and every time he was given a

15   catheter?

16        A.     That was the documentation that was

17   provided for me as an example of the catheters

18   that Mr. Betancourt was given, yes.

19        Q.     Where does it say that this was the

20   one that he was given each and every time, or is

21   that something that -- that plaintiff's attorney

22   told you?

23        A.     This is what -- this was provided by

24   the plaintiff's attorney.  This was what they were

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 141

1    given.  I'm not sure if it was the Department of

2    Corrections, or if it was the medical vendor, or

3    whom -- who gave it to her, but this was the item

4    that they said this was representative of, I

5    believe, of what the catheters that Mr. Betancourt

6    had been receiving.

7            Q.      **Okay.**

8            A.      That's all I got.

9            Q.      **Now, on paragraph B --**

10           A.      Are we back to the affidavit?

11           Q.      **Yes.  We're back to the affidavit,**

12   **paragraph C of your affidavit.**

13           A.      Okay.

14           Q.      **What is the basis for your opinion**

15   **in paragraph C?**

16           A.      So the basis for my comment in

17   paragraph C was that my understanding was that he

18   was being provided catheters that were labeled as

19   single use.  That because they're labeled single

20   use, it is -- that it's better medical practice

21   for him to use them once in appropriate fashion

22   that he should know how to use, discard them, use

23   another one for another use.  And that, my concern

24   was, is that because he hadn't been given ones for

Rebecca Lubelczyk, M.D.
March 17, 2014

1    every time he had to empty his bladder, that these

2    urinary tract infections were becoming so

3    frequent.

4         Q.    Now, are you assuming that he was

5    only given catheters that were documented in his

6    medical file?

7         A.    I could only go on what the

8    documentation was that I received to review.  And

9    it is good practice in the DOC, in the medical

10   unit, to document when certain supplies are given,

11   just like when medication's are given.

12        Q.    Is this always done, in your

13   experience as a correctional doctor?

14        A.    It should always be done.

15        Q.    Is it always done?

16        A.    Have there been times when

17   somebody's been given something and that

18   documentation wasn't recorded?

19        Q.    Yes, ma'am.

20        A.    I'm sure it has.  It shouldn't, but

21   I'm sure it has.

22        Q.    Ma'am, you previously stated in

23   early part of the deposition, that you didn't know

24   the structural difference between a -- a reusable

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 143

1   catheter and a nonreusable catheter, a disposable

2   catheter.  Based on that information, how could

3   you state what you just stated to me in paragraph

4   C?

5              MS. MARCELL:  Object to form.

6              THE WITNESS:  I'm basing my

7         paragraph C -- I'm basing my paragraph C

8         on -- basically relying upon the

9         manufacturer that they manufacture the

10        single-use catheters in a certain way

11        that's different than the disposable -- the

12        reusable catheters, excuse me, such that

13        the reusable catheters can be made a

14        certain way that allows them to be

15        reusable.

16        Q.    (By Mr. Neff)  You don't know if

17   they are, in fact, different?

18        A.    No.  I actually haven't gone to look

19   at the individual catheters specifically enough to

20   note any differences.

21        Q.    Now at paragraph D in your comment,

22   to follow-up on that, is there any indication in

23   the medical records, that Mr. Betancourt developed

24   urethra issues?

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 144

1          A.      I'm thinking back to my review.

2    Hold on.  I don't think I seen anything in his

3    documentation that states he's got, currently, a

4    urethra issue at this time, no.

5          Q.      Is there any indication that

6    Mr. Betancourt developed kidney problems?

7          A.      No.  I haven't seen anything in the

8    documentation, other than the -- he had a kidney

9    stone late in the incarceration period that I was

10   reviewing.  But --

11         Q.      That was a bladder stone, wasn't it,

12   ma'am?

13         A.      Oh, I'm sorry, bladder stone.

14   Probably from the kidney stone, but yes.  And by

15   the time they diagnosed, it was a bladder stone,

16   yeah.  But I don't think that's related,

17   necessarily, to his use of catheters and what kind

18   of catheters he used.

19         Q.      Now, what is the basis for your

20   calculation in paragraphs F and G of your

21   affidavit?

22         A.      F and G.  I was using the

23   documentation from MARs.  I was using the

24   documentation from the notes, trying to document

Rebecca Lubelczyk, M.D.
March 17, 2014

1    as frequently as possible how many times, and how

2    many catheters he was given over a course of time

3    period.

4         Q.      Did you look at his grievances and

5    responses thereto as to how many times he was

6    given catheters?

7         A.      I looked at the grievances, yes.

8    What was the question?

9         Q.      Did you include that in your

10   calculation, in the grievance response that you

11   state I gave him X amount of catheters, did you

12   include that in your calculation of F and G?

13        A.      I did not corroborate and see if

14   those were the exact ones that they were talking

15   about, the ones that were in the documentation,

16   because I was going only on the MARs and the

17   documentation that I could find in the medical

18   records, not in the grievances.

19        Q.      So assuming he was given any medical

20   supplies that aren't documented, clearly, that's

21   not in your calculations either, right?

22        A.      Correct, because I didn't feel like

23   I would have accurate documentation of things that

24   were being given on the side that weren't

---

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 146

1    accounted for.  I could only account for what were

2    being accounted for.

3         Q.     Understood.  Now, your first

4    paragraph of -- sorry.  Your first sentence of

5    paragraph H --

6         A.     Yes.

7         Q.     -- you state that another urinary

8    tract infection was diagnosed on April the 8th

9    2011, which progressed to muscle spasms in the

10   leg.  How do you know that one is connected to the

11   other?

12        A.     In patients who have spinal cord

13   injury and some -- and paraplegia or partial

14   paraplegia, sometimes there's abnormal signals

15   that come from the body when something's wrong,

16   and it can come out in different manifestation

17   than in people who have intact spinal cords.

18             So like a urinary tract infection in

19   Mr. Betancourt, if led to progress, it could

20   actually trigger muscle spasms in the -- in the

21   spinal cord, because the spinal cord's trying to

22   tell the brain something, but it has disrupted

23   pathway so it's doing it in a different way.

24   We've see that in people who have spinal cord

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 147

1    injuries, that when something's wrong, they get

2    muscle spasms and twitching of affected parts.

3            Q.      Doctor, this wasn't a suggestion in

4    the first paragraph.  It was -- you stated it as a

5    fact.

6            A.      Yes.

7            Q.      You said, "Another urinary tract

8    infection was diagnosed on April the 8th 2011,

9    which progressed to muscle spasms in the leg."

10           A.      Yes.

11           Q.      How do you know that that's a true

12   statement?

13           A.      I believed it was true because I

14   thoughts that in his description and the medical

15   records, when they were doing the exam, that he

16   was developing muscle spasms, that it was directly

17   related to his spinal cord and his urinary tract

18   infection.

19           Q.      Did he have a history of muscle

20   spasms prior to April of 2011?

21           A.      I've seen back spasms.

22           Q.      You didn't see any leg spasms?

23           A.      I can't recall leg spasms,

24   particularly.

Rebecca Lubelczyk, M.D.
March 17, 2014

1      Q.      And if there were leg spasms in the

2  past, would that change your statement?

3      A.      Hard to know because he might have

4  had leg spasms in conjunction with other urinary

5  tract infections too.  It may not happen with

6  every single urinary tract infection, it may

7  happen with certain ones.  And only if you checked

8  his urine at the time he was having the muscle

9  spasms and the urine was clean, then we would know

10  the muscle spasm wasn't related to the urinary

11  tract infection.

12      Q.      Could someone, in the condition of

13  Mr. Betancourt, have leg spasms and not have a

14  urinary tract infection?

15      A.      Oh, yeah.  It's possible, yes.

16      Q.      And the last sentence of paragraph H

17  of your affidavit you said that this was

18  compounded by delay of 17 days to treat with

19  antibiotics.  What do you mean by that; how was it

20  compounded?

21      A.      Well, my comment there was I was

22  worried that his condition was being compounded by

23  the delay of 17 days because, in his condition,

24  the urinary tract infection could progress.  It

Electronically signed by Brenda Ginisi (401-014-954-6554)                                        351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 149

1    did noted get to the point of kidney infection,

2    thank goodness.  But with a delay of 17 days it

3    certainly -- the infection just can proliferate

4    while it's awaiting to treatment.

5         Q.    Is there any indication from the

6    records that you saw, that this alleged delay of

7    17 days caused any of that damage to

8    Mr. Betancourt?

9         A.    I'm just looking.  No.  I don't see

10   anything that says there's any further damage that

11   occurred.

12        Q.    In paragraph L you state that on

13   August 29, 2012 another urinary tract infection

14   was diagnosed, most likely due to the lack of

15   catheter provisions provided?

16        A.    Mm-hmm.

17        Q.    How do you know the UTI was from the

18   lack of catheters as opposed to something else,

19   such as the lack of washing his hands, or the lack

20   of personal hygiene, proper personal hygiene, or

21   the lack of adequately or properly holding the

22   catheter, how do you know the provision of

23   catheter as opposed to something else?

24        A.    I was basing that statement on the

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 150

1  fact that his -- the pattern of how often or how

2  infrequent he's getting catheters, new catheters

3  to use, and that, that was the most likely risk

4  factor for this because he's constantly being --

5  he's just constantly being told to -- sorry.  He's

6  constantly reusing the catheters again and again,

7  and it was going on for several months.  And it

8  just, again, it seemed to be another pattern.  I

9  can't comment on, again, the specific of his own

10  personal routine, because that's not documented

11  that I can -- so I can comment on.  This is what I

12  can comment on.

13       Q.    **Without knowledge of his personal**

14  **routine, his cleanliness, his hygiene, his**

15  **handling of catheters, you actually can't rule**

16  **those out, can you, as a reason for the UTI?**

17            MS. MARCELL:  Object to form.

18       Q.    **(By Mr. Neff)  Doctor, can you rule**

19  **those out?**

20       A.    I'm thinking through.  If it was

21  more like a contaminant, what we usually would see

22  on the urine is more of a mixture of bacteria from

23  general surfaces and stuff, because there's no one

24  bacteria on a surface, like on your hands or, you

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 151

1    know, out in the room or feces, or whatever.

2                Especially, if someone's, you know,

3    dirty, they have several -- many strains of

4    bacteria that are present.  And his cultures that

5    I looked at were single bacteria that suggested it

6    was -- it was a urinary tract infection from one

7    bacteria, rather than a contaminant or a multiple

8    bacteria from a very dirty surface.

9         Q.      **What bacteria is usually on**

10   **someone's hands?**

11        A.      Staph aureus is highly prevalent,

12   staph epidermidis is also one.  Those are the

13   major ones, because usually on the hands and skin

14   it's a gram-positive bacteria.  The ones that

15   usually get into the urine are gram-negative ones,

16   like E-coli, Klebsiella, H flu can get into the

17   urine.

18        Q.      **With the improper hygiene, could he**

19   **be getting gram negative?**

20        A.      Oh -- oh, definitely.  Definitely.

21   But what I'm saying is, is that, if there was a

22   concern about not washing hands you would

23   anticipate that there would be more of a variety

24   of flora of bacteria that were coming in, instead

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 152

1    of a single one.  You would expect to see more,

2    kind of topical bacteria, rather than the gram

3    negative ones that we see in the urine, which are

4    mostly fecal because just the anatomy of the

5    urethra to the anal area, they're so proximal to

6    one another.  That's the most common contaminate

7    or infection.

8            Q.      So if he didn't have proper hygiene,

9    he could, in fact, be getting the same contaminate

10   each time onto the catheter, thus causing very

11   similar infections, or the same type of

12   infections, the same type of bacteria?

13                   MS. MARCELL:  Object to form.

14                   THE WITNESS:  I mean, that's why we

15              use the antiseptic, the Betadine, to try

16              and clear off that -- that area as much as

17              possible.

18           Q.      (By Mr. Neff)  And that's every

19   time, Doctor?

20           A.      I'm sorry?

21           Q.      Was he using Betadine every time?

22           A.      The patient should be using it.

23   Again, I don't have the documentation of his

24   specific routines.  I haven't had anybody show --

Rebecca Lubelczyk, M.D.
March 17, 2014

1  him show them that and they've documented, that I

2  could review.  But he's definitely getting urinary

3  tract infections that a person who has, you know,

4  catheterization dependency needs do, but not so

5  much like, you know, it was intentional.  Like it

6  was dirtied or anything like that.  Dirtied ones,

7  dirtied hands would definitely give you a much

8  more varied, sort of, bacteria in the culture.

9       Q.     Now, in paragraph N of your

10  affidavit, you talk about what you refer to is

11  medical orders.  Is it says, "Medical orders show

12  one to two catheters a week times six months."

13  Who made this order?

14       A.     Oh, I got to go back to the record.

15       Q.     Was it a doctor?

16       A.     From what I can see, I think it's --

17  I think there's only physicians at Columbia.  I

18  don't think I saw notations of a PA or an NP, a

19  nurse practitioner or a physician's assistant.

20       Q.     Do you think a doctor made this

21  order?

22       A.     Wait one second.  I have

23  Dr. Hernandez.  That was on the 12th; is that

24  right?  Yeah, 2012.  I have Dr. Hernandez that did

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 154

1    that order.

2         Q.      Do you know why he made that order?

3         A.      I can't recall offhand what was

4    specifically -- he did that one particular for.

5         Q.      You don't know why he changed if to

6    one -- one to two?

7         A.      I'm sorry, can you repeat the

8    question again?  You broke up there for a second.

9         Q.      You don't know why he changed it to

10   the way he changed it?

11        A.      Hold on.  Let me see what it was

12   before and what he changed it to.  Well, he's got

13   the catheter supplies, two caths a week for six

14   months, or then changed it to one to two caths per

15   week for six months.  That was on December 7th.

16   That was that order.

17        Q.      Okay.  But you don't know why he did

18   that?

19        A.      I have to look back into my records

20   and see if I can find it, if there's anything in

21   particular.  No.  I actually have to go back to

22   the medical record and try to look that up.

23        Q.      But off the top of your head, you

24   don't know?

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 155

1          A.     I can't remember.

2          Q.     Okay.  Will you look at paragraph O

3     in your affidavit, and can you please explain to

4     me what you mean by that, by your statement there

5     in O?

6          A.     O.  All right.  Review of the

7     records.  So there was a period of time when he

8     was told that he had to produce an old catheter to

9     get a new catheter.  And at one point in time they

10    said, if you need to go right now we'll give you

11    one right now.  And at the time when he had come

12    up to medical he -- he actually didn't have to go.

13    But he was -- so he didn't get a new catheter at

14    that point in time.

15              Unfortunately, it seemed like when

16    he needed to go he was supposed to come up to

17    medical to get a new catheter, to bring the old

18    one, and then he would get a new one.  But when

19    you need to urinate, or when his bladder gets full

20    enough, it may not coincide with medical supply

21    time and when he's able to ask for permission to

22    go up and to go get those supplies.  It may be in

23    the middle of count, it may be in the middle of

24    something else where there's no movement, where

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 156

1    they allow the guys to go back and forth between

2    departments.  And so it was --

3         Q.      You don't know how they allow

4    inmates in Florida Department of Corrections to

5    move about, do you?

6         A.      I would assume that there is -- I'd

7    have to go on the basis of what I know for inmate

8    movements for the institutions that I've worked

9    in.

10        Q.      Which are Rhode Island and

11   Massachusetts, correct?

12        A.      Yeah.

13        Q.      And you've never worked for the

14   Florida Department of Corrections, correct?

15        A.      No, I haven't.

16        Q.      So you don't know how they allow

17   their inmates to move for medical supplies, do

18   you?

19        A.      No.  It looks like they had

20   schedules --

21        Q.      Doctor, it's a simple question.  Do

22   you, or do you not know how inmates are allowed to

23   move about for medical supplies within the Florida

24   Department of Corrections?

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1        MS. MARCELL:  Object to form.

2        THE WITNESS:  I think I have an

3    incomplete understanding of their movement,

4    yes.

5        Q.    (By Mr. Neff)  After an inmate uses

6    a catheter, would he usually need another one?

7        A.    I'm sorry, repeat that one more

8    time.

9        Q.    After someone, an inmate or someone

10   else -- we'll stick with inmate.  After an inmate

11   uses a catheter and empties his bladder, would he

12   immediately need another one?

13       A.    He would not immediately need

14   another one in order to use another one.  But,

15   yes, he should be -- he should get access to

16   another one after that, because at some point in

17   time he's going to need another one.

18       Q.    How long does it take for a normal

19   human bladder to refill?

20       A.    Well, that would vary between

21   people, and obviously their intake and many

22   different factors.  I would say that a person

23   should urinate between four and six hours,

24   normally, after their last void.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 158

1      Q.      How long does it take for

2   Mr. Betancourt's bladder to refill; is there any

3   indication in his medical records?

4      A.      That we can't know specifically of

5   how much his -- how quickly his bladder refills.

6      Q.      What was his water intake like; I

7   thought you said you saw something about that?

8      A.      No.  Actually, it was food.  I

9   reread those notes.  It was food that he had that

10  was limiting, and I didn't see any notations about

11  his limiting his own water intake, I'm sorry.

12     Q.      So you're changing your testimony as

13  to that?

14     A.      I'm clarifying it, yes.

15     Q.      Okay.  I would appreciate you

16  clarify, if you come across something before we

17  happen to ask about it.  I would personally

18  appreciate that.  It's my only chance to talk to

19  you today before trial.

20     A.      Okay.  I will do that.

21     Q.      Thank you.

22     A.      Go ahead.

23     Q.      So if Mr. Betancourt, once he had

24  just used the catheter immediately asked for

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

1    another, there should be plenty of time to get

2    one, correct, Doctor?

3              MS. MARCELL:   Object to form.

4              THE WITNESS:   I would think

5         Mr. Betancourt should have four to six

6         hours before his next needed void to access

7         medical to go get another catheter for his

8         next void.

9         Q.    (By Mr. Neff)   And under your

10   experience working for the Rhode Island Department

11   of Corrections and the Massachusetts Department of

12   Corrections, is four to it six hours sufficient

13   time to make it to medical?

14        A.    The way that the systems that I've

15   worked in have been set up, they only do supplies

16   once a day, and if they need something more

17   frequently than that because they won't give out a

18   24-hour supply at a particular time, then they'll

19   come down to the med line or predetermined time

20   three times a day.  Most times the system is not

21   set up to do something in a 11 to seven overnight

22   shift for medical supplies.  Most facilities don't

23   have the staff to do that.

24        Q.    Okay.  Does the Florida Department

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

1    of Corrections facility have the staff to do that?

2            A.      That, I can't comment on.  I do not

3    know.

4            Q.      And do you know how often inmates in

5    the Florida Department of Corrections are able to

6    access medical?

7                    MS. MARCELL:  Object to form.

8                    THE WITNESS:  I mean, some

9            facilities in the Florida Department of

10           Correction, I'm sure they can access 24/7

11           via their officer, if there's overnight

12           shift, if there is medical resources at

13           those times.  But, usually, there's certain

14           circumstances that they will access medical

15           for and there's -- there are those

16           circumstances that they won't access

17           medical for the patient only because it's

18           something that doesn't have to be addressed

19           in the middle of the night.

20           Q.      (By Mr. Neff)  So you stated under

21   typical circumstances, an inmate is given, in the

22   DOC that you've worked in, enough supply to last

23   24 hours.

24           A.      I --

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 161

1      Q.      In your experience, why would they
2  not be given enough supplies to last the 24 hours?
3      A.      My current facility, they give
4  supplies for a month for a patient.  I've seen it
5  in other institutions where they've give enough
6  supplies for a week.  In instances where there's
7  such a high, high level of security, like in
8  segregation, I can't think of a specific example,
9  but, typically, if someone needs something that
10 they cannot keep in their cell because of the
11 security constraints, they're given it one time,
12 and then they return it after that use is over.
13 So they're not allowed to keep it in that cell.
14 So those are the higher level securities.
15     Q.      Okay.  On paragraph P, please
16 explain the basis for P, for paragraph P?
17     A.      The medical staff had clear
18 knowledge that the catheters provided were
19 one-time-use-only catheters?
20     Q.      Mm-hmm.
21     A.      The basis that I made that comment
22 was the information that I was provided that said
23 this was the catheter that they were using.
24     Q.      In one of the photographs?

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 162

1      A.      Yes.  And that's what it says on the

2    photo -- on the label of catheter, that they're

3    single-use-only catheters.

4           Q.      Okay.  In paragraph T of your

5    affidavit, you talk about the dates 2010 through

6    2014, I'm assuming that's a misstatement.

7      A.      Oh, okay.  What is it --

8           Q.      T?

9      A.      T.  Did not change their orders.

10    Oh, because they did change their orders.

11           Q.      No.  I'm talking about the dates.

12    You told me earlier that you had only seen medical

13    records through 2013, correct?

14      A.      Oh, yeah, that's supposed to be

15    2013.

16           Q.      Okay.  So that's wrong, 2014 is

17    wrong?

18      A.      2014 is absolutely wrong.  I

19    apologize.  Yes, you're right.

20           Q.      In your review of medical records,

21    was Mr. Betancourt being provided diapers?

22      A.      Yes.  I did see reference to

23    sanitary underwear -- disposable underwear, yes.

24           Q.      And how often was he provided

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 163

1    diapers?

2           A.      There were times that he was given

3    diapers -- I hate to say diapers.  There were

4    times he was given disposable undergarments at

5    times when he was given catheters also.  There

6    were times when he was just given the disposable

7    briefs independently.

8           Q.      Okay.  And do you know how many he

9    was given at a time?

10          A.      It varied.  Trying to give an

11   example.  He was given, in November 6, 2010 he was

12   given 10.  Let me see.  December 25, 2010, it just

13   says a package of medium diapers was dispensed.

14   The 31st of December he was given five medium

15   diapers, seven.  Sometimes it was two, sometimes

16   it was -- they mentioned a package.

17          Q.      Okay.  And in your review of the

18   medical records, did it appear that he was given

19   sufficient supply of diapers?

20          A.      I'm just looking again, yep.  Let me

21   just check.  Yeah.  I actually thought he was

22   getting a sufficient supply of disposable briefs.

23          Q.      Have you ever prescribed a certain

24   course of treatment only to have the attending

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 164

1    nurse unilaterally alter that treatment?

2        A.    Can you ask that again, one more

3    time?

4        Q.    Have you ever prescribed a certain

5    course of treatment to an inmate only to have the

6    attending nurse unilaterally alter that treatment?

7        A.    Would that be with or without

8    consultation with the physician?

9        Q.    Without consultation with the

10   physician.

11       · A.    I guess I have to say, I think it

12   has happened.

13       Q.    Was the nurse disciplined?

14       A.    I think I have seen instances now

15   that -- yes, I think I've seen instances where a

16   nurse was disciplined for that type of incident.

17       Q.    So, in your experience, is it

18   unusual for a nurse to disregard a doctor's

19   prescribed course of treatment?

20       A.    Yes, it's unusual.

21       Q.    But when it happens, you're saying

22   they're generally disciplined for that?

23       A.    Yes.  I mean -- yes, they have some

24   sort of format to -- for discipline, and the level

Rebecca Lubelczyk, M.D.
March 17, 2014

1    of discipline.

2            Q.      Well, personally with you, Doctor,

3    if you prescribed a certain course of treatment

4    for an inmate and a nurse unilaterally changed

5    that course of treatment without consulting you,

6    how would you react?

7            A.      I would bring it to their

8    supervisor.

9            Q.      Would you be happy with them?

10           A.      I would be -- I would wonder why it

11   was that they decided to change it so I could get

12   a better understanding of why they those to do

13   what they did.

14           Q.      Is that because you have more

15   training and experience than nurses do, generally?

16           A.      Well, I think it's because we all

17   try and work as a team.  And if, for some reason,

18   they thought that there was a inconsistency with

19   the care or problem with the care, I definitely

20   would want to find out what the thought process

21   was behind that decision so that, if there was an

22   issue, we can clarify what it was so that it

23   wouldn't happen again.  But that incident would

24   still have to be reported to their supervisor,

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 166

1    because it's an action that they should not

2    necessarily take on their own but bring to

3    somebody's attention that they had a question

4    about it.

5            Q.      **Have you ever prescribed a certain**

6    **course of treatment, only to have the warden**

7    **unilaterally alter the treatment?**

8            A.      I'm thinking.  Hold on.

9            MS. MARCELL:  I'm sorry.  Lance, did

10   you say the warden?

11           MR. NEFF:  Yes, the warden.

12           MS. MARCELL:  Okay.

13           THE WITNESS:  I'm thinking because

14   most of the times we've -- end up having

15   discussions with the departments, so they

16   approach us, us being medical, or me as the

17   physician, to ask about a certain order or

18   prescription, or whatever it may be.  I'm

19   trying to think of an example where they

20   overtly did it without -- without

21   consultation, and I can't think of one

22   right now.

23           Q.      (By Mr. Neff)  **Would it be unusual**

24   **for a warden to disregard a doctor's prescribed**

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1      course of treatment for an inmate?

2            A.      Would it be unusual?  I would say it

3      would be unusual.

4            Q.      Have you heard of the American

5      Geriatric Society?

6            A.      I have.

7            Q.      Is this journal a reputable journal?

8            A.      I believe it is.

9            Q.      Do you have any other opinion

10     related to this case, other than what you stated

11     in your affidavit, or what you stated today?

12           A.      No.  I thought -- no.

13           Q.      That was a no, ma'am?

14           A.      I'm sorry.  That was a no.

15           Q.      Okay.  Are all opinions that you

16     gave today made within with a reasonable degree of

17     medical certainty?

18           A.      Yes.

19                   MR. NEFF:  Doctor, I appreciate your

20           time today.  And, certainly, stay safe

21           working where you are working in the

22           Department of Corrections, I know how

23           dangerous it can be.

24                   THE WITNESS:  Thank you.  How is the

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    weather down there?

2              MR. NEFF:  Well, today it's a little

3    bit dreary, but it's supposed to warm up by

4    the weekend.  I think you have ice and

5    snow, correct?

6              THE WITNESS:  Oh, my goodness, I

7    think Virginia had more ice and snow than

8    we did all winter, but it was fairly chilly

9    this morning.  And our reporter has got a

10   question for us.  I guess, clarification?

11             MS. MARCELL:  I have some questions

12   to clarify, though, too.

13             THE WITNESS:  Oh, I'm sorry.

14             MS. MARCELL:  Because I know you

15   completed, I just wanted to get a few

16   things on the record.  Are we off or are we

17   on?

18             THE COURT REPORTER:  We're not off

19   the record.  We're on the record.

20

21

22   EXAMINATION BY MS. MARCELL:

23

24        Q.    Doctor, I'm just going to do a

Rebecca Lubelczyk, M.D.
March 17, 2014

1    quick -- few quick questions to for you.  You do

2    have scientific, technical and specialized

3    knowledge in the medical field in the correctional

4    setting, correct?

5         A.     I do.

6         Q.     All right.  And you've used reliable

7    medical principles and methods, and applied those

8    principles and methods in rendering your opinions

9    today, correct?

10        A.     I did.

11        Q.     Okay.  Generally, does the public

12   know about how to perform catheterization, in your

13   experience as a doctor?

14        A.     The general public?

15        Q.     The normal layperson know how to

16   catheterize?

17        A.     Not usually.  They usually have to

18   be taught by a nurse assigned to them to go over

19   the technique and show them how to do it, that

20   they know how to do it.

21        Q.     So, usually, to instruct the patient

22   on catheterization requires medical expertise,

23   knowledge to inform that patient, correct?

24        A.     Yeah.  They have nurses that are

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    catheter care nurses that can -- that teach and

2    troubleshoot problems out in the community, yes.

3         Q.    Okay.  And there are times where

4    doctors may take on that role as well?

5         A.    I'd imagine so.

6         Q.    All right.  Now, you were asked

7    questions regarding the affidavit you rendered.

8    Before the affidavit was finalized, didn't you

9    provide the first draft document listing a number

10   of problems that you noted in the medical care?

11        A.    Before the affidavit?

12        Q.    Didn't you provide a problem sheet?

13        A.    Problem sheet.  Was that like --

14        Q.    Like an error sheet, you listed a

15   number of errors?

16        A.    Yes.  I'm sorry, yes.

17        Q.    That was the first document that was

18   drafted, correct?

19        A.    Yes.  That was my first draft of a

20   document summarizing.

21        Q.    Okay.  And, then, any points that

22   were ultimately made in the affidavit were an

23   accurate reflection of your medical opinion?

24        A.    I believe so, yeah.

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 171

1        Q.      Okay.  You were asked a series of

2    questions about inmates and whether they're

3    truthful in their grievances.  In your practice --

4    in the urban practice that you've actually

5    participated in, isn't it true that outside

6    patients can be untruthful --

7        A.      Yes, that's true.

8        Q.      -- in their complaints?

9        A.      Yes, that's true.

10       Q.      And patients outside the

11   correctional system also not cooperate with

12   medical orders?

13       A.      That I do know has happened, yeah.

14       Q.      Okay.  And can patients outside the

15   correctional system also seek medical care for

16   secondary gain?

17       A.      That has happened in outside

18   practices too, yes.

19       Q.      Because that's not only in regards

20   to inmates only, right?

21       A.      Correct.  It's a practice that's

22   inside and outside the walls.

23       Q.      And, then, finally, you were

24   provided exhibit -- an exhibit to review,

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 172

1   specifically from the national -- the clinical --

2   the National Institute for Health regarding the

3   clinical center for National Institute for Health?

4          A.     The one that we just received today?

5          Q.     Correct.

6          A.     Yes.  We've got that.

7          Q.     All right.  The document this was

8   labeled Clean Intermittent Self-Catheterization

9   Procedure for Men?

10         A.     Yep.

11         Q.     And in that document that you were

12  provided, did it note under catheterization, that

13  usually you must catheterize yourself at least

14  every six hours and at bedtime?

15         A.     Yeah.  The statement is, "Usually,

16  you must catheterize yourself at least every six

17  hours and at bedtime," correct.

18         Q.     How many times is that a day?

19         A.     Every six hours a day would be four

20  times a day.  If you had added in bedtime, that

21  would be a fifth.

22         Q.     Okay.  And under, how to, I guess,

23  clean intermittent self-catheterization, is there

24  also a statement that sterile equipment is used

Electronically signed by Brenda Ginisi (401-014-954-6554)                                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

1    when you're in the hospital, and is sometimes

2    needed for people with a recurrent or chronic

3    urinary tract infections?

4         A.    Yes.  I see that statement there.

5         Q.    Okay.  Do you disagree with that

6    statement, that there may be times where a person

7    requires sterile equipment, if they have chronic

8    urinary tract infections?

9         A.    I'm just rereading it for a second.

10   Hold on.

11        Q.    Okay.

12        A.    Yeah I could -- yeah, I could see

13   that.  It says sometimes it is needed for people

14   with chronic, or recurrent, or urinary.  Yeah.  I

15   just not had seen that document before so I just

16   was getting familiar with it again.

17        Q.    And, again, this document doesn't

18   specifically identify the type of catheter it's

19   referring to.  It indicates that that's something

20   the doctor or nurse will discuss with them as to

21   what they need, correct?

22        A.    Correct.  And it's also assumes that

23   the patient is in -- again, it's a generic sort of

24   a form, and it's addressing a specific population.

Electronically signed by Brenda Ginisi (401-014-954-6554)

351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 174

1    It's not specifically designed or written for

2    corrections at all.

3         Q.    Right.  And, then, when it indicates

4    "managing your urinary tract infections," doesn't

5    it also indicate if you tend to get urinary tract

6    infections, you may need to boil your catheters

7    before using them?

8         A.    There is a statement about that,

9    yes.

10        Q.    Do you know if inmates have -- in

11   your experience, do inmates have the ability to

12   boil catheters where you practice?

13        A.    I have not had patients do that,

14   that I know of, the ones that use catheters.

15        Q.    Okay.  And then on page three of

16   that document it also indicates that, I guess to

17   control odor and remove thick mucus deposits, you

18   may want to soak the catheters in white vinegar

19   solution once a week.  In your experience, in the

20   department of corrections where you've worked

21   before, in Massachusetts and Rhode Island, do you

22   know if inmates have access to a white vinegar

23   solution?

24        A.    No.  I don't believe so.  I think

Rebecca Lubelczyk, M.D.
March 17, 2014

1   that would be -- that could be considered

2   contraband.

3                  MS. MARCELL:  Okay.  All right.  I

4          have no further questions.

5                  MR. NEFF:  We're good.

6                  MS. MARCELL:  Lance, are you

7          ordering, or are we holding off right now?

8                  MR. NEFF:  No.  I'd like the

9          original and a PDF e-mailed to me, please.

10                 THE COURT REPORTER:  PDF e-mailed,

11         okay.

12                 MS. MARCELL:  And I'll take a copy

13         and one via e-mail as well.

14                 THE COURT REPORTER:  Okay.  I have

15         one last question with regard to exhibits,

16         just for further clarification.  Mr. Neff,

17         I have the 36 pages that we're marking --

18         or that have already been marked that are

19         going to be included with the exhibit.

20         There's also a few pages that were e-mailed

21         over to the witness today that you would

22         like marked as Exhibit E.  Is that, in

23         totality, everything that you need?

24                 MR. NEFF:  Yes, it is, the medical

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 176

1          documents that we spoke about.  That would

2          be it.

3

4                  (Deposition concluded at 2:20 p.m.)

5

6                  (Exhibit E, Medical Documents,

7                  marked)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Electronically signed by Brenda Ginisi (401-014-954-6554)                    351a2e11-c383-4597-9152-4a6f51767501

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 177

1        I, BRENDA M. GINISI, Notary Public, do

2   hereby certify that REBECCA LUBELCZYK, M.D.

3   appeared before me and satisfactorily identified

4   herself on the 17th day of March, 2014, at the

5   offices of CATUOGNO COURT REPORTING, 155 South

6   Main Street, 2nd Floor, Providence, Rhode Island

7   02903 and was by me duly sworn to testify to the

8   truth and nothing but the truth as to her

9   knowledge touching and concerning the matters in

10  controversy in this cause; that she was thereupon

11  examined upon her oath and said examination

12  reduced to writing by me; and that the statement

13  is a true record of the testimony given by the

14  witness, to the best of my knowledge and ability.

15       I further certify that I am not a relative

16  or employee of counsel/attorney for any of the

17  parties, nor a relative or employee of such

18  parties, nor am I financially interested in the

19  outcome of the action.

20  WITNESS MY HAND this 4th day of April,

21  2014.

22

23  Brenda M. Ginisi            My Commission expires:

24  Notary Public               March 31, 2016

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Lubelczyk, M.D.
March 17, 2014

Page 178

1   Today's date:        April 7, 2014

2   To:                  Karen M. Marcell, Esq.

3   Copied to:           Lance E. Neff, Esq.

4   From:                Brenda M. Ginisi

5   Deposition of:       Rebecca Lubelczyk, M.D.

6   Taken:               March 17, 2014

7   Action:   Adam Betancourt vs. State of Florida, et

8   al

9   ================================================

10          Enclosed is a copy of the deposition of

11   Rebecca Lubelczyk, M.D.  Pursuant to the Rules of

12   Civil Procedure, Dr. Lubelczyk has thirty days to

13   sign the deposition from today's date.

14          Please have Dr. Lubelczyk sign the enclosed

15   signature page.  If there are any errors, please

16   have her mark the page, line and error on the

17   enclosed correction sheet.  She should not mark

18   the transcript itself.  This addendum should be

19   forwarded to all interested parties.

20          Thank you for your cooperation in this

21   matter.

22

23

24

Rebecca Lubelczyk, M.D.
March 17, 2014

1              IN THE UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF FLORIDA

3                   JACKSONVILLE DIVISION

4                   CASE NO.: 3:13-cv-00287-HES-JRK

5

6     ******************************

7     ADAM BETANCOURT,                  *

8                        Plaintiff    *

9     vs.                              *

10    STATE OF FLORIDA, et al,         *

11                       Defendants    *

12    ******************************

13

14

15         I, Rebecca Lubelczyk, M.D., do hereby

16    certify, under the pains and penalties of perjury,

17    that the foregoing testimony is true and accurate,

18    to the best of my knowledge and belief.

19         WITNESS MY HAND, this    day of         ,

20    2014.

21

22         _____

23              REBECCA LUBELCZYK, M.D.

24    bmg

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Lubelczyk, M.D.
March 17, 2014

```
1                    CORRECTION SHEET

2

3   DEPONENT:      Rebecca Lubelczyk, M.D.

4   CASE:          Adam Betancourt vs. State of

5   Florida, et al

6   DATE TAKEN:  March 17, 2014

7   *********************************************

8   PAGE  / LINE /   CHANGE OR CORRECTION AND REASON

9   *********************************************

10  _____/_____/_____

11  _____/_____/_____

12  _____/_____/_____

13  _____/_____/_____

14  _____/_____/_____

15  _____/_____/_____

16  _____/_____/_____

17  _____/_____/_____

18  _____/_____/_____

19  _____/_____/_____

20  _____/_____/_____

21  _____/_____/_____

22  _____/_____/_____

23  _____/_____/_____

24  _____/_____/_____
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**